UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA

MICCOSUKEE  TRIBE  OF
INDIANS OF FLORIDA,

       Plaintiff,

v.

UNITED STATES ENVIRONMENTAL
PROTECTION AGENCY and UNITED
STATES OF AMERICA,

       Defendants.

Case No.

## COMPLAINT

To defend its sovereignty and authority against unlawful administrative diminishment, Plaintiff, the Miccosukee Tribe of Indians of Florida ("Miccosukee" or "Miccosukee Tribe"), a federally recognized Indian tribe and a Tribal government, by and through undersigned counsel, hereby asserts as follows:

## INTRODUCTION

1.    The Federal Water Pollution Control Act ("Clean Water Act" or "CWA"), 33 U.S.C. §§ 1251-1387, prohibits the discharge of any pollutant by any person, unless specifically authorized by the Act.

2.    The Clean Water Act created two permitting programs to provide a mechanism for authorizing limited discharges of pollutants, and vested authority for implementing those permitting programs with the federal government. 33 U.S.C. §§ 1342, 1344.

3.    Section 404 of the Clean Water Act created one of the two permitting programs: a program for permitting the discharge of dredged or fill material. 33 U.S.C. § 1344.

4.      The authority for the CWA § 404 permitting program was divided between the United States Army Corps of Engineers ("Corps"), which is responsible for issuing permits, and the United States Environmental Protection Agency ("EPA"), which is responsible for establishing the requirements for those permits and for overseeing the Corps' implementation of the permitting program. 33 U.S.C. § 1344(b).

5.      Section 404(g) of the Clean Water Act established conditions under which a state can propose to the EPA that the state assume responsibility for issuing permits for the discharge of dredged or fill material into certain waters within the state. 33 U.S.C. § 1344(g).

6.      A state with an approved CWA § 404 permitting program issues permits under the authority of state law. 33 U.S.C. § 1344(h)(2)(A).

7.      A state is not authorized to assume responsibility for issuing permits for the discharge of dredged or fill material into waters over which the state lacks "adequate authority to carry out the described program." 33 U.S.C. § 1344(g)(1).

8.      A proposal submitted to EPA under CWA § 404(g) must include an affirmative statement from the state attorney general that the state possesses "adequate authority to carry out the described program." 33 U.S.C. § 1344(g)(1).

9.      A state's proposal must include "a full and complete description of the program [the State] proposes to establish and administer under State law." 33 U.S.C. § 1344(g)(1).

10.      EPA has adopted regulations at 40 CFR Part 233 that establish substantive and procedural requirements for such proposals and for the EPA's review of such proposals.

11.      The State of Florida submitted a proposal to the EPA under § 404(g) on August 20, 2020. *See* Exhibit 1 (*Florida's Request To Assume Administration of a Clean Water Act Section 404 Program*, 85 Fed. Reg. 57853 (Sept. 16, 2022)).

12.     EPA approved Florida's proposal on December 17, 2020. *See* <u>Exhibit 2</u> (*EPA's Approval of Florida's Clean Water Act Section 404 Assumption Request*, 85 Fed. Reg. 83553 (Dec. 22, 2022)).

13.     EPA's approval of Florida's CWA 404 permitting program impermissibly disregarded and diminished the Miccosukee's Tribal Sovereignty by subjecting more than 200,000 acres of Indian lands to the State's regulatory jurisdiction.

## JURISDICTION AND VENUE

14.     The Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 and 28 U.S.C. § 1362.

15.     The Miccosukee Tribe, a federally recognized Indian tribe and a Tribal government, asserts civil claims arising under the laws of the United States, including the United States Constitution and the Clean Water Act, to provide remedies set forth in the Administrative Procedure Act, 5 U.S.C. § 701 et seq., and the Declaratory Judgment Act, 28 U.S.C. § 2201.

16.     The allegations of the Complaint give rise to an actual controversy within the meaning of 28 U.S.C. § 2201.

17.     Venue is proper in this Judicial District pursuant to 28 U.S.C. § 1391(e) because this lawsuit names as defendants an agency of the United States and the United States, this action does not involve claims for real property, and the Miccosukee Tribe is located in Miami-Dade County, Florida, which is within this Judicial District.

## PARTIES

18.     Plaintiff, the Miccosukee Tribe, is a federally recognized Indian tribe and a Tribal government, which provides essential governmental services to its approximately 605 enrolled

members living on and off the Miccosukee's tribal lands. Declaration of Kevin Donaldson at ¶8 ("Donaldson Declaration").

19.     The Miccosukee Tribe brings this action to assert and protect its own rights, and the rights of its members.

20.     By concluding that the State of Florida's application to administer the CWA § 404 permitting program was complete and subsequently approving that application, EPA impermissibly diminished the Miccosukee's sovereignty by subjecting the Tribe and its members to state regulation.

21.     By concluding that the State of Florida's application to administer the CWA § 404 permitting program was complete and subsequently approving that application, EPA impermissibly diminished rights granted to the Miccosukee by the United States and the State of Florida.

22.     As a result of EPA's actions, the ability of the Miccosukee and its members to exercise the rights granted to them by the United States and the State of Florida have been significantly restricted.

23.     As a result of EPA's actions, the Miccosukee and its members have been prevented from obtaining one or more permits necessary to build homes for Tribal members on Indian lands. Donaldson Declaration at ¶¶ 21-24.

24.     As a result of EPA's actions, the Miccosukee and its members have suffered a concrete and particularized injury that is capable of redress by this court.

25.     Defendant, the United States Environmental Protection Agency ("EPA"), is an agency of the United States whose actions caused the harm suffered by the Miccosukee and its members, and whose actions are challenged in this case.

26.     Defendant United States of America is named as a defendant pursuant to 5 U.S.C. §§ 702-703, because this is an action for judicial review of actions of one or more agencies of the United States that have affected Plaintiff adversely.

## RELEVANT BACKGROUND

**1.  The Miccosukee Tribe of Indians of Florida is Entitled to Tribal Sovereignty on Indian Lands.**

27.     The way of life of the Miccosukee Tribe has been intertwined with and dependent upon the Everglades for generations. Donaldson Declaration at ¶ 8.

