## UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF FLORIDA

| | |
|---|---|
| MICCOSUKEE TRIBE OF INDIANS OF FLORIDA, <br><br> *Plaintiff,* <br><br> v. <br><br> UNITED STATES ENVIRONMENTAL PROTECTION AGENCY and UNITED STATES OF AMERICA, <br><br> *Defendants*, <br><br> and <br><br> THE STATE OF FLORIDA and FLORIDA DEPARTMENT OF ENVIRONMENTAL PROTECTION, <br><br> *Defendant-Intervenor.* | Case No. 1:22-cv-22459-KMM |

## PLAINTIFF'S  MOTION FOR SUMMARY JUDGMENT

The Federal Water Pollution Control Act ("Clean Water Act," "CWA," or "Act") § 501(a) authorizes the Administrator of the United States Environmental Protection Agency ("EPA") to "prescribe such regulations as are necessary" to implement the Act. Under that authority, EPA adopted regulations that specify "the procedures EPA will follow, and the criteria EPA will apply, in approving, reviewing, and withdrawing approval of State programs under section 404 of the Act." 40 C.F.R. § 233.1(a) (referring to 40 C.F.R. Part 233). Having duly promulgated such regulations, the question raised by this case is,  "Does EPA have to follow its own regulations?"

The Administrative Procedure Act ("APA") answers that question with an unequivocal, "Yes," instructing a court to "set aside agency action, findings, and conclusions" that fail to follow the law in any of four different ways. 5 USC §§ 706(a)-(d). It their answer to the Complaint filed in this case, the Federal Defendants admitted that EPA's regulations established

1

both substantive and procedural requirements for the agency's review of Florida's application. For the reasons set forth below, because EPA's approval of the State of Florida's application to administer a State permitting program for the discharge of dredge or fill material into navigable waters failed to comply with the CWA, EPA's regulations implementing the CWA, and the United States Constitution, that approval must be set aside.

STATUTORY AND REGULATORY BACKGROUND

### I.   Administrative Procedure Act

The APA establishes the processes a Federal government agency must follow when completing certain agency actions, such as formal rule makings and adjudications, 5 U.S.C. §§ 553, 554, and provides a right of action to seek judicial review of all agency actions "made reviewable by statute and final agency action for which there is no other adequate remedy in a court." 5 U.S.C. § 704. Agency actions subject to review under the APA include "an agency rule, order, license, sanction, relief, or the equivalent denial thereof, or failure to act." 5 U.S.C. § 551. A reviewing court "shall…hold unlawful and set aside agency action, findings, and conclusions" that the court finds are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," 5 U.S.C. § 706(2)(A); "contrary to Constitutional right, power, privilege, or immunity," 5 U.S.C. § 706(2)(B); "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right," 5 U.S.C. § 706(2)(C); or "without observance of procedure required by law," 5 U.S.C. § 706(2)(D).

### II.   The Clean Water Act

The CWA, 33 U.S.C. §§ 1251-1387, prohibits the "discharge of any pollutant by any person," unless specifically authorized by the Act. 33 U.S.C. § 1311. To provide a mechanism for authorizing limited discharges of pollutants, the Act created two permitting programs and vested initial authority for implementing those permitting programs with the federal government. 33 U.S.C. §§ 1342, 1344. The first permitting program, the National Pollutant Discharge Elimination System, is authorized by CWA § 402 and governs industrial discharges of pollutants. 33 U.S.C. § 1342. The second permitting program is the dredged and fill material permitting program authorized under CWA § 404. 33 U.S.C. § 1344. The authority for implementing the CWA § 404 permitting program is divided between the United States Army Corps of Engineers ("Corps"), which is responsible for issuing permits, and the EPA, which is

2

responsible for establishing the requirements for those permits and for overseeing the Corps' implementation of the permitting program. 33 U.S.C. § 1344(b).

The CWA establishes conditions under which a state can propose to the EPA that the state assume responsibility for issuing permits for the discharge of dredged or fill material "into the navigable waters…within its jurisdiction." 33 U.S.C. § 1344(g). A state's proposal must include both a "full and complete description of the program [the state] proposes to establish and administer *under State law*" ("Program Description") and a statement from the state attorney general or chief legal officer of an independent state agency that "that *the laws of such State*…provide adequate authority to carry out the described program" ("Attorney Statement"). 33 U.S.C. § 1344(g)(1) (emphasis added). The statutorily required program description must include a "description of the waters of the United States within a State over which the State assumes jurisdiction under the approved program; a description of the waters of the United States within a State over which the Secretary retains jurisdiction subsequent to program approval; and a comparison of the State and Federal definitions of wetlands." 40 C.F.R. § 233.11(g).

While EPA regulations specify that states and Tribes that assume responsibility for CWA § 404 permitting are required to "regulate all *discharges* of dredged or fill material into waters regulated by the State under section 404(g)–(1)," 40 C.F.R. § 233.1(b) (emphasis added), the CWA is clear that not all *waters* within a state *can* be assumed as part of a state permitting program under the authority of CWA § 404(g). Specifically, CWA § 404(g) excludes certain navigable waters from state CWA § 404 permitting programs.

> ...for the discharge of dredged or fill material into the navigable waters (other than those waters which are presently used, or are susceptible to use in their natural condition or by reasonable improvement as a means to transport interstate or foreign commerce shoreward to their ordinary high water mark, including all waters which are subject to the ebb and flow of the tide shoreward to their mean high water mark, or mean higher high water mark on the west coast, including wetlands adjacent thereto) within [the state's] jurisdiction...