28.     The Miccosukee Tribe occupied the Everglades prior to the arrival of the first European explorers and took refuge in the Everglades to avoid forced relocation west in the 1800s. Donaldson Declaration at ¶ 8.

29.     Today, Tribal members live and work on Indian lands within the Everglades that include reservation, trust, perpetually leased, reserved, and fee simple Indian lands, portions of which are within Everglades National Park, Big Cypress National Preserve, and Water Conservation Area 3A. Donaldson Declaration at ¶¶ 8 and 12-19.

**a.  The Miccosukee Tribe is a Federally Recognized Indian Tribe with Jurisdiction over Indian Lands.**

30.     As a federally recognized Indian Tribe, the Miccosukee Tribe exercises its powers of self-governance to advance and protect the water quality within the Everglades under a tribal constitution approved by the Secretary of the Interior. Donaldson Declaration at ¶ 7.

31.     In 1994, EPA granted the Tribe "Treatment as a State" ("TAS") for purposes of implementing the water quality standards and certification programs under Sections 303(c) and 401 of the of the Clean Water Act, respectively. Donaldson Declaration at ¶ 9.

32.     Since then, EPA has approved the Tribe's water quality standards for surface waters

and expanded the geographic scope of the approval to include additional Indian lands. Donaldson Declaration at ¶ 11.

33.     The Tribe's water quality standards include a narrative standard specifying that approved discharges will result in "no imbalance of aquatic flora and fauna," and a numerical standard that limits the total phosphorus level in any discharge to 10 parts per billion. Exhibit 3 (*Water Quality Standards for Surface Waters of the Miccosukee Tribe of Indians of Florida*, Miccosukee Environmental Protection Code, Subtitle B (March 3, 2021) ("Miccosukee Water Quality Standards")); Donaldson Declaration at ¶ 10.

34.     The Tribe's lands, however, are among the most impacted by changes in the quality and quantity of water in the Everglades.

35.     Situated between the Everglades Agricultural Area and Everglades National Park, Indian lands have often been seen as a convenient place to direct water that was not wanted elsewhere, either because it contained too much phosphorous or because there was simply too much of it. Donaldson Declaration at ¶ 12.

36.     Too often, the discharges exceed the Tribe's water quality standards, and the artificially adjusted water levels have begun to significantly change the species composition across the Miccosukee Tribe's homelands. Donaldson Declaration at ¶ 12.

**b. The Miccosukee Possesses Rights and Authority Over Lands Beyond the Boundaries of the Federal Reservation.**

37.     The Miccosukee lands include the Tribe's federal reservation as well as other land in which it holds significant interests.

38.     The Miccosukee lands include the following:

    i.     The Miccosukee Federal Reservation;

    ii.    Trust Lands Held by the United States Government;

      iii.     The Miccosukee Reserved Area;

      iv.     Perpetually Leased Lands;

      v.     Reserved Rights Lands; and

      vi.     Fee Simple Lands.

Donaldson Declaration at ¶ 13.

39.     These categories of Miccosukee lands are described in detail herein.

### i.  The Miccosukee Federal Reservation

40.     The Miccosukee federal reservation is known as the Alligator Alley Reservation. Donaldson Declaration at ¶ 14.

41.     The Alligator Alley Reservation consists of approximately 74,812 acres. Donaldson Declaration at ¶ 14.

42.     CWA § 404 permitting authority for the Alligator Alley Reservation was retained by the U.S. Army Corps of Engineers. *See* Exhibit 4 (*Florida Retained Waters Screening Tool Alligator Alley Reservation)*.[1]

### ii.  Trust Lands

43.     The United States government holds several parcels of Trust Lands for the Miccosukee.

44.     Trust Lands are as follows:

      A.  Tamiami Trail Reservations: 1.5 acres each, totaling 4.5acres;

      B.  Krome Avenue Reservation: 231 acres;

---

[1] Available at:
http://fdep.maps.arcgis.com/apps/webappviewer/index.html?id=2cb8724cfd18408db80c8f2d7bb68a2e (last visited August 3, 2022).

    C.  Dade Corners Reservation: 0.92 acres;

    D.  Lambick Reservation: 214 acres;

    E.  Coral Way Reservation: 50 acres;

    F.  SEMA Reservation: 302 acres;

    G.  Miccosukee Ranch West Reservation (Formerly Sherrod Ranch): 2,421 acres; and

    H.  Miccosukee Ranch North Reservation (Formerly Cherry Ranch): 2,361 acres.

Donaldson Declaration at ¶ 15.

45.    CWA § 404 permitting authority for the Trust Lands was retained by the U.S. Army Corps of Engineers. *See* <u>Exhibit 5</u> (*Florida Retained Waters Screening Tool Trust Lands*).[2]

### iii.  The Miccosukee Reserved Area

46.    The Miccosukee Reserved Area was established by the Miccosukee Reserved Area Act, Public Law 105-313, 16 U.S.C. § 410 note.

47.    The Miccosukee Reserved Area is subject to the exclusive jurisdiction of the federal government. 16 U.S.C. § 410 note at section 5(d).

48.    The Miccosukee Reserved Area is located within Everglades National Park. Donaldson Declaration at ¶ 16.

49.    The Miccosukee Reserved Area consists of 695 acres. Donaldson Declaration at ¶ 16.

---

[2] Available at:
http://fdep.maps.arcgis.com/apps/webappviewer/index.html?id=2cb8724cfd18408db80c8f2d7bb68a2e (last visited August 3, 2022).

50.     CWA § 404 permitting authority for the Miccosukee Reserved Area was retained by the U.S. Army Corps of Engineers. *See* <u>Exhibit 6</u> (*Florida Retained Waters Screening Tool Miccosukee Reserved Area*).[3]

### iv.  Leased Lands

51.     The Miccosukee Leased Lands were established through a perpetual lease between the Board of Trustees of the Internal Improvement Trust Fund of the State of Florida and the Miccosukee Tribe. <u>Exhibit 7</u> at pp. 5-7 (*Lease Agreement Between the Governor and Cabinet as the Board of Trustees of the Internal Improvement Trust Fund of the State of Florida, the Chairman of the Governing Board of the South Florida Water Management District, the Florida Game and Freshwater Fish Commission, and the Miccosukee Tribe of Indians of Florida, reprinted in* 128 Cong. Rec. 31639-31641 (Dec. 16, 1982) ("Lease Agreement")).