33 U.S.C. § 1344(g)(1) ("Commerce Waters"). State law may require permits for the discharge of dredged or fill material into excluded waters, 33 U.S.C. § 1344(t), but those permits will not be considered to be issued under an approved state CWA § 404 permitting program. Instead, the Army Corps will retain responsibility for issuing CWA § 404 permits for the discharge of dredged and fill material into these waters. 33 U.S.C. § 1344(h)(2)(A) (directing the Secretary of

the Army to suspend the issuance of permits only "for activities with respect to which a permit may be issued pursuant to [an approved state program]").

EPA's long-standing interpretation of CWA § 404(g)(1), which is codified in the agency's regulations, is that it also excludes waters on "Indian lands." 40 C.F.R. § 233.1(b). Because EPA determined that, "in many cases, States…will lack authority to regulate activities on Indian lands," the agency adopted regulations that specify that the "Secretary of the Army acting through the Corps of Engineers will continue to administer the program on Indian lands if a State which is not an Indian Tribe does not seek and have authority to regulate activities on Indian lands." 40 C.F.R. § 233.1(b). "If a State seeks approval of a program covering activities on Indian lands," the Attorney Statement must include "an analysis of the State's authority over such activities" in the statement they provide to EPA as part of the proposal. 40 C.F.R. § 233.12(b).

Upon receipt of a complete application, EPA has 120 days within which to determine if a proposed state program has the necessary authorities as specified in CWA § 404(h)(1). 33 U.S.C. § 1344(h)(1). If EPA determines that the proposed state program does have the required authorities, EPA so notifies the state and the Army Corps. 33 U.S.C. § 1344(h)(2)(A). Once the state subsequently notifies the Army Corps that the state is operating the approved program, the Army Corps is required to suspend issuance of CWA § 404 permits "for activities with respect to which a permit may be issued pursuant to such State program." 33 U.S.C. § 1344(h)(2)(A). A state with an approved CWA § 404 permitting program issues permits under the authority of state law. 33 U.S.C. § 1344(h)(2)(A).

## STANDARD OF REVIEW

When a challenge to an agency action, such as this one, seeks review under the APA, a "reviewing court shall decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning or applicability of the terms of an agency action." 5 U.S.C. § 706. Reviewing courts "shall…hold unlawful and set aside agency action, findings, and conclusions" that the court finds are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," 5 U.S.C. § 706(2)(A); "contrary to Constitutional right, power, privilege, or immunity," 5 U.S.C. § 706(2)(B); "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right," 5 U.S.C. § 706(2)(C); or "without observance of procedure required by law," 5 U.S.C. § 706(2)(D).

Within the 11th Circuit, "a court shall set aside an action of an administrative agency where it is arbitrary, capricious, or an abuse of discretion…[but] shall not substitute its judgment for that of the agency." *Preserve Endangered Areas of Cobb's History v. United States Army Corps of Eng'rs,* 87 F.3d 1242, 1246 (11th Cir. Ct. App. 1996). "To determine whether an agency decision was arbitrary and capricious, the reviewing court must consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment." *Citizens for Smart Growth v. Sec'y of the DOT*, 669 F.3d 1203, 1210 (11th Cir. Ct. App. 2012) (citing *Fund for Animals*, 85 F.3d 535, 541-542 (11th Cir. Ct. App. 1996)). Review of an agency action must be "searching and careful," but the standard of review a court measures an agency action against is "narrow." *Citizens for Smart Growth v. Sec'y of the DOT*, 669 F.3d 1203, 1210 (11th Cir. Ct. App. 2012) (citing *Fund for Animals*, 85 F.3d 535, 541-542 (11th Cir. Ct. App. 1996)).

**ARGUMENT**

EPA failed to follow the CWA and its own regulations when it approved Florida's application despite the fact the application did not contain all required elements. As a result, under the APA, EPA's approval of Florida's proposal to operate a CWA § 404 permitting program must be set aside because the approval was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right," and "without observance of procedure required by law," 5 U.S.C. § 706(2)(A), (C), and (D). Further, the approval was "contrary to Constitutional right, power, privilege, or immunity," and must be set aside on that basis. 5 U.S.C. § 706(2)(B).

I.   **EPA's Approval was Arbitrary, Capricious or Otherwise Not in Accordance with Law Because Florida's Application Did Not Comply with Applicable Statutory and Regulatory Requirements**

A state that requests approval from EPA to operate a CWA § 404 permitting program is required by the CWA to submit two documents to the agency: a "full and complete description of the program [the state] proposes to establish and administer under State law" and an Attorney Statement "that *the laws of such State*…provide adequate authority to carry out the described program." 33 U.S.C. § 1344(g)(1). The Program Description and the Attorney Statement are essential to the success of the State's request. The 120-day statutory review period for review of

the request does not begin until EPA receives both documents, and, together, the two documents must demonstrate that the state has the requisite authority as specified in CWA §§ 404(h)(1)(A)-(H) in order for the proposed program to be approved. 33 U.S.C. § 1344(h).