52.     The Miccosukee Leased Lands consist of approximately 189,000 acres. Donaldson Declaration at ¶ 17.

53.     EPA's approval of the State of Florida's application transferred CWA § 404 permitting authority for the Leased Lands to the State of Florida. *See* <u>Exhibit 8</u> (*Florida Retained Waters Screening Tool Lands Subject to Florida's Permitting Program*).[4]

54.     The Miccosukee possesses the following rights on the Leased Lands:

---

[3] Available at:
http://fdep.maps.arcgis.com/apps/webappviewer/index.html?id=2cb8724cfd18408db80c8f2d7bb68a2e (last visited August 3, 2022) (Labeled as "Tamiami Trail Reservation.").

[4] Available at:
http://fdep.maps.arcgis.com/apps/webappviewer/index.html?id=2cb8724cfd18408db80c8f2d7bb68a2e (last visited August 3, 2022) (Not identified as retained waters).

A.   Hunt and fish for subsistence purposes. Exhibit 7 at p. 6 (*Lease Agreement* at ¶ 3a).

B.   Take frogs for consumption or commercial purposes. Exhibit 7 at p. 6 (*Lease Agreement* at ¶ 3a).

C.   Engage in traditional subsistence agriculture. Exhibit 7 at p. 6 (*Lease Agreement* at ¶ 3b).

D.   Reside, including the construction of traditional homes. Exhibit 7 at pp. 6-7 (*Lease Agreement* at ¶ 3c).

E.   Use for Tribal religious purposes. Exhibit 7 at pp. 6-7 (*Lease Agreement* at ¶ 3c).

F.   Take and use native materials. Exhibit 7 at pp. 6-7 (*Lease Agreement* at ¶ 3c).

G.   Require any mineral exploration, extraction, or development be conducted using technology that best protects the natural state of the Leased Lands and that is least disruptive to the Tribe's rights. Exhibit 7 at p. 7 (*Lease Agreement* at ¶ 3d).

55.   Florida may not require a permit or license in order for the Miccosukee to exercise its right to hunt, fish, or take frogs. Exhibit 7 at p. 6 (*Lease Agreement* at ¶ 3a).

56.   The use of the Leased Lands by the Miccosukee is subject to the following limitations:

A.   Applicable laws and regulations in effect on the effective date of the lease. Exhibit 7 at p. 7 (*Lease Agreement* at ¶ 5).

    B.  Laws and regulations enacted by the South Florida Water Management District. <u>Exhibit 7</u> at p. 7 (*Lease Agreement* at ¶ 5).

    C.  Future laws and regulations not inconsistent with the rights granted to the Miccosukee. <u>Exhibit 7</u> at p. 7 (*Lease Agreement* at ¶ 5).

    D.  Actions by the South Florida Water Management District or the Army Corps of Engineers to manage, regulate, raise, or lower water levels within the Lease Lands. <u>Exhibit 7</u> at p. 7 (*Lease Agreement* at ¶ 6).

57.    Congress codified the Miccosukee's rights to use the Leased Lands in the Florida Indian Land Claims Settlement Act of 1982. Florida Indian Land Claims Settlement Act of 1982, 25 U.S.C. §§ 1741-1749, Pub. L. 97-399, Dec. 31, 1982 ("Settlement Act of 1982").

58.    The Settlement Act of 1982 expressly codified the terms of a settlement agreement between the Miccosukee and the State of Florida that resolved *Miccosukee Tribe of Indians of Florida v. State of Florida, et al.,* Case No. 79-253-CIV-JWK, which had been filed in the United States District Court for the Southern District of Florida. Settlement Act of 1982 at § 1741. *See also*, <u>Exhibit 7</u> at pp. 3-5 (*Settlement Agreement Between the Governor and Cabinet as the Board of Trustees of the Internal Improvement Trust Fund of the State of Florida, the Chairman of the Governing Board of the South Florida Water Management District, the Florida Game and Freshwater Fish Commission, and the Miccosukee Tribe of Indians of Florida*).

59.    The Settlement Act of 1982 ratified the terms of the Settlement Agreement and the terms of the Lease Agreement. *See,* Settlement Act of 1982.

60.    While the Act extinguished certain listed Miccosukee rights and interests, Congress was explicit that "nothing" in the Act "shall be construed as extinguishing any aboriginal right, title, interest, or claim to lands or natural resources...defined as 'excepted interests' in paragraph

3c of the Settlement Agreement between the State of Florida and the Miccosukee Tribe." Settlement Act of 1982 at § 1744(b)(1).

61.     Among the "excepted interests" listed in paragraph 3c of the Settlement Agreement are the rights granted to the Miccosukee in the Lease Agreement. Exhibit 7 at p. 4 (*Settlement Agreement* at 3c(5)).

62.     Florida State laws and regulations that restrict or burden the Miccosukee's exercise of the rights granted to the Tribe by the Lease Agreement and the Settlement Agreement are inconsistent with the granting of those rights to the Miccosukee.

63.     By the plain language of the statute, therefore, the rights and interests guaranteed to the Miccosukee in the Lease Agreement were not affected by the diminishment of Tribal rights and interests that may be effectuated by other provisions of the Act.

64.     Paragraph 3c of the Settlement Agreement also retained the Tribe's rights in the other Indian lands at issue here. Exhibit 7 at p. 4 (*Settlement Agreement* at 3c(1-4)).

65.     The State of Florida agreed that a condition precedent to the Settlement Agreement becoming effective was that the State would enact legislation that provided the Miccosukee with "the right to exercise within the Leased Area the same governmental jurisdiction over Indians that the Miccosukee Tribe exercises in its reservation…." Exhibit 7 at p. 3 (*Settlement Agreement* at 1b).