According to EPA, a "complete program description" is not a nicety, but rather "is essential for determining the adequacy of a State's program. *Clean Water Act Section 404 Program Definitions and Permit Exemptions; Section 404 State Program Regulations*, 53 Fed. Reg. 20764, 20766 (June 6, 1988) (Final Rule). EPA exercised its authority under CWA § 501(a) and promulgated regulations implementing § 404(g) that explained in greater detail the required components of both the Program Description and the Attorney Statement, and created new requirements that a state seeking approval to operate a CWA § 404 permitting program must enter into separate Memorandums of Agreement with the relevant EPA Regional Administrator and the Secretary of the Army. 40 C.F.R. §§ 233.10-233.14. EPA adopted these detailed requirements for an application after receiving public comments on the agency's proposed rule that argued that additional information was needed for the public to assess the adequacy of a state or Tribal program. 53 Fed. Reg. 20764, 20766 (June 6, 1988). In response to those comments, EPA specified that the program description "must include a detailed description of the extent of the State's jurisdiction," and that "the State must describe <u>separately</u> the waters it will assume after program approval and the waters retained by the Corps." *Id.* (emphasis added).

    **a. EPA's Approval of Florida's Program was Arbitrary, Capricious, or Otherwise Not in Accordance with Law Because Florida's Program Description Failed to Adequately Describe the Waters to be Assumed by the State**

The text of the regulations EPA adopted is clear: a proposal to assume the CWA § 404 permitting program must contain three distinct pieces of information regarding the reach of a state's program: a "description of the waters of the United States within a State over which the State assumes jurisdiction under the approved program; a description of the waters of the United States within a State over which the Secretary retains jurisdiction subsequent to program approval; and a comparison of the State and Federal definitions of wetlands." 40 C.F.R. § 233.11(g). In its application, however, Florida made no attempt to describe the waters within the State's boarders for which the State would be assuming permitting authority. Instead, for the regulatorily-required description of the waters to be assumed by the State's 404 program, Florida offers various versions of a tautology.

First, Florida's application explained that "[t]he state defines" "State assumed waters" to mean "waters of the United States that the state assumes permitting authority over pursuant to s. 404 of the Clean Water Act, Pub. L. No. 92-500, as amended, 33 U.S.C. ss. 1251 et seq., and rules promulgated thereunder, for the purposes of permitting the discharge of dredge or fill material." Florida Application, Section (a): *Description of the Scope and Structure of the State's Program (Required by 40 C.F.R. § 233.11(a))*, at page 2 ("Florida Program Description"). A statement that "State assumed waters" means the waters of the United States that the state assumes permitting authority over may be factually true, but it includes no information that would help a person understand whether a particular water was an "assumed water." As such, it fails to describe "the waters of the United States within a State over which the State assumes jurisdiction under the approved program." *See,* 40 C.F.R. § 233.11(g).

Second, Florida included a different definition of assumed waters in Section (h) of its application. There, Florida stated that "State-assumed waters...are all waters of the United States that are not retained waters." Florida Application, Section (h): *Description of the Waters of the United States within a State over which the State Assumes Jurisdiction Under the Approved Program (Required by 40 C.F.R. § 233.11(h))*, at page 2 ("Florida Assumed Waters Description"). Again, this statement included no information that would help a person understand whether a particular water was an "assumed water." The statement that "State-assumed waters...are all waters of the United States that are not retained waters" does not offer any information about what assumed waters are; it merely states what assumed waters *are not*. Unlike the definition of State assumed waters in the Florida Program Description, the statement in the Florida Assumed Waters Description is factually incorrect, as the definition of "Retained Waters" contained in Florida's application does not include certain waters that were not assumed by the State, such as waters on Indian lands or in Indian Country. Florida Program Description at page 2.

EPA's regulations mandate that an application to administer the CWA § 404 permitting program include a description of the waters over which a state will assume permitting authority. 40 C.F.R. § 233.11(g). By approving Florida's program without a description of the waters to be assumed by the State, EPA impermissibly read the requirement to describe the waters to be assumed by the State out of the regulations. EPA's decision to approve Florida application

7

despite the fact that it did not include all elements required by EPA's regulations was arbitrary, capricious or otherwise not in accordance with law. 5 U.S.C. § 706(2)(A).

      **b.  EPA's Approval of Florida's Program was Arbitrary, Capricious, or Otherwise Not in Accordance with Law Because Florida's Application Relied on an Incomplete Description of Waters to be Retained by the Army Corps**

Even if Florida's statement that "State-assumed waters...are all waters of the United States that are not retained waters" could be understood to be a description of the waters to be assumed by the State, it would remain insufficient to meet the requirement in 40 C.F.R. § 233.11(g) because it relied on an incomplete – and, therefore, inaccurate – definition of "Retained Waters." The descriptive value, if any, of the statement regarding "State-assumed waters" in the Florida Assumed Waters Description depends entirely on an accurate understanding of what constitutes "Retained Waters." The definition of "Retained Waters" contained in Florida's application was incomplete and, as a result, inaccurate.

The Florida Program Description defines "Retained Waters" as follows:

> "Retained waters" means those waters which are presently used, or are susceptible to use in their natural condition or by reasonable improvement as a means to transport interstate or foreign commerce shoreward to their ordinary high water mark, including all waters which are subject to the ebb and flow of the tide shoreward to their mean high water mark, including wetlands adjacent thereto. The USACE will retain responsibility for permitting for the discharge of dredged or fill material in those waters identified in the Retained Waters List, as well as all waters subject to the ebb and flow of the tide shoreward to their mean high water mark that are not specifically listed in the Retained Waters List, including wetlands adjacent thereto landward to the administrative boundary. The administrative boundary of adjacent retained waters will be the landward project boundary of each project that proposes discharges of dredged or fill material waterward of a 300-foot guide line established from the ordinary high water mark or mean high tide line of the retained water. [State 404 Program Applicant's Handbook section 2.0 (b) 41.]