66.     The Settlement Act of 1982 also specifies that the Leased Lands are to be treated as reservation lands for the purposes of "law enforcement over Indians." Settlement Act of 1982 § 1745(b).

67.     In addition, the Leased Lands are exempt from all State and local taxes. Settlement Act of 1982 § 1745(a).

68.     Congress expressly limited Florida's ability to take or diminish the rights or interests on the Leased Land that the Miccosukee retained in the Settlement Agreement for anything other than a public purpose. Settlement Act of 1982 § 1745(c).

69.     Should the State of Florida take or diminish the rights or interests on the Leased Land that the Miccosukee retained in the Settlement Agreement for a public purpose, the State must compensate the Tribe for any such taking or diminishment. Settlement Act of 1982 § 1745(c).

### v.  Reserved Rights

70.     The Miccosukee Reserved Rights were established through federal legislation. *See,* 16 U.S.C. § 410b; 16 U.S.C. § 698; and Settlement Act of 1982 § 1744(b)(1).

71.     The Miccosukee Reserved Rights are located on lands within Everglades National Park. Donaldson Declaration at ¶ 18.

72.     The Miccosukee Reserved Rights are located on lands within Big Cypress National Preserve. Donaldson Declaration at ¶ 18.

73.     EPA's approval of the State of Florida's application transferred CWA § 404 permitting authority for the Miccosukee Reserved Rights to the State of Florida. *See* Exhibit 8.

74.     Everglades National Park is in the exclusive jurisdiction of the United States. 16 U.S.C. §§ 410 et seq.

75.     Eleventh Circuit precedent has determined that because "Everglades National Park remains in the exclusive jurisdiction of the federal government, Florida has not and cannot extend its jurisdiction to cover Indian lands located within the Park." United States v. Daye, 696 F.2d 1305, 1307 (11th Cir. 1983), *cited by* Miccosukee Tribe of Indians v. United States, No. 00-3453-CIV, 2000 U.S. Dist. LEXIS 22929 (S.D. Fla. Dec. 15, 2000).

76.     In United States v. Daye, the United States certified that the State of Florida lacked

jurisdiction to enforce violations of law within Everglades National Park. <u>Daye</u>, at 1307.

### vi. Fee Simple Lands

77.     The Miccosukee owns several parcels of land in fee simple.

78.     Fee Simple Lands are as follows:

    A.  The Miccosukee Golf Course: 229 acres.

    B.  Teitelbaum and Siegall Property: 10 acres.

    C.  Lambick Property: 2.2 acres.

    D.  Kendall Drive Property: 99 acres.

    E.  Sabines Property: 2 acres.

    F.  Padgett Property: 80 acres.

    G.  Big Cypress Bend Property: 10 acres.

    H.  Embassy Property: 0.6 acres.

Donaldson Declaration at ¶ 19.

79.     EPA's approval of the State of Florida's application transferred CWA § 404 permitting authority for the Miccosukee Fee Simple Lands to the State of Florida with two exceptions. *See* <u>Exhibit 8</u>.

80.     The Army Corps of Engineers retained CWA § 404 permitting authority over the Big Cypress Bend Property and the Embassy Property based on a finding that the properties were subject to the ebb and flow of the tide. *See* <u>Exhibit 9</u> (*Florida Retained Waters Screening Tool Big Cypress Bend Property and Embassy Property*).[5]

---

[5] Available at:
http://fdep.maps.arcgis.com/apps/webappviewer/index.html?id=2cb8724cfd18408db80c8f2d7bb68a2e (last visited August 3, 2022).

**2. EPA Regulations Limit the Scope of State CWA § 404 Permitting Programs.**

81.     States and Tribes that assume responsibility for Clean Water Act § 404 permitting are required to assume such authority for all regulated activities and all regulated waters within their jurisdiction, subject to two exceptions. 40 C.F.R. § 233.1.

82.     The EPA cannot approve a state's proposal to assume CWA § 404 permitting authority for waters "presently used, or [] susceptible to use in their natural condition or by reasonable improvement as a means to transport interstate or foreign commerce," including waters subject to the ebb and flow of the tide ("Commerce Waters"). 33 U.S.C. § 1344(g) (1).

83.     Nor can EPA approve a state's proposal to assume CWA § 404 permitting authority for waters over which the state lacks "adequate authority to carry out the described program." 33 U.S.C. § 1344(g)(1) and 1344(h)(2)(B).

84.     EPA regulations implementing the CWA recognize that "in many cases, States other than Indian Tribes will lack authority to regulate activities on Indian lands." 40 C.F.R. § 233.1(b).

85.     EPA regulations further specify that "[t]he Secretary of the Army acting through the Corps of Engineers will continue to administer the program on Indian lands if a State which is not an Indian Tribe does not seek and have authority to regulate activities on Indian lands." 40 C.F.R. § 233.1(b).

86.     In order for a state to assume authority over the CWA § 404 permitting program on Indian lands, therefore, the state must explicitly seek such authority and have adequate legal authority to carry out the proposed program on those lands. 40 C.F.R. § 233.1(b).

87.     In the absence of either a proposal from a state to assume authority over the CWA § 404 permitting program on Indian lands or adequate legal authority to carry out the proposed

program on those lands, EPA regulations specify that CWA § 404 permitting authority over Indian

lands will remain with the Army Corps of Engineers. 40 C.F.R. § 233.1(b).

**3. The CWA and EPA Regulations Establish the Detailed Requirements for a State Proposal to be Complete.**

88.     The CWA identifies two items that must be included in a state's proposal to assume

CWA § 404 permitting authority. 33 U.S.C. § 1344(g)(1).

89.     Specifically, the CWA requires a state proposal to include, (a) "a full and complete

description of the program it proposes to establish and administer," and (b) "a statement from the

attorney general ...that the laws of such State...provide adequate authority to carry out the described

program." 33 U.S.C. § 1344(g)(1).

**a. The CWA and EPA Regulations Require a Full and Complete Description of the Proposed State Permitting Program**

90.     EPA has adopted regulations implementing CWA § 404(g) that create additional

requirements for state proposals to assume CWA § 404 permitting authority. *See*, 40 C.F.R. Part

233.