Florida Program Description at 2-3. While the definition effectively describes the characteristics of the waters that are identified in the definition as retained waters, the list of waters is incomplete. Specifically, the definition of "Retained Waters" omits any waters that were retained by the Corps on "Indian lands" (or on the subset of "Indian Lands" that constitute "Indian Country"). Florida Program Description at 2-3.

Recognizing that state programs are required to reach all lands within the state and that many states will "lack authority to regulate activities on Indian lands," EPA created an exception to the prohibition on partial state programs that excludes waters on Indian lands from the scope of waters that can be assumed by state program unless the state specifically seeks authority to issue permits on those lands. 40 C.F.R. § 233.1 (b). When "a State seeks approval of a program covering activities on Indian land," EPA's regulations created an additional requirement that the Attorney General's statement "shall contain an analysis of the State's authority over such activities." 40 C.F.R. § 233.12(b). Florida's application did not seek authority to implement the state's CWA § 404 permitting program on Indian lands, and explicitly stated that the State's program did not include "Indian Country," as defined in 18 U.S.C. § 1151. Attorney Statement at 3. Yet, Florida's application made no attempt to identify or describe the waters on Indian lands that would be retained waters not subject to Florida's permitting program. In fact, the section of Florida's application where the State purported describe which waters would be assumed by the State's program does not include the words "Tribal," "Indian," and "Lands" anywhere in the section. Florida Assumed Waters Description. Absent a proposal in the application to seeking authority to issue permits on Indian lands, waters on Indian lands are, by regulation, retained waters. 40 C.F.R. § 233.1(b). EPA's approval of Florida's application notwithstanding the fact that it did not include waters on Indian lands as retained waters was arbitrary and capricious or otherwise not in accordance with law. 5 U.S.C. § 706(2)(A).

## II. EPA's Approval was Arbitrary, Capricious or Otherwise Not in Accordance with Law Because it Impermissibly Substituted the Term "Indian Country" for the Term "Indian lands"

The term "Indian lands" appears in four separate provisions of EPA's regulations implementing CWA § 404. *See,* 40 C.F.R. §§ 233.1(b) (explaining that the Corps will continue to issue permits on Indian Lands unless the state seeks that authority); 233.12(b) (requiring the Attorney Statement for a state that seeks approval of a "program covering activities on Indian Lands" to include an analysis of the state's authority on such lands); 233.70 (approving Michigan's CWA § 404 permitting program for waters within the state "except those on Indian lands…"); and 233.71 (approving New Jersey's CWA § 404 permitting program for waters within the state "except those on Indian lands…"). The term Indian Country, in contrast, appears nowhere in 40 C.F.R. Part 233. Nevertheless, Florida's application and EPA's approval were

impermissibly based on an evaluation of the State's proposed program on waters within "Indian Country."

There is no suggestion in the administrative history of 40 C.F.R. 233.1(b) or 40 C.F.R. Part 233 that EPA intended "Indian lands" to mean "Indian Country." EPA first published regulations creating the requirements and process for state assumption of the § 404 permitting program in 1980 as part of the agency's Consolidated Permit Regulations. *See*, 45 Fed. Reg. 33290 (May 19, 1980). Next, the agency overhauled those regulations in 1988. *See*, 53 Fed. Reg. 20764 (June 6, 1988). Then, EPA updated the relevant sections of the regulations in 1993. *See*, 58 Fed. Reg. 8172 (Feb. 11, 1993). In each of those actions, EPA had the opportunity and authority to replace any reference to Indian lands within Part 233 with a reference to Indian Country or to define Indian lands as synonymous with Indian Country, but the agency never did so. Similarly, prior to approving Florida's application, EPA's approvals of state CWA § 404 permitting programs have always excluded waters on "Indian lands." *See*, 40 C.F.R. § 233.70 (approving Michigan's CWA § 404 permitting program for waters within the state "except those on Indian lands…"); and 40 C.F.R. § 233.71 (approving New Jersey's CWA § 404 permitting program for waters within the state "except those on Indian lands…").

Further, the administrative record for EPA's approval of Florida's application demonstrates that EPA recognized the difference between Indian lands and Indian Country. For example, EPA's notes taken to document the discussion that occurred as part of the government-to-government consultation between EPA and the Miccosukee first describes the Tribe's position it "has cultural resources and an interest in a variety of lands," and that "permits on those lands should trigger government to government consultation and an opportunity for tribes to be involved in the project," before moving to a discussion of what is meant by the term "Indian Country." *EPA Government-to-Government Consultation with the Miccosukee Tribe of Indians of Florida on the State of Florida's Request for Assumption of the Clean Water Act Section 404 Program and Consultation Under Section 106 of the National Historic Preservation Act (NHPA),* EPA-HQ-OW-2018-0640-0599, p. 1 (October 8, 2020). Notably, EPA carried that distinction into the "Specific Action Items from the Discussion," which included an item for the Miccosukee to "provide information that supports the Tribe's position about lands in Florida that it believes meet the statutory definition of Indian Country," while including an item for EPA to "follow-up with the Tribe regarding the issues they've raised regarding Tribal Lands." *Id.* at 2.