91.     EPA adopted detailed requirements for state proposals to assume CWA § 404

permitting authority after receiving comments on the agency's proposed rule that argued that

additional information was needed in order for the public to be able to assess the adequacy of a

state or Tribal program. Exhibit 10 at p. 4 (*Clean Water Act Section 404 Program Definitions and

Permit Exemptions; Section 404 State Program Regulations*, 53 Fed. Reg. 20764, 20766 (June 6,

1988) ("1988 Final Rule")).

92.     In order to be complete, EPA regulations require a state proposal to include the

following:

(a) A letter from the Governor of the State requesting program approval.

(b) A complete program description, as set forth in § 233.11.

(c) An Attorney General's statement, as set forth in § 233.12.

(d) A Memorandum of Agreement with the Regional Administrator, as set forth in § 233.13.

(e) A Memorandum of Agreement with the Secretary, as set forth in § 233.14.

(f) Copies of all applicable State statutes and regulations, including those governing applicable State administrative procedures.

40 C.F.R. 233.10.

93.    EPA also established detailed requirements for each required component of a state proposal.

94.    For example, the program description must include a "description of the waters of the United States within a State over which the State assumes jurisdiction under the approved program" and "a description of the waters of the United States within a State over which the Secretary retains jurisdiction subsequent to program approval." 40 CFR § 233.11(h).

95.    According to EPA, a "complete program description" is not a nicety, but rather "is essential" for determining the adequacy of a state's program. Exhibit 10 at p. 4 (1988 Final Rule at 20766).

96.    As EPA explained in the preamble to the final rule, in consideration of the comments the agency received,  EPA adopted regulations that mandated that the program description "must include a detailed description of the extent of the State's jurisdiction," and that "the State must describe separately the waters it will assume after program approval and the waters retained by the Corps." Exhibit 10 at p. 4 (1988 Final Rule at 20766)(emphasis added) (referring to 40 CFR § 233.11(a) & (h)).

97.     Florida, however, made no attempt to describe the waters within the State's boarders for which the State would be assuming permitting authority.

98.     Instead, for the regulatorily-required description of the waters to be assumed by the State's 404 program, Florida offered a tautology: "State-assumed waters [] are all waters of the United States that are not retained waters." Exhibit 11 at p. 2 (Florida Application, Program Description Section (h): *Description of the Waters of the United States within a State over which the State Assumes Jurisdiction Under the Approved Program*, at p. 2 ("Program Description Section (h)").

99.     Florida's proposal did include a description of waters to be retained by the Army Corps. Exhibit 11 at p. 2 (Program Description Section (h) at p. 2).

100.    Florida defined "Retained Waters" as follows:

> "Retained Waters" means those waters which are presently used, or are susceptible to use in their natural condition or by reasonable improvement as a means to transport interstate or foreign commerce shoreward to their ordinary high water mark, including all waters which are subject to the ebb and flow of the tide shoreward to their mean high water mark, including wetlands adjacent thereto. The USACE will retain responsibility for permitting for the discharge of dredged or fill material in those waters identified in the Retained Waters List (Appendix A of the State 404 Program Applicant's Handbook), as well as all waters subject to the ebb and flow of the tide shoreward to their mean high water mark that are not specifically listed in the Retained Waters List, including wetlands adjacent thereto landward to the administrative boundary. The administrative boundary demarcating the adjacent wetlands over which jurisdiction is retained by the USACE is a 300-foot guide line established from the ordinary high water mark or mean high tide line of the retained water. In the case of a project that involves discharges of dredged or fill material both waterward and landward of the 300-foot guide line, the USACE will retain jurisdiction to the landward boundary of the project for the purposes of that project only.

Exhibit 11 at p. 2 (Program Description Section (h) at p. 2).

101.    Florida's proposal also included a second definition of Retained Waters. *See*

Exhibit 12 (Program Description Section (a): *Description of the Scope and Structure of the State's Program* ("Program Description Section (a)").

102.    The final sentences of the two definitions are different. Exhibit 12 at p. 2 (Program Description Section (a) at p. 2). Compare:

      a.   "The administrative boundary demarcating the adjacent wetlands over which jurisdiction is retained by the USACE is a 300-foot guide line established from the ordinary high water mark or mean high tide line of the retained water. In the case of a project that involves discharges of dredged or fill material both waterward and landward of the 300-foot guide line, the USACE will retain jurisdiction to the landward boundary of the project for the purposes of that project only."

      b.   "The administrative boundary of adjacent retained waters will be the landward project boundary of each project that proposes discharges of dredged or fill material waterward of a 300-foot guide line established from the ordinary high water mark or mean high tide line of the retained water."

103.    As referenced in both versions of the definition of Retained Waters, Florida also produced a "Retained Waters List," which identified waters that would be retained by the Army Corps by name. *See,* Exhibit 13 at pp. 43-46 (State Program Applicant's 404 Handbook at Appendix A).

104.    EPA regulations implementing CWA 404 require the agency to take public comment on a state's proposal to assume CWA 404 permitting authority. 40 C.F.R. § 233.15.

105.    Because Florida included the Retained Waters definitions and cite to Retained Waters List in its proposal, the public was able to comment on any water included in or omitted

from that list during the public comment period. *See* Exhibit 1.

106.    As EPA had intended when adopting its regulations, EPA's subsequent adoption of the Retained Waters List provides the clarity and predictability that "make it easier for the public to understand the split jurisdiction between the State and the Corps." Exhibit 10 at p. 4.

107.    Florida did not list or describe any waters that were not included in the State's proposal because they were on Indian lands.

> **b.  The CWA and EPA Regulations Require a Statement from the Attorney General or Attorney Representing an Independent Agency that State Law Provides Adequate Authority to Implement the Proposed Permitting Program.**

108.    CWA § 404(g)(1) mandates that a state proposal to assume CWA § 404 permitting authority include a statement from the state Attorney General or, in the case of an independent state agency, an attorney representing the agency ("Attorney Statement"). 33 U.S.C. § 1344(g)(1).