The term "Indian lands" appears in regulations implementing various EPA programs, and where EPA intended for "Indian lands" to have the same meaning as "Indian Country," EPA included such a definition in the text of the regulation itself. See, e.g., 40 C.F.R. § 144.3 (defining "Indian lands" as "Indian Country" as defined at 18 U.S.C. 1151); 40 C.F.R. § 258.2 (adopting the definition of 18 U.S.C. 1151 for "Indian lands"). In fact, on July 19, 2023, EPA issued a press release announcing that the agency has signed a proposed rule that would clarify certain provisions of Part 233, including, *for the first time*, proposing to include a definition of Indian lands to be the same as the definition of Indian Country contained at 18  U.S.C. 1151. *See, Clean Water Act Section 404 Tribal and State Program Regulation,* at 182-183 (July 13, 2023) (Pre-publication version available at https://www.epa.gov/system/files/documents/2023-07/Pre-publication%20Version%20of%20the%20404%28g%29%20NPRM_508c_QC_1.pdf).

Despite the regulations' use of the term "Indian lands" and the absence of the term "Indian Country" from Part 233, EPA's approval relies on a statement in Florida's application that "Indian Country, as defined in 18 U.S.C. § 1151, is not included in Florida's 404 program." Attorney Statement, page 3. By approving Florida's application despite the fact that it impermissibly substituted the term "Indian Country" for "Indian lands," EPA read the term "Indian lands" completely out of the regulations and relied on a different consideration than the one required by the agency's own regulations. Agency action is "arbitrary and capricious if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, [or] offered an explanation for its decision that runs counter to the evidence before the agency." *Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43, 103 S. Ct. 2856, 77 L. Ed. 2d 443 (1983). As a result, EPA's approval was arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law and must be set aside. See, 5 U.S.C. § 706(2)(A).

### a.   EPA's decision to rely on the definition of Indian Country from 18 U.S.C. § 1151 was arbitrary, capricious, and an abuse of discretion

Because the term Indian Country appears nowhere in EPA's regulations implementing the CWA § 404 program, the agency enjoyed wide latitude in how it would define that term. EPA's choice to use the 18 U.S.C. § 1151 definition of the term "Indian Country," which was specifically designed to limit the areas where Tribes had exclusive criminal jurisdiction, however, was outside the bounds of the agency's discretion. The term Indian Country first appeared in US law in 1834, when it was defined to be "all that part of the United States west of

the Mississippi and not within the states of Missouri and Louisiana, or the territory of Arkansas."
Nonintercourse Act of 1834, 25 U.S.C. § 177. Over the nearly 200 years since, Indian Country
has been defined in many different ways depending on the context in which the term was being
used, and the definition from 18 U.S.C. § 1151 is among the narrowest.

There is no basis for using 18 U.S.C. § 1151's definition of Indian Country to determine
where a state has civil regulatory authority over waters on Indian lands. In fact, both Congress
and the Supreme Court have rejected arguments that states with criminal jurisdiction over Indian
lands also automatically have civil jurisdiction over the same lands. See, 28 U.S.C. § 1360 and
18 U.S.C. § 1162 (addressing civil jurisdiction separately from criminal jurisdiction), Public Law
280 (repealed), *Bryan v. Itasca County, Minnesota*, 426 U.S. 373 (1976), and *Seminole Tribe of
Florida v. Butterworth*, 491 F. Supp. 1015 (S.D. Fla. 1980), affirmed, 658 F.2d 310 (5th Cir.
1981), cert. denied, 455 U.S. 1020 (1982). Importantly, EPA's determination as to the meaning
of Indian Country, which does not appear in CWA § 404 nor 40 C.F.R. Part 233, is not entitled
to any deference. *Hydro Res., Inc. v. United States EPA*, 562 F.3d 1249, 1260 (10th Cir. 2009).

While Florida cites to and quotes the definition of Indian Country from 18 U.S.C. § 1151,
that definition of Indian Country does not address jurisdiction over waters. On its face, the
definition only delineates criminal jurisdiction over "lands," "communities," and "allotments."
18 U.S.C. § 1151. It offers no guidance on jurisdiction over waters, nor does it provide any
description or indication of waters that would be included or waters that would be excluded. The
definition contained at 18 U.S.C. § 1151 was designed to divvy up criminal jurisdiction over
Tribal members between the federal government and state governments, and the plain language
of § 1151 expressly limits its use to use "in this chapter." 18 U.S.C. § 1151. In addition to
provisions regarding intoxicants and counterfeiting Indian crafts, Congress created a defined list
of offenses that are subject to § 1151's definition: "murder, manslaughter, kidnapping, maiming,
a felony under chapter 109A, incest, a felony assault under section 113, an assault against an
individual who has not attained the age of 16 years, felony child abuse or neglect, arson,
burglary, robbery, and a felony under section 661 of this title." 18 U.S.C. §§ 1151-1159. Absent
from the list are the unauthorized discharge of dredged or fill material, any type of environmental
violation, any type of regulatory violation, and any non-criminal violation of law.

> **b. Florida's description of retained waters did not include waters on Indian
> lands or in Indian Country**.

Even if Indian Country was an appropriate surrogate for Indian lands, which it is not, EPA's approval of Florida's application would still be inconsistent with the CWA and EPA's regulations because Florida did not include waters in Indian Country in its definition of retained waters. As explained above, the regulations require Florida to describe the waters that will be assumed by the State and the waters retained by the Corps, 40 C.F.R. 233.11(g), and Florida's application fails to do either for waters that are located in Indian Country or Indian lands. In fact, it is clear from Florida's application and supporting materials that Florida does <u>not</u> view waters in Indian Country to be "retained waters." Florida Assumed Waters Description, at 2 (definition of "Retained Waters").