109.    EPA regulations establish requirements for the content of the Attorney Statement. 40 C.F.R. § 233.12(a)-(d).

110.    Per the regulations, the Attorney Statement must:

(a) state that State laws are adequate to implement the proposed program, citing to statutes, regulations, and judicial decisions, 40 C.F.R. § 233.12(a),

(b) contain an analysis of the State's authority over activities on Indian lands, if the State is seeking permitting authority over such activities, 40 C.F.R. § 233.12(b),

(c) analyze the effect of any state law that prohibits taking private property without just compensation on the state's ability to implement the proposed program, 40 C.F.R. § 233.12(c), and

(d) certify that the state has full authority to implement the proposed program, even if that authority is split between more than one state agency. 40 C.F.R. § 233.12(d).

111.     The Attorney General for the State of Florida has acknowledged that it "is generally recognized that state laws do not apply to tribal Indians on Indian reservations unless Congress has granted such authority." Exhibit 14 at p. 2 (Advisory Legal Opinion - AGO 94-45, *Jurisdiction of state over Indian reservations*, May 10, 1994).

112.     In that Opinion, Florida's Attorney General formally acknowledged that the State of Florida does not have civil regulatory authority over Indian Tribes, concluding that, "[a]lthough the state has been granted civil jurisdiction, such authority relates to private civil litigation in the state courts and not to civil regulatory authority." Exhibit 14 at p. 3..

113.     The Attorney Statement for Florida's proposal was signed by the General Counsel of the Florida Department of Environmental Protection. *See*, Exhibit 15 ("Florida Attorney Statement").

114.     The Florida Attorney Statement omits the requirement that an Attorney Statement include an analysis of the State's authority over activities on Indian lands, if the State is seeking permitting authority over such activities, contained at 40 C.F.R. § 233.12(b). *See,* Exhibit 15 at p. 2.

115.     EPA approved Florida's proposal despite this omission. Exhibit 2.

116.     The Florida Attorney Statement includes no analysis of the State's authority to regulate activities on Indian lands. *See*, Exhibit 15 ("Florida Attorney Statement").

117.     EPA approved Florida's proposal notwithstanding the fact that the proposal did not include an analysis of the State's authority to regulate activities on Indian lands. Exhibit 2.

118.     Specifically, Florida's proposal never analyzed the impact of the Settlement Act of 1982 on the State's ability to implement the proposed permitting program. Exhibit 15.

119.     EPA approved Florida's proposal notwithstanding the fact that the proposal did not

include an analysis of the impact of the Settlement Act of 1982 on the State's ability to implement the proposed permitting program. Exhibit 2.

120.   Florida's proposal did not include an analysis of the impact of the Lease Agreement or the Settlement Agreement on the State's ability to successfully implement the program. Exhibit 15.

121.   EPA approved Florida's proposal notwithstanding the fact that the proposal did not include an analysis of the impact of the Lease Agreement or the Settlement Agreement on the State's ability to successfully implement the program. Exhibit 2.

122.   Florida's proposal did not include an analysis of the impact of the takings provisions of the Settlement Act of 1982 on the State's ability to successfully implement the program. Exhibit 15.

123.   EPA approved Florida's proposal notwithstanding the fact that the proposal did not include an analysis of the impact of the takings provisions of the Settlement Act of 1982 on the State's ability to successfully implement the program. Exhibit 2.

124.   Florida's proposal did not include an analysis of the Florida Attorney General's Advisory Legal Opinion - AGO 94-45, *Jurisdiction of state over Indian reservations*, May 10, 1994, on the State's ability to successfully implement the program. Exhibit 15.

125.   EPA approved Florida's proposal notwithstanding the fact that the proposal did not include an analysis of the impact of the Florida Attorney General's Advisory Legal Opinion - AGO 94-45, *Jurisdiction of state over Indian reservations*, May 10, 1994, on the State's ability to successfully implement the program. Exhibit 2.

**4. Effect of EPA's Approval of Florida's Proposal to Assume CWA 404 Permitting Authority on Waters on Indian Lands**

126.   The CWA only authorizes EPA to transfer CWA 404 permitting authority to a state after finding that the state has adequate authority to implement the proposed program. 33 U.S.C. § 1344(h)(2).

127.   EPA regulations implementing CWA § 404 do not define "Indian Lands." *See*, 40 C.F.R. § 233.2.

128.   In explaining the geographic scope of lands over which Tribes can be approved to implement various Clean Water Act programs in the same manner as a state, however, EPA recognized that the inherent sovereignty of Tribes requires the agency to view what constitutes a Tribe's reservation – and, thus, Indian Lands – in light of relevant statutes and case law:

> The meaning of the term "reservation" must, of course, be determined in light of statutory law and with reference to relevant case law. EPA considers trust lands formally set apart for the use of Indians to be "within a reservation" for purposes of section 518(e)(2), even if they have not been formally designated as "reservations." *Oklahoma Tax Commission v. Citizen Band Potawatomi Indian Tribe of Oklahoma*, 111 S.Ct. 905, 910 (1991). This means it is the status and use of the land that determines if it is to be considered "within the reservation" rather than the label attached to it.

Exhibit 16 at p. 6 (*Clean Water Act; Section 404 Tribal Regulations,* 58 Fed. Reg. 8172, 8177 (Feb. 11, 1993)).

**a. Unless a State Demonstrates that it has Adequate Authority to Implement a Proposed CWA § 404 Permitting Program on Indian Lands and Seeks Such Authority in its Proposal, the Army Corps Retains Authority Over Such Waters.**

129.   As noted above, EPA, in duly promulgated regulations, recognized that many states lack authority to regulate the discharge of dredged and fill material into waters on Indian lands. 40 C.F.R. § 233.1(b).

130.    EPA regulations specify that a state's lack of authority to regulate activities on Indian lands will result in the Army Corps retaining permitting authority over those lands. 40 C.F.R. § 233.1(b).

**b.  Florida's Proposal did not Exclude Waters on Indian Lands as Retained Waters, nor did the Proposal Include an Analysis of the State's authority to Implement the Proposed Program on Indian Lands.**

131.    Florida's definitions of Retained Waters do not include waters on Indian lands as a type of retained water. Exhibit 11 at p. 2 and Exhibit 12 at p. 2.