Florida's application explains that other than waters subject to the ebb and flow of the tide, retained waters are "those waters identified in the Retained Waters List," which is included as Appendix A of the State 404 Program Applicant's Handbook. *See*, State 404 Program Applicant's Handbook at page 10 and Appendix A (Dec. 22, 2020) ("Handbook"). The Handbook reinforces the conclusion that the State does not view waters in Indian Country as retained waters. Neither the definition of retained waters that appears in the Handbook, nor the list of waters included in Appendix A, mention waters in Indian Country. *Id.* Florida's decision to exclude waters in Indian Country from the definition of retained waters is significant, because, as discussed above, Florida's application specifies that assumed waters are all waters of the United States that are not retained waters. If Florida's statement that "State-assumed waters...are all waters of the United States that are not retained waters" is found by the Court to be a sufficient description that satisfies the requirement in 40 C.F.R. § 233.11(g), then Florida's omission of waters on Indian lands or Indian Country from the definition of "retained waters" would necessarily mean that all waters on Indian lands or Indian Country are assumed waters under the application.

### c. Florida's conclusory statements regarding Indian Country do not provide a legal basis for EPA's approval

Despite failing to include waters in Indian Country from the definition and list of retained waters and defining assumed waters as all waters other than retained waters, the General Counsel's Statement included with Florida's application includes a statement, without any further support or explanation, that "Indian Country, as defined in 18 U.S.C. § 1151, is not included in Florida's 404 program." Attorney Statement, page 3. Florida's conclusory statements about Indian Country do not satisfy the requirements established by EPA's regulations for state

CWA § 404 program applications. Despite EPA's best efforts, when viewed in the context of all other information submitted as part of Florida's application, Florida's conclusory statements about Indian Country cannot form the basis of a decision to approve Florida's application. The statements do not change Florida's definition of retained waters, nor do they amend the assertion of jurisdiction over all waters other than retained waters that is contained in Florida's Program Description. EPA's reliance on such statements when approving Florida's program was arbitrary, capricious, or otherwise not in accordance with law, and the approval must be set aside. 5 U.S.C. § 706(2)(A).

### d. EPA's refusal to determine the scope of Indian lands results in an impermissible delegation of authority to the State of Florida

EPA was obligated to determine which waters were retained because they were on Indian lands prior to approving Florida's program and the agency's refusal to do so constituted an unauthorized and unconstitutional delegation of that authority to the State of Florida. Despite EPA's assurance that the Memorandum of Agreement with Florida regarding the State's CWA § 404 permitting program "does not determine what constitutes 'Indian Country' as that term is defined in 18 U.S.C. § 1151," the on-the-ground consequence of EPA's approval of Florida's program without the regulatorily required description of the waters assumed and analysis of authority over Indian lands is that EPA has effectively determined that the majority of Miccosukee lands do not qualify as Indian lands. Memorandum of Agreement Between the Florida Department of Environmental Protection and the United States Environmental Protection Agency, at page 7 (July 7, 2020) ("MOA"). EPA's transfer of the CWA § 404 permitting program for these Indian lands exceeded the authority Congress gave to EPA, and before approving Florida's application, EPA was obligated to determine whether these lands were Indian lands. *See, Michigan v. EPA*, 268 F.3d 1075 (D.C. Cir. 2001).

The consequence of EPA's refusal to decide which waters are on Indian lands has been that the State of Florida decides. As documented above, Florida made no effort to describe which waters on Indian lands over which the State would assume jurisdiction and which would be retained by the Corps. See, Section I, *infra*. In fact, EPA rejected a request from the Miccosukee to discuss "whether specific lands constitute Indian Country under the definition set forth at 18 U.S.C. § 1151," explaining that "EPA believes that case-specific questions regarding what lands meet the definition of Indian Country should be considered on a case-by-case basis during implementation." *Letter from Jeaneanne Gettle, U.S. EPA to Jeanine Bennett, Miccosukee Tribe*

14

*of Indians of Florida* (December 15, 2020). After EPA Florida had secured approval of its program without ever having to describe the waters retained as Indian lands, FDEP unveiled a sophisticated mapping tool that purports to define what constitutes Indian Country. EPA's regulations establish a presumption that a state application does not include waters on Indian lands and places the burden of overcoming that presumption on the state. EPA's refusal to determine the scope of Indian lands or Indian Country has effectively reversed that presumption and placed the burden on the Miccosukee to overcome the State's assertion of jurisdiction on a permit by permit basis. Congress gave EPA no such authority in the CWA.

Further, EPA cannot rely on the objection process outlined in the MOA as being sufficiently protective of the Tribe's rights. As a threshold matter, requiring the Tribe to go through the process of monitoring public notices to identify any projects on Indian lands and then raise an objection to the State and EPA on a permit by permit basis has required and will require the Tribe to spend significant time and money simply because EPA refused to identify the scope of Indian lands. Even when the Tribe objects, nothing requires EPA to determine whether a water is on Indian lands or to do anything to prevent the permit from being issued. While EPA "shall" consider information the Tribe submits to the State regarding jurisdiction over Indian lands or Indian Country when "exercising its CWA authority to oversee FDEP's program," the MOA only says that the information "may" be the basis for EPA objecting to a proposed permit "when appropriate." MOA at 1-2. On its face, EPA's doubly caveated statement that information demonstrating a project is on Indian lands "may" be the basis for EPA objecting to a proposed permit "when appropriate," does not obligate the agency to take any action.