132.    Florida's Retained Waters List does not list any waters based on the fact the waters are located on Indian lands. Exhibit 13.

133.    The Florida Attorney Statement did not include an analysis of the State's authority to regulate activities on Indian lands. Exhibit 15.

134.    Nevertheless, EPA's approval of Florida's proposal transferred CWA § 404 permitting authority over the Miccosukee Leased Lands, Reserved Rights, and Fee Simple Lands to the State of Florida unless such lands were subject to the ebb and flow of the tide. Exhibit 8.

**5.  Florida's Statements Regarding "Indian Country" do not Comply with the Requirements of CWA § 404 or EPA's Regulations Regarding Proposals to Assume CWA § 404 Permitting Authority.**

135.    While Florida's proposal fails to address waters on "Indian lands," the State did include references to "Indian Country" in two parts of the State's proposal.

136.    First, the Florida Attorney Statement, included with Florida's application, does include a statement -- without any further support or explanation --  that "Indian country, as defined in 18 U.S.C. § 1151, is not included in Florida's 404 program." Exhibit 15 at p. 3.

137.    Second, the State's Program Applicant's Handbook also includes a statement – located outside of the definition of retained waters – that the Corps will retain authority to permit

"projects" within Indian Country "as that term is defined at 18 U.S.C. § 1151." Exhibit 13 at p. 14.

138.    The term "Indian Country" does not appear in CWA § 404 or EPA's regulations implementing CWA § 404. *See*, 33 U.S.C. § 1344; 40 C.F.R. Part 233.

139.    EPA has issued no regulation defining or interpreting "Indian lands," as that term is used in 40 C.F.R. § 233.1(b), as being synonymous with "Indian Country."

140.    EPA approved Florida's proposal based on assertions the State made regarding permitting authority over Indian Country. Exhibit 2.

**a. Florida's Statements Regarding "Indian Country" do not Expand the State's Definitions of Retained Waters.**

141.    Florida's definitions of Retained Waters make no reference to Indian lands or to Indian Country. Exhibit 11 at p. 2 and Exhibit 12 at p. 2.

142.    Florida's Retained Waters List does not list any waters based on the fact the waters are located on Indian lands or in Indian Country. Exhibit 13 at Appendix A.

143.    Statements in Florida's proposal regarding Indian Country did not change the list of Retained Waters in any way.

**b. Florida's Proposal Failed to Identify What Waters are Within Indian Country.**

144.    Florida's State Program Applicant's 404 Handbook states that a "list of 'Indian country' can be found online in the Corps' Jacksonville District Regulatory Division Sourcebook." Exhibit 13 at p. 14.

145.    The Jacksonville District Regulatory Division Sourcebook, however, contains no such list.[6]

---

[6] Available online at https://www.saj.usace.army.mil/Missions/Regulatory/Source-Book/ (last visited July 18, 2022).

c. **Florida's Proposal Impermissibly Relied on the Definition of "Indian Country" from 18 U.S.C. § 1151.**

146.    While Florida cites to and quotes the definition of Indian country from 18 U.S.C. § 1151, that definition of Indian country does not address jurisdiction over waters. *See*, 18 U.S.C. § 1151.

147.    The definition contained at 18 U.S.C. § 1151 was designed to divide criminal jurisdiction over Tribal members between the federal government and state governments.

148.    The plain language of § 1151 expressly limits its use to use "in this chapter." 18 U.S.C. § 1151.

149.    In addition to provisions regarding intoxicants and counterfeiting Indian crafts, Congress created a defined list of offenses that are subject to § 1151's definition: "murder, manslaughter, kidnapping, maiming, a felony under chapter 109A, incest, a felony assault under section 113, an assault against an individual who has not attained the age of 16 years, felony child abuse or neglect, arson, burglary, robbery, and a felony under section 661 of this title." 18 U.S.C. §§ 1151-1159.

150.    Absent from the list are the unauthorized discharge of dredged or fill material, any type of environmental violation, any type of regulatory violation, and any non-criminal violation of law.

151.    The definition contained at 18 U.S.C. § 1151 does not address jurisdiction over waters.

152.    On its face, the definition only delineates criminal jurisdiction over "lands," "communities," and "allotments." 18 U.S.C. § 1151.

153.    Section 1151 offers no guidance on jurisdiction over waters, nor does it provide any description or indication of waters that would be included or waters that would be excluded.

26

*See* 18 U.S.C. § 1151.

154.    EPA's approval of the section 404 permit is "final agency action" within the meaning of 5 U.S.C. § 704 because it is an "order" granting a "license" within the meaning of 5 U.S.C. §§ 551(6), (8), (13) and 701(b)(2); because approval of the permit marked the consummation of the agency's decision-making process; and because approval of the permit determined Miccosukee's rights or obligations and triggered legal consequence for Miccosukee.

### COUNT I
### (Declaratory and Injunctive Relief
### 5 U.S.C. § 706(2)(A) and 28 U.S.C. §§ 2201-2202)

155.    The Miccosukee Tribe restates and re-alleges preceding paragraphs 1- 154 as if fully stated herein.

156.    The Administrative Procedure Act ("APA") authorizes judicial review of agency actions. 5 U.S.C. §§ 702, 704

157.    The APA directs a Court to set aside agency actions, findings, and conclusions found to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law. 5 U.S.C. § 706(2)(A).

158.    EPA's approval of Florida's proposal to administer a program for permitting the discharge of dredged and fill material was an arbitrary and capricious final agency action under the APA, , because EPA failed to consider many important issues that should have been central to the permitting decision.

159.    EPA's approval of Florida's proposal to administer a program for permitting the discharge of dredged and fill material was an arbitrary and capricious final agency action under the APA, because EPA failed to adequately explain the basis for its decision.

160.    EPA's approval of Florida's CWA 404 permitting program proposal was arbitrary

and capricious and in violation of the CWA because the proposal was incomplete.