Whatever assurance the statement was intended to provide is undermined is further undermined by the fact that EPA has waived its authority to object to a FDEP permit solely because the permit is for waters on Indian lands or in Indian Country. Instead, EPA only reserved the authority to object to FDEP permits that will have significant adverse effects on Tribal waters – specifically, when the agency determines that the "proposed project would *fail to comply with the 404(b)(1) Guidelines due to the impact* on waters of another state or waters within 'Indian Country,' as that term is defined at 18 U.S.C. § 1151." MOA at 7 (emphasis added). By limiting its authority to object to only those permits violate the 404(b)(1) Guidelines *due to the impact* of the activities permitted, EPA waived its ability to object to an FDEP permit simply because the project is in waters that are on Indian lands or in Indian Country.

15

EPA's refusal to determine which waters were on Indian lands resulted in an impermissible delegation of authority to define which waters are on Indian lands to the State of Florida and exceeded the authority provided to EPA in CWA § 404(g). As such, EPA's approval must be set aside. 5 U.S.C. § 706(2)(C).

**III.    The Miccosukee lands are Indian lands, and EPA lacks authority to transfer CWA § 404 permitting authority over those lands to the State of Florida.**

As the Tribe demonstrated as part of the government-to-government consultation between EPA and the Tribe, see, e.g., *Letter from Hon. Billy Cypress, Miccosukee Tribe of Indians of Florida, to Jeaneanne Gettle, EPA* (December 9, 2020), Miccosukee lands, including leased lands and other lands on which the Miccosukee's rights have been codified by the United States Congress and the Tribe's sacred sites, constitute Indian lands. Eleventh Circuit precedent in a prior case involving the Miccosukee and the United States determined that the Tribe's "interests [in the leased lands] obviously qualify as a property entitled to procedural due process protection." *Miccosukee Tribe of Indians of Fla. v. United States*, 716 F.3d 535, 558-59 (11th Cir. 2013) (holding that the "Corps cannot take all or part of the Tribe's property interests under the Lease Agreement and the Trustee Deed without affording the Tribe due process"). Neither EPA nor Florida has provided any factual or legal basis for concluding otherwise.

Further, there is precedent documenting that the State of Florida lacks jurisdiction within Everglades National Park – and over Indian lands within the Park. In fact, in United States v. Daye, the United States certified to the court that the State of Florida lacked jurisdiction to enforce violations of law within Everglades National Park. United States v. Daye, 696 F.2d 1305, 1307 (11th Cir. 1983). The court agreed, finding that because "Everglades National Park remains in the exclusive jurisdiction of the federal government, Florida has not and cannot extend its jurisdiction to cover Indian lands located within the Park." United States v. Daye, 696 F.2d 1305, 1307 (11th Cir. 1983); *see also* Miccosukee Tribe of Indians v. United States, No. 00-3453-CIV, 2000 U.S. Dist. LEXIS 22929, at 23 (S.D. Fla. Dec. 15, 2000) (confirming that the holding of Daye was "that the State has no jurisdiction within Everglades National Park").

Neither the Attorney Statement nor EPA's approval addressed the Tribe's well-established rights on Indian lands nor the State's lack of jurisdiction within Everglades National Park. EPA's approval of Florida's application to administer the CWA § 404 permitting program without excluding Indian lands and land within Everglades National Park was arbitrary and capricious or otherwise not in accordance with law and must be set aside." 5 U.S.C. § 706(2)(A).

      **a.**  **The Tribe has not waived its rights on these Indian lands, nor have the Tribe's rights been extinguished**

As specified by the Supreme Court, "Indian tribes still possess those aspects of sovereignty not withdrawn by treaty or statute, or by implication as a necessary result of their dependent status." *United States v. Wheeler*, 435 U.S. 313, 323 (1978). Courts have applied that principle to the Clean Water Act's provisions addressing Tribal rights and authority, finding that "Indian tribes have residual sovereign powers" that "guarantee the powers enumerated in [the treatment as a state provisions of the Act], absent an express statutory elimination of those powers." *City of Albuquerque v. Browner*, 97 F.3d 415, 423 (10th Cir. 1996). In explaining the geographic scope of lands over which Tribes are able to be approved to implement various Clean Water Act programs in the same manner as a state, EPA recognizes that the inherent sovereignty of Tribes requires the agency to view what constitutes a Tribe's reservation in light of relevant statutes and case law:

> The meaning of the term "reservation" must, of course, be determined in light of statutory law and with reference to relevant case law. EPA considers trust lands formally set apart for the use of Indians to be "within a reservation" for purposes of section 518(e)(2), even if they have not been formally designated as "reservations." *Oklahoma Tax Commission v. Citizen Band Potawatomi Indian Tribe of Oklahoma*, 111 S.Ct. 905, 910 (1991). This means it is the status and use of the land that determines if it is to be considered "within the reservation" rather than the label attached to it.

57 Fed. Reg. 8172, 8177 (Feb. 11, 1993). When determined in light of relevant statutes and case law, the Miccosukee reservation includes all of the Tribe's lands. As such, those lands must be considered as Indian lands and as Indian Country, and retained by the Army Corps.