161.    Florida's proposal failed to properly identify the Indian lands and waters where Florida lacks permitting authority as required by 40 C.F.R. § 233.11(h).

162.    Florida's proposal failed to provide an analysis of the State's authority over Indian lands over which the State sought permitting authority as required by 40 C.F.R. § 233.12(b).

163.    Florida's proposal failed to provide an analysis of the impact of the Lease Agreement, the Settlement Agreement, the Florida Indian (Miccosukee) Land Claims Settlement Act, the Miccosukee Reserved Area Act, or the acts establishing Everglades National Park and Big Cypress National Preserve on the State's ability to implement the proposed permitting program as required by 40 C.F.R. § 233.12.

164.    EPA's approval of Florida's proposal was arbitrary and capricious and in violation of the CWA because the conclusory statements regarding Indian country in Florida's Attorney Statement did not provide an adequate legal basis for EPA's approval.

**COUNT II**
**(Declaratory and Injunctive Relief**
**5 U.S.C. § 706(2)(A) and 28 U.S.C. §§ 2201-2202)**

165.    The Miccosukee Tribe restates and re-alleges preceding paragraphs 1-164 as if fully stated herein.

166.    The Administrative Procedure Act ("APA") authorizes judicial review of agency actions. 5 U.S.C. § 702.

167.    The APA directs a Court to set aside agency actions, findings, and conclusions found to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law. 5 U.S.C. § 706(2)(A).

168.    EPA's approval was arbitrary and capricious or otherwise not in accordance with

law because it failed to comply with its own regulation, when it impermissibly substituted the term "Indian country" in place of the regulatory text of 40 C.F.R. § 233.12(b).

**COUNT III**
**(Declaratory and Injunctive Relief**
**5 U.S.C. § 706(2)(A) and 28 U.S.C. §§ 2201-2202)**

169.     The Miccosukee Tribe restates and re-alleges preceding paragraphs 1-168 as if fully stated herein.

170.     The Administrative Procedure Act ("APA") authorizes judicial review of agency actions. 5 U.S.C. §§ 702, 704.

171.     The APA directs a Court to set aside agency actions, findings, and conclusions found to be "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C. § 706(2)(C).

172.     Because Florida's proposal did not comply with the requirements of CWA § 404(g) implementing that provision, EPA's transfer of the CWA 404 permitting program over Indian lands to the state of Florida was in excess of EPA's statutory authority.

**COUNT IV**
**(Declaratory and Injunctive Relief**
**5 U.S.C. § 706(2)(D) and 28 U.S.C. §§ 2201-2202)**

173.     The Miccosukee Tribe restates and re-alleges preceding paragraphs 1-172 as if fully stated herein.

174.     The APA directs a Court to set aside agency actions that fail to observe procedure required by law. 5 U.S.C. § 706(2)(D).

175.     EPA regulations mandate EPA provide a period of not less than 45-days for the public to comment on a state proposal. 40 CFR §233.15(e).

176.     The purpose of the public notice is for "interested members of the public to express

[their] views on the State Program." 40 CFR §233.15(e)(1).  In order to provide the public with the required comment opportunity, section 233.15(e) requires EPA to describe the waters included in the proposal.

177.    Because Florida did not include a list or description in the State's proposal of the waters that were not included in the proposal because they were on Indian lands, the public was denied a meaningful opportunity to review and comment on the scope of Florida's proposed permitting program.

178.    Because the public was not given a meaningful opportunity to comment on the scope of Florida's proposal, EPA's approval of Florida's proposal failed to observe procedure required by law.

### COUNT V
### (Declaratory and Injunctive Relief
### United States Constitution)

179.    The Miccosukee Tribe restates and re-alleges preceding paragraphs 1-178 as if fully stated herein.

180.    The APA directs a court to set aside a final agency action that is "contrary to constitutional right, power, privilege, or immunity." 5 U.S.C. § 706(2)(B).

181.    Article 1, Section 8, of the United States Constitution specifies that "Congress shall have the power to…regulate commerce with foreign nations, and among the several states, and with the Indian tribes."

182.    EPA's approval of Florida's proposal is contrary to constitutional right, power, privilege, or immunity and an unconstitutional abrogation of tribal sovereignty because it gave Florida regulatory jurisdiction over Tribal lands and subjected the Miccosukee to Florida's jurisdiction on those lands.

## **PRAYER FOR RELIEF**

Wherefore, the Miccosukee Tribe respectfully requests the Court:

1.      Enter a declaratory judgment pursuant to 28 U.S.C. § 2201 and 5 U.S.C. § 706 declaring that EPA's approval of Florida's proposal that the state assume responsibility for issuing permits for the discharge of dredged or fill material into certain waters within the State was arbitrary, capricious, an abuse of discretion, and otherwise not in accordance with law and procedural requirements;

2.      Enter a declaratory judgment pursuant to 28 U.S.C. § 2201 and 5 U.S.C. § 706 declaring that EPA's transfer of authority to the State of Florida to issue permits for the discharge of dredged or fill material into certain waters within the State was in excess of EPA's statutory authority;

3.      Enter a judgement vacating EPA's approval of Florida's proposal that the state assume responsibility for issuing permits for the discharge of dredged or fill material into certain waters within State and subsequent transfer of authority to the State of Florida to issue permits for the discharge of dredged or fill material into certain waters within the State; and

4.      Award the Miccosukee Tribe its reasonable attorney fees, costs, and such other and further relief as the Court deems just and proper.

Dated this 4th day of August, 2022.

George B. Abney (Florida Bar # 171557)
ALSTON & BIRD LLP
One Atlantic Center
1201 West Peachtree Street
Atlanta, GA 30309-3424
Telephone:  404-881-7000
Facsimile:  404-881-7777
E-mail:  George.Abney@alston.com

Kevin S. Minoli (to seek admission *pro hac vice*)
ALSTON & BIRD LLP
950 F Street, NW
Washington, DC 20004
Telephone:  202-239-3300
Facsimile:  202-239-3333
E-mail:  Kevin.Minoli@alston.com


Attorneys for Plaintiff Miccosukee Tribe of
Indians of Florida