      **b.**  **The Eleventh Circuit has recognized that Congress codified the Miccosukee's rights to these Indian lands in the Florida Indian Land Claims Settlement Act of 1982 and the lands must be considered Indian lands and Indian Country as a result**

In 1982, the United States Congress codified the Miccosukee's rights to more than 189,000 acres of lands held in perpetual lease by the State of Florida, lands deeded to the United States for the Tribe's benefit, lands within Everglades National Park and Big Cypress Preserve, and lands within the State Reservation established under Florida law, rendering all such lands Indian lands. The Florida Indian Land Claims Settlement Act of 1982 codified a settlement

agreement between the Miccosukee and the State of Florida and expressly ratified the terms of the settlement and the lease that underlaid it. Florida Indian Land Claims Settlement Act of 1982, 25 U.S.C. §§ 1741-1749 ("Settlement Act of 1982"). While the Act extinguished certain listed Miccosukee rights and interests, Congress was explicit that "nothing" in the Act "shall be construed as extinguishing any aboriginal right, title, interest, or claim to lands or natural resources...defined as 'excepted interests' in paragraph 3c of the Settlement Agreement between the State of Florida and the Miccosukee Tribe." 25 U.S.C. § 1744(b)(1). By the plain language of the statute, therefore, the rights and interests reserved by the Tribe in Paragraph 3c survived any diminishment of Tribal rights and interests effectuated by other provisions of the Act.

Paragraph 3c of the Settlement Agreement retained the Tribe's rights in all of the Indian lands at issue here. First, the Agreement retained the Tribe's rights to hunting, fishing, and trapping that had been established under Florida law. Second, the Agreement between the State and the Tribe retained the Tribe's *existing* rights in the following excepted interests:

- The State Reservation established under the provisions of Chapter 285, Florida Statutes;

- The lands described in Dedication Deed No. 23228, dated November 20, 1962, from the Trustees of the Internal Improvement Fund of the State of Florida, as modified on October 6, 1981;

- Rights granted the Miccosukee Tribe by special use permits issued by the Secretary of the Interior in the Everglades National Park;

- Rights recognized in the Miccosukee Tribe in the Big Cypress Preserve pursuant to 16 U.S.C. § 410(b) and 689(j) and in the Big Cypress Area pursuant to Section 380.055, Florida Statutes; and

- Rights granted the Miccosukee Tribe under the Lease Agreement.

These excepted interests include interests in the lands that the Miccosukee has asserted are Indian lands throughout EPA's review of Florida's application.

The Eleventh Circuit has previously determined that these interests are property interests held by the Miccosukee, subject to protection of the Due Process clause of the United States Constitution. *Miccosukee Tribe of Indians of Fla. v. United States*, 716 F.3d 535, 558-59 (11th Cir. 2013) (concluding that the "interests [in the leased lands] obviously qualify as a property

entitled to procedural due process protection…"). Having litigated that issue previously, the Defendants should not be allowed to re-argue that conclusion here.

In addition to codifying the Miccosukee's rights, other provisions of the Settlement Act of 1982 make clear that the State of Florida lacks the authority to implement the CWA § 404 permitting program on these lands. Specifically, the Act states that the lands are to be treated as reservation lands for the purposes of "law enforcement over Indians," limiting Florida's authority to enforce the Clean Water Act on these lands. 25 U.S.C. § 1745(b). Per the Supreme Court, the fact that the federal government may have *delegated its authority* to enforce criminal laws against Indians on these lands to a state "as a necessary result of [the Indian's] dependent status" does not constitute the extinguishment of Tribal sovereignty over these lands or over the actions of Indians on these lands. *United States v. Wheeler*, 435 U.S. 313, 323 (1978). In addition, Congress expressly limited Florida's ability to take or diminish the rights or interests on the lands that were retained in the Settlement Agreement for anything other than a public purpose, and required the State to compensate the Tribe for any such diminishment. 25 U.S.C. § 1745(c).

EPA's regulations require that states demonstrate that they have the legal authority to implement a permitting program on all assumed waters, and obligate states to  include an analysis of applicable takings laws on the State's ability to successfully implement the program, but Florida's application addressed neither of these requirements. 40 C.F.R. §§ 233.12(a)-(c). EPA's approval of Florida's application without the required analyses was arbitrary and capricious or otherwise not in accordance with law.

       **c.  If EPA's approval of Florida's application includes Indian lands, the approval exceeded EPA's authority**.

Because the provisions of the Settlement Act of 1982 render the lands at issue as Indian lands, EPA lacked the authority under its regulations to approve Florida's application to administer the CWA § 404 permitting program on those lands. There is nothing in the administrative record for EPA's approval of Florida's application that contradicts the Miccosukee's assertion that the lands at issue are Indian lands. Nor is there any basis to argue that Florida's application sought authority to issue permits on Indian lands. Under those facts, EPA's regulations dictate that the Corps will remain the permitting authority over Indian lands. EPA's approval of Florida's program  that cannot be assumed by the State of Florida's permitting program, and neither Florida nor EPA has cited to any law that excludes these lands

from the definition of Indian lands or of Indian Country. As a result, EPA's approval of Florida's application to assume the CWA § 404 permitting program without explicitly retaining authority over these lands was arbitrary, capricious, and not in accordance with law, and in excess of statutory jurisdiction, authority, or limitations, and must be set aside. 5 U.S.C. § 706(2)(A) & 5 U.S.C. § 706(2)(C).

## CONCLUSION

For the foregoing reasons, Plaintiff respectfully requests that the Court grant Plaintiff's Motion for Summary Judgement.

Respectfully submitted,

GEORGE B. ABNEY
Florida Bar # 171557
george.abney@alston.com
Alston & Bird LLP
One Atlantic Center
1201 West Peachtree Street
Atlanta, GA 30309-3424
Phone: 404-881-7000
Fax: 404-881- 7777


/s/ *Kevin S. Minoli*
KEVIN S. MINOLI
DC Bar # 1630494
kevin.minoli@alston.com
Alston & Bird LLP
950 F Street NW
Washington , DC 20004
Phone: 202-239-3760
Fax: 404-881-7777

*Attorneys for Plaintiff Miccosukee Tribe of Indians of Florida*