## UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF FLORIDA

MICCOSUKEE TRIBE OF INDIANS OF
FLORIDA,

        *Plaintiff*,

    v.

UNITED STATES ENVIRONMENTAL
PROTECTION AGENCY and UNITED
STATES OF AMERICA,

        *Defendants*,

    and

THE STATE OF FLORIDA and
FLORIDA DEPARTMENT OF
ENVIRONMENTAL PROTECTION,

        *Defendant-Intervenor.*

Case No. 1:22-cv-22459-KMM

## THE FEDERAL DEFENDANTS' COMBINED MEMORANDUM
## IN SUPPORT OF THEIR CROSS-MOTION FOR SUMMARY JUDGMENT
## AND IN OPPOSITION TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

TODD KIM
Assistant Attorney General
Environment and Natural Resources Division

PAUL CIRINO (DC Bar #1684555)
ANDREW S. COGHLAN (CA Bar #313332)
Environmental Defense Section
U.S. Department of Justice
P.O. Box 7611
Washington, D.C. 20044-7611
Telephone: (202) 514-3468 (Cirino)
Telephone: (202) 514-9275 (Coghlan)
paul.cirino@usdoj.gov
andrew.coghlan@usdoj.gov

Dated:  September 27, 2023        *Attorneys for the Federal Defendants*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................. ii

INTRODUCTION ............................................................................................................... 1

STATUTORY FRAMEWORK ............................................................................................. 3

    A.    The Clean Water Act .......................................................................... 3

    B.    The Scope of Section 404 Assumption ............................................. 3

    C.    State Section 404 Assumption Requests and EPA's Review
        Thereof ............................................................................................... 5

FACTUAL BACKGROUND ............................................................................................... 6

    A.    Florida's Assumption Request ........................................................... 7

    B.    EPA's Consultation with the Tribes in Florida ................................. 9

    C.    EPA's Approval of Florida's Section 404 Assumption Request .......... 11

PROCEDURAL HISTORY ................................................................................................. 11

STANDARD OF REVIEW ................................................................................................. 13

ARGUMENT ..................................................................................................................... 14

I.     The State's Description of Assumed and Retained Waters Was Consistent
      with the Clean Water Act Implementing Regulation ...................................... 15

II.    EPA Reasonably Construed "Indian lands" as "Indian country" ................... 20

III.   EPA Was Not Required to Determine Whether Plaintiff's Lands Are in
      Indian Country ............................................................................................... 24

CONCLUSION ................................................................................................................... 29

CERTIFICATE OF SERVICE ............................................................................................. 30

# TABLE OF AUTHORITIES

## CASES

*Alaska v. Native Vill. of Venetie Tribal Gov't*,
    522 U.S. 520 (1998) ................................................................... 18, 22

*Am. Bioscience, Inc. v. Thompson*,
    269 F.3d 1077 (D.C. Cir. 2001) ............................................. 13

*Auer v. Robbins*,
    519 U.S. 452 (1997) ................................................................ 23

*Bowles v. Seminole Rock & Sand Co.*,
    325 U.S. 410 (1945) ................................................................ 23

*Brinklys v. Johnson*,
    175 F. Supp. 3d 1338 (M.D. Fla. 2016) ............................... 13

*Citizens for Smart Growth v. Sec'y of Dep't of Transp.*,
    669 F.3d. 1203 (11th Cir. 2012) ............................................ 14

*Citizens to Pres. Overton Park, Inc. v. Volpe*,
    401 U.S. 402 (1971) ................................................................ 14

*City of Olmsted Falls v. FAA*,
    292 F.3d 261 (D.C. Cir. 2002) ............................................... 14

*DeCoteau v. Dist. Cnty. Ct. for Tenth Jud. Dist.*,
    420 U.S. 425 (1975) ................................................................ 22

*Erie Cnty. v. Chaudhuri*,
    802 F.3d 267 (2d Cir. 2015) ................................................... 18

*Gas & Elec. Co. v. NRDC*,
    462 U.S. 87 (1983) .................................................................. 13

*Innovator Enters., Inc. v. Jones*,
    28 F. Supp. 3d 14 (D.D.C. 2014) .......................................... 13

*Kisor v. Wilkie*,
    139 S. Ct. 2400 (2019) ...................................................... 23, 24

*Louisiana v. Salazar*,
    170 F. Supp. 3d 75 (D.D.C. 2016) ........................................ 13

*Marsh v. Or. Nat. Res. Council*,
    490 U.S. 360 (1989) ................................................................ 13

*Marshall Cnty. Health Care Auth. v. Shalala,*
    988 F.2d 1221 (D.C. Cir. 1993) .................................................................................. 13

*Miccosukee Tribe of Indians v. United States,*
    No. 00-3453-CIV, 2000 WL 35623105 (S.D. Fla. Dec. 15, 2000) ........................... 28

*Michigan v. EPA,*
    268 F.3d 1075 (D.C. Cir. 2001) .................................................................................. 18

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.,*
    463 U.S. 29 (1983) ...................................................................................................... 13

*New LifeCare Hosps. of N.C., LLC v. Azar,*
    466 F. Supp. 3d 124 (D.D.C. 2020) ............................................................................ 20

*Pinero v. Jaddou,*
    637 F. Supp. 3d 1300 (S.D. Fla. 2022).......................................................................... 13

*United States v. Daye,*
    696 F.2d 1305 (11th Cir. 1983).............................................................................. 28, 29

*Wallaesa v. FAA,*
    824 F.3d 1071 (D.C. Cir. 2016) .................................................................................. 20

*Wash. Dep't of Ecology v. EPA,*
    752 F.2d 1465 (9th Cir. 1985) ............................................................................... 22, 24

## STATUTES

5 U.S.C. § 706(2)(A) ............................................................................................... 12, 13

5 U.S.C. § 706(2)(B) ...................................................................................................... 12

18 U.S.C. § 1151 ....................................... 2, 4, 8, 9, 10, 16, 18, 19, 20, 21, 22, 23, 24

33 U.S.C. § 1251(a) ......................................................................................................... 3

33 U.S.C. § 1251(b) ......................................................................................................... 3

33 U.S.C. § 1311(a) ......................................................................................................... 3

33 U.S.C. § 1342 ............................................................................................................. 3

33 U.S.C. § 1342(b) ......................................................................................................... 3

33 U.S.C. § 1344(a) ......................................................................................................... 3

33 U.S.C. § 1344(g) ...................................................................................... 3, 8, 12, 16, 17

33 U.S.C. § 1344(g)(1) ......................................................................................... 4, 5, 7, 18

33 U.S.C. § 1344(h) .................................................................................................... 26

33 U.S.C. § 1344(h)(1)(C) ......................................................................................... 28

33 U.S.C. § 1344(h)(1)(E) ......................................................................................... 28

33 U.S.C. § 1344(h)(2)(A) ........................................................................................... 6

33 U.S.C. § 1344(h)(3) ................................................................................................. 6

33 U.S.C. § 1344(h)(4) ................................................................................................. 6

33 U.S.C. § 1344(i) ...................................................................................................... 6

33 U.S.C. § 1344(j)-(*l*) ............................................................................................... 6

33 U.S.C. § 1362(6) ..................................................................................................... 3

33 U.S.C. § 1362(7) ..................................................................................................... 3

33 U.S.C. § 1362(12) ................................................................................................... 3

33 U.S.C. § 1377(e) ..................................................................................................... 3

Pub. L. No. 105-313, 112 Stat. 2964 (1998)............................................................. 29

## CODE OF FEDERAL REGULATIONS

33 C.F.R. pt. 328 ......................................................................................................... 3

40 C.F.R. pt. 120 ......................................................................................................... 3

40 C.F.R. pt. 233 ...................................................................................................... 6, 11

40 C.F.R. § 131.8(b)(3)(iii) ........................................................................................ 26

40 C.F.R. § 144.3 ........................................................................................................ 21

40 C.F.R. § 233.1(b) .............................................................. 4, 9, 18, 19, 21, 22, 23

40 C.F.R. § 233.10 ..................................................................................................... 5, 7

40 C.F.R. § 233.10 - .14 ............................................................................................... 7

40 C.F.R. § 233.11 ....................................................................................................... 5

40 C.F.R. § 233.11(a) ................................................................................................. 15

40 C.F.R. § 233.11(g) ........................................................................................... 15, 26

40 C.F.R. § 233.11(h) ...................................................................................... 15, 16, 17

40 C.F.R. § 233.12 ...................................................................................................... 24

40 C.F.R. § 233.12(b) ........................................................................................... 12, 18

40 C.F.R. § 233.13(b)(3) ............................................................................................... 5

40 C.F.R. § 233.14 ...................................................................................................... 27

40 C.F.R. § 233.14(a) .................................................................................................... 5

40 C.F.R. § 233.14(b)(1) ............................................................................................... 5

40 C.F.R. § 233.15(a) .................................................................................................... 5

40 C.F.R. § 233.15(e)(1) ........................................................................................... 5, 12

40 C.F.R. § 233.15(e)(2) ............................................................................................... 5

40 C.F.R. § 233.15(g) .................................................................................................... 6

40 C.F.R. § 233.2 .......................................................................................................... 4

40 C.F.R. § 258.2 ........................................................................................................ 21

40 C.F.R. § 233.70 ...................................................................................................... 19

40 C.F.R. § 233.71 ...................................................................................................... 19

## FEDERAL REGISTER

49 Fed. Reg. 45292 (Nov. 15, 1984) .......................................................................... 21

52 Fed. Reg. 3355 (Feb. 3, 1987) ............................................................................... 29

85 Fed. Reg. 57853 (Sept. 16, 2020) ........................................................................ 7, 9

85 Fed. Reg. 83553 (Dec. 22, 2020) .......................................................................... 11

88 Fed. Reg. 55276 (Aug. 14, 2023) .......................................................................... 22

## FLORIDA STATUTES

Fla. Stat. § 6.075 ................................................................................................................ 29

Fla. Stat. § 373.4146(2) (2018) ........................................................................................... 6

## LEGISLATIVE HISTORY

H.R. Rep. No. 95-830 (1977) ............................................................................................... 3

Defendants United States of America and the United States Environmental Protection Agency (jointly, the "Federal Defendants," "EPA," or the "Agency") respectfully submit this Memorandum of Law in support of EPA's Cross-Motion for Summary Judgment and in opposition to the Motion for Summary Judgment of Plaintiff Miccosukee Tribe of Indians of Florida ("Plaintiff" or the "Tribe"), which was untimely filed on July 28, 2023 (Dkt. No. 32).

## INTRODUCTION

This case involves Plaintiff's challenge to EPA's approval of the State of Florida's application to assume the Clean Water Act Section 404 permitting program. The program involves regulation and enforcement of discharges of dredged or fill material into waters of the United States, including wetlands. EPA reasonably approved Florida's request after determining that its application was complete and that the State had the necessary authority to operate the program.

In its Complaint and summary judgment motion, Plaintiff challenges three narrow aspects of the Agency's decision, but none of these contentions has merit. *First*, the Tribe argues that the State did not adequately describe the waters that were to be assumed by the State and those that were to be retained by the federal government. The State plainly complied with the applicable regulatory requirements by expressly excluding waters in Indian country from the scope of its application, and including a list of the specific lakes, creeks, and rivers for which jurisdiction would be retained by the federal government, as well as definitions of retained and assumed waters that were consistent with the Clean Water Act. The Agency is entitled to summary judgment on this issue.

*Second*, Plaintiff argues that EPA acted arbitrarily and capriciously by interpreting the undefined regulatory term "Indian lands" as having the same meaning as the definition of

"Indian country" in 18 U.S.C. § 1151.  As an initial matter, Plaintiff failed to present this issue during the administrative process and thus cannot properly raise this argument for the first time in this Court.  But even if the Court were to reach the merits, EPA is entitled to summary judgment.  The Agency has a longstanding practice of interpreting "Indian lands" by reference to the "Indian country" statute in regulations analogous to those at issue, and courts have upheld that interpretation as accurately reflecting the general boundary between state and federal authority.  In its motion, Plaintiff has offered no alternative definition and cited no legal authority supporting its argument that EPA's interpretation was unlawful.  The Court should grant summary judgment in the Agency's favor on this issue.

*Finally*, Plaintiff argues—based on its prior erroneous arguments—that EPA was required to determine, as a pre-condition to approving Florida's application, whether the Tribe's landholdings are within Indian country.  The Tribe, however, cites no obligation in the Clean Water Act or the Agency's implementing regulations that directs the Agency to render such determinations as part of the Section 404 assumption process.  To the contrary, the structure of the statute and the applicable regulations, make clear that such parcel-specific questions will be addressed during program implementation in the context of specific permit applications.  The Court should therefore reject Plaintiff's flawed contentions in this regard.

For these reasons, which are explained in greater detail below, EPA did not act arbitrarily, capriciously, or contrary to law with respect to its approval of the State's request to assume the Section 404 permitting program.  Accordingly, the Court should grant the Federal Defendants' Cross-Motion for Summary Judgment and deny Plaintiff's Motion for Summary Judgment.

## STATUTORY FRAMEWORK

### A.  The Clean Water Act

Congress enacted the Clean Water Act to "restore and maintain the chemical, physical, and biological integrity of the Nation's waters." 33 U.S.C. § 1251(a).  The Act prohibits the unauthorized "discharge of any pollutant."  *Id.* § 1311(a).  A "discharge" includes "any addition of any pollutant to navigable waters from any point source."  *Id.* § 1362(12).  The term "pollutant" includes "dredged spoil" and fill material, such as "rock" and "sand."  *Id.* § 1362(6). And "navigable waters" is broadly defined as "the waters of the United States, including the territorial seas."  *Id.* § 1362(7).  EPA and the United States Army Corps of Engineers ("the Corps") have issued regulations interpreting the phrase "waters of the United States."  40 C.F.R. pt. 120 (EPA) & 33 C.F.R. pt. 328 (Corps).

The Clean Water Act establishes two permitting programs for authorizing discharges. Under Section 404, the Corps may issue a permit "for the discharge of dredged or fill material into the navigable waters at specified disposal sites."  33 U.S.C. § 1344(a).  Under Section 402, EPA may issue a "National Pollutant Discharge Elimination System," or "NPDES," permit for the discharge of other pollutants, such as chemical waste or sewage.  *Id.* § 1342.

### B.  The Scope of Section 404 Assumption

While the Clean Water Act authorizes federal implementation of the Section 404 and NPDES permitting programs, it "is the policy of Congress that the States . . . implement" those programs.  33 U.S.C. § 1251(b).  To that end, the Act allows states and tribes to assume primary responsibility for NPDES and Section 404 permitting programs for waters within their respective jurisdiction.  *Id.* §§ 1342(b), 1344(g), 1377(e).  The transfer of Clean Water Act permitting authority from the federal government to states or tribes "is not a delegation of Federal authority" under Section 404.  H.R. Rep. No. 95–830, at 104 (1977).  Rather, states "establish[

programs] under State law," which "function[] in lieu of the Federal program." *Id.* In the Section 404 context, this is known as state "assumption."[1]

Even after state assumption, the Corps continues to administer the Section 404 program in "waters which are presently used, or are susceptible to use . . . as a means to transport interstate or foreign commerce," in "waters which are subject to the ebb and flow of the tide," or in "wetlands adjacent thereto."  33 U.S.C. § 1344(g)(1).  These are known as "retained waters," while waters subject to state Section 404 permitting authority are known as "assumed waters."

Except for retained waters, a state that assumes Section 404 permitting authority must do so for all waters of the United States "within its jurisdiction." *Id.*  Thus, a "[p]artial State program[]" applicable in some waters within a state's regulatory jurisdiction, but not in others, is "not approvable under section 404."  40 C.F.R. § 233.1(b).  Conversely, a state may not assume Section 404 permitting authority for waters that lie outside its regulatory jurisdiction.  *Cf.* 33 U.S.C. § 1344(g)(1) (providing for state assumption over waters "within its jurisdiction," "other than" retained waters.).  These include certain "Indian lands" over which states "lack authority to regulate."  40 C.F.R. § 233.1(b).  EPA has long construed "Indian lands" as used in 40 C.F.R. § 233.1(b) and other EPA regulations to be synonymous with "Indian Country," as defined in 18 U.S.C. § 1151.[2]  The Corps "will continue to administer" the Section 404 program in these areas unless a Tribe assumes Section 404 permitting authority.  *Id.*

---

[1]  The Clean Water Act refers to "State" assumption of the Section 404 program.  EPA's regulations define "State" to include Indian Tribes meeting certain requirements.  40 C.F.R. § 233.2.  The references to "States" in the statute and regulations therefore include such Tribes.

[2]  *See* 18 U.S.C. § 1151 (defining "Indian country" as "(a) all land within the limits of any Indian reservation under the jurisdiction of the United States Government, notwithstanding the issuance of any patent, and, including rights-of-way running through the reservation, (b) all dependent Indian communities within the borders of the United States whether within the original or subsequently acquired territory thereof, and whether within or without the limits of a state, and

### C.  State Section 404 Assumption Requests and EPA's Review Thereof

A state seeking to assume Section 404 permitting authority must submit an assumption application to EPA, known as a program submission.  40 C.F.R. § 233.10.  That submission must include "a full and complete description of the program" that the state "proposes to establish and administer under State law" and "a statement from the attorney general (or the attorney for those State agencies which have independent legal counsel), . . . that the laws of such State . . . provide adequate authority to carry out the described program."  33 U.S.C. § 1344(g)(1).  EPA regulations elaborate on those general statutory requirements, prescribing, for example, eight required elements of a "full and complete" program description, and four required elements of the "attorney general's statement."  40 C.F.R. §§ 233.11 to .12.  EPA regulations also require states to submit a "Memorandum of Agreement with the Secretary [of the Army]" that includes a "description of waters of the United States within the State over which the Secretary retains jurisdiction, as identified by the Secretary."  *Id.* § 233.14(a), (b)(1).  That description typically includes a "Retained Waters List."  In addition, states are required to submit a Memorandum of Agreement with EPA, which must include "[p]rovisions addressing EPA and State roles and coordination with respect to compliance monitoring and enforcement activities."  *Id.* § 233.13(b)(3).

Once EPA receives a Section 404 assumption request, it has 30 days to "determine whether the submission is complete."  40 C.F.R. § 233.15(a).  If so, the Agency will publish a notice to that effect in the Federal Register and must solicit comments from members of the public and federal agencies and hold a public hearing.  *Id.* § 233.15(e)(1), (2).  Within 120 days of receipt of a complete application, EPA must "approve or disapprove" the state's Section 404

_____

(c) all Indian allotments, the Indian titles to which have not been extinguished, including rights-of-way running through the same.").

assumption request, unless the state agrees to an extension.  40 C.F.R. § 233.15(g).  If EPA fails

to act within that period, and a state does not agree to an extension, then the state's assumption

request is "deemed approved" by operation of law.  33 U.S.C. § 1344(h)(3).

EPA "shall approve" a state assumption request if, based on the materials submitted and

comments received, it determines that the state's program meets the eight criteria at CWA

Section 404(h)(1).  *Id.* § 1344(h)(2)(A).  These criteria define the minimum standards that a state

Section 404 program must satisfy.  EPA has promulgated regulations setting forth the procedures

that the Agency will follow, and the criteria that it will apply, in approving, reviewing, and

withdrawing approval of state Section 404 permitting programs.  40 C.F.R. pt. 233.

Following EPA approval (or deemed approval through inaction), the Corps suspends its

Section 404 permitting activity in waters subject to the state's authority.  33 U.S.C. § 1344(h)(4).

EPA then exercises oversight of the state-administered Section 404 program, including by

reviewing and, if warranted, objecting to permits.  *Id.* § 1344(j)–(*l*).  If EPA objects to a permit

and the state does not address its objection, then authority to issue that permit reverts to the

Corps.  *Id.*  EPA also retains its enforcement authority even after state assumption.  Finally, if the

Agency determines that a state "is not administering" its Section 404 program "in accordance

with" the requirements of the Clean Water Act, then it may withdraw its approval and return the

program to the Corps.  *Id.* § 1344(i).

## FACTUAL BACKGROUND

More than 40 years after Congress enacted Section 404(g)(1), just two states—New

Jersey (1994) and Michigan (1984)—had assumed Section 404 permitting authority.  Then, in

2018, Florida's Legislature passed a law conferring on the Florida Department of Environmental

Protection ("FDEP") "the power and authority to assume, in accordance with 40 C.F.R. part 233,

the dredge and fill permitting program established in s. 404 of the Clean Water Act."  Fla. Stat. §

373.4146(2) (2018).  Over the ensuing years, FDEP enacted new regulations, modified existing regulations, and developed other elements of its Section 404 program.

### A. Florida's Assumption Request

On August 20, 2020, the State of Florida (the "State" or "Florida") submitted to EPA a formal assumption request.  *See* Ex. A; 85 Fed. Reg. 57853 (Sept. 16, 2020).  The State's submittal, comprising more than 100 documents, was organized by reference to EPA's assumption regulations (40 C.F.R. § 233.10 to .14) and included materials responsive to each of the required elements in those regulations.  Dkt. No. 26 (Certified Index to Administrative Record); *see also* Ex. B.  Among many other things, the State's submittal included hundreds of pages of existing and newly enacted sections of the Florida Administrative Code and a new State 404 Program Applicant's Handbook (Ex. D) outlining various guidelines and procedures that are incorporated by reference in state regulations.

As relevant here, the State also submitted a description of the waters that it would not assume because they are "retained" by the Corps under Clean Water Act Section 404(g)(1), 33 U.S.C. § 1344(g)(1).  Ex. D § 1.1 ("State-assumed waters . . . are all waters of the United States that are not retained waters."); *see also* Ex. O, Ex. P.  Consistent with Section 404(g)(1)'s text, the State defined "retained waters" as "those waters which are presently used, or are susceptible to use in their natural condition or by reasonable improvement as a means to transport interstate or foreign commerce shoreward to their ordinary high water mark, including all waters which are subject to the ebb and flow of the tide shoreward to their mean high water mark, including wetlands adjacent thereto."  Ex. D § 2.0(b)(41).  The definition further emphasized that the Corps would retain responsibility for permitting in waters defined in the accompanying Retained Waters List, which lists dozens of specific rivers, creeks, and lakes in Florida.  Ex. D App'x A.

The State's submission made clear that applicants with projects within retained waters should direct their applications to the Corps, and that projects within all other waters (state-assumed waters) are processed by the State.  Ex. D § 4.1.  Separate and apart from the definition and Retained Waters List, the State's submission also confirmed that the Corps also retains permitting authority for projects within "Indian country" as defined at 18 U.S.C. § 1151. *Id.*  In its required Attorney General statement, in the section entitled "Florida Authority," the State reiterated that "Indian Country, as defined in 18 U.S.C. § 1151, is not included in Florida's 404 program."  Ex. E at 3.

The State's submission also included a Memorandum of Agreement ("MOA") between FDEP and the Corps.  Ex. F.  This Memorandum provides that the Corps would "retain responsibility" for Section 404 permitting "in those waters identified in the Retained Waters List . . . as well as all waters subject to the ebb and flow of the tide shoreward to their mean high water mark that are not specifically listed in the Retained Waters List, including wetlands adjacent thereto landward to the administrative boundary," and in waters of the United States within "'Indian Country,' as that term is defined at 18 U.S.C. § 1151."  Ex. F at 2.  Under the MOA, FDEP assumes permitting responsibility in "[a]ll waters of the United States not retained by the Corps."  *Id.*  And the Corps agreed to update the Retained Waters List based on new navigability determinations or by agreement of FDEP and the Corps that a proposed project lay "within the Corps' jurisdiction," as defined in 33 U.S.C. § 1344(g), "but is not within the Retained Waters List."  *Id.* at 3.

In addition to the FDEP and Corps MOA, the State's submission also included the requisite MOA between EPA and FDEP.  Ex. G.  At the outset, the EPA-FDEP MOA recognized that "FDEP does not exercise jurisdiction over "Indian country," as that term is defined in 18

U.S.C. § 1151 and does not seek such authority through this Agreement." *Id.* at 1.  It further provided that, "[i]n the event a question arises whether activities proposed in a permit application or draft general permit are within Indian country, and thus should be processed by the Corps, information regarding the issue may be presented to FDEP during the comment period and may also be provided to EPA." *Id.*  EPA agreed in the MOA that it shall consider such information "in exercising its CWA authority to oversee FDEP's program and may, as appropriate, provide a basis for EPA to comment upon, object to, or make recommendations with respect to the permit application or draft general permit." *Id.* at 1-2.

Because Florida's submission included every element required by EPA's Section 404 assumption regulations, including descriptions of the waters to be retained by the Corps and assumed by the State, EPA declared the submission complete as of the date of submission.  Ex. A at 1.  On September 16, 2020, the Agency published a Federal Register notice of its receipt of a complete assumption request package and opened a 45-day public comment period during which it scheduled two virtual public hearings.  Ex. A; 85 Fed. Reg. at 57853.  In that notice, the Agency noted that "[t]he Corps retains CWA Section 404 permitting authority over waters of the United States within 'Indian country' as that term is defined at 18 U.S.C. 1151[.]" *Id*. (citing to 40 C.F.R. § 233.1(b)).

### B. EPA's Consultation with the Tribes in Florida

After publishing the notice of a complete submission, EPA sought comments from the public and consulted and coordinated with federally recognized Indian tribes in Florida.  EPA and Plaintiff participated in at least two meetings in which tribal officials shared comments and concerns about Florida's proposed program.  Exs. H-L.

On October 8, 2020, Plaintiff's representatives advised EPA of various concerns regarding the State's assumption request.  Ex. I.  Among the issues raised by Plaintiff were

contentions that "all of Florida is still Indian country." *Id.* Alternatively, the Tribe asserted that two categories of lands outside the boundaries of Plaintiff's formal reservations and trust lands, in which Plaintiff has rights and/or interests should be considered as Indian country. *Id.* Specifically, Plaintiff asserted that the following areas also constitute Indian country: (1) Everglades National Park and Big Cypress National Preserve, based on the enabling legislation for those lands and (2) certain lands that the State has perpetually leased to Plaintiff. *Id.* EPA committed to follow up with the Tribe regarding these issues. *Id.* On December 3, 2020, Plaintiff repeated these concerns during a meeting with EPA regarding cultural preservation matters. Ex. J.

On December 9, 2020, Plaintiff sent written comments to EPA regarding the State's assumption request. Ex. K. As relevant here, Plaintiff stated that "Everglades National Park, Big Cypress National Preserve, the Leased lands in WCA 3A, along with Miccosukee trust lands are indeed Indian Country as defined in 18 USC §1151 and should not be subject to 404 assumption by the State of Florida." *Id.* Plaintiff asserted that it has occupied the park, the preserve, and the leased lands "for hundreds of years," and thus those lands fall within the definition of "Indian Country" and thus should not be assumed by the State. *Id.*

On December 15, 2020, EPA responded that it "understand[s] that [the Tribe] seek[s] to have further engagement regarding whether specific lands constitute Indian country under the [applicable] definition. The EPA believes that case-specific questions regarding what lands meet the definition of Indian country should be considered on a case-by-case basis during implementation." Ex. L. The Agency advised that it was "ready to discuss these matters with [Plaintiff] in January and will be available to meet with [Plaintiff] and the relevant permitting authority as specific instances arise." *Id.*

### C. EPA's Approval of Florida's Section 404 Assumption Request

EPA received and reviewed more than 3,000 comments submitted during the comment period and public hearings.  Ex. M.  In the roughly six weeks allotted by the statute, the Agency summarized and responded to substantive comments.  *Id*.  Based on its review of Florida's submission and the comments received, the Agency concluded that the State had "the necessary authority to operate a program in accordance with the requirements found in CWA section 404 and 40 C.F.R. part 233," and on December 22, 2020, it published notice of its approval.  Ex. N; 85 Fed. Reg. 83553 (Dec. 22, 2020).

## PROCEDURAL HISTORY

More than a year and a half after EPA published its approval of the State's assumption request, Plaintiff commenced this action by filing the Complaint on August 4, 2022.  Dkt. No. 1. Plaintiff alleges that it the federal government retains jurisdiction over a wide swath of lands, which not only include the 74,812 acres within its federal reservation, known as the Alligator Alley Reservation, but also other lands outside the reservation boundaries in which it holds "significant interests," including: (1) approximately 5,584.42 acres of trust lands held by the federal government (the "Trust Lands"); (2) the Miccosukee Reserved Area, which consists of 695 acres within the exterior boundaries of Everglades National Park; (3) approximately 189,000 acres of lands subject to a lease agreement with the State (the "Leased Lands"); (4) various reserved rights, established through federal legislation, located on lands within the Everglades National Park and the Big Cypress National Preserve; and (5) approximately 432.8 acres owned by Plaintiff in fee simple (the "Fee Simple Lands").[3]  Compl. at 6-14.

---

[3]  Prior to EPA's approval of the State's assumption of the Section 404 permitting program, Plaintiff had submitted two Section 404 permit applications that were pending with the Corps. One application involved the construction of a home within Big Cypress National Preserve; the

The Complaint alleges four separate claims under the Administrative Procedure Act ("APA"), 5 U.S.C. § 706(2)(A).  Count I alleges generally that EPA's decision "failed to consider many important issues that should have been central to the permitting decision," "failed to adequately explain the basis for its decision," and "did not provide an adequate legal basis." Compl. ¶¶ 158-59, 164.  Count I further alleges that the State's proposal was incomplete in various aspects.  *Id.* ¶¶ 160-63.  Count II alleges that EPA's decision "failed to comply with its own regulation, when it impermissibly substituted the term 'Indian country' in place of the regulatory text of 40 C.F.R. § 233.12(b)."  Compl. ¶ 168.  In Count III, Plaintiff alleges that EPA exceeded its authority because the State's proposal did not comply with the requirements of 33 U.S.C. § 1344(g).  Compl. ¶¶ 171-72.  Count IV alleges that EPA violated the requirement in 40 C.F.R. § 233.15(e)(1) that the Agency provide the public an opportunity to comment because the State did not include a list or description of assumed waters in its proposal.  Compl. ¶¶ 173-78. Finally, in Count V, Plaintiff requests that the Court set aside EPA's approval as allegedly contrary to constitutional right, power, privilege or immunity, 5 U.S.C. § 706(2)(B).  Compl. ¶¶ 179-82.  Plaintiff seeks declaratory and injunctive relief, as well as attorneys' fees and costs.  *Id.* at 31.  The Federal Defendants were ultimately served on November 21, 2022.

On March 14, 2023, EPA filed the Certified Index to the Administrative Record.  Dkt. No. 26.  Plaintiff filed its summary judgment motion on July 28, 2023.[4]  Dkt. No. 32.

---

other sought a permit in connection with the creation of uplands suitable for the construction of homes within the Leased Lands.  Dkt. No. 1-2 ¶¶ 21-23 (Donaldson Decl.).  After EPA's approval, the Corps transferred these applications to FDEP because they did not involve retained waters or waters in Indian country.  Plaintiff subsequently requested that FDEP suspend processing "to protect the Tribe's sovereignty," *id.* ¶ 24, and FDEP has advised Plaintiff that it has granted this request.

[4]  On July 7, 2023, the Court entered an order setting forth the operative briefing schedule for cross-motions for summary judgment.  Dkt. No. 31.  The order directed Plaintiff to file its

## STANDARD OF REVIEW

"[W]hen a [party] seeks review of agency action under the APA . . . the entire case on review is a question of law," and the district judge "sits not as a finder of fact but as an appellate court" and the "entire case on review is a question of law." *Pinero v. Jaddou*, 637 F. Supp. 3d 1300, 1306 (S.D. Fla. 2022) (cleaned up) (citing *Marshall Cnty. Health Care Auth. v. Shalala*, 988 F.2d 1221, 1226 (D.C. Cir. 1993). *Am. Bioscience, Inc. v. Thompson*, 269 F.3d 1077, 1083 (D.C. Cir. 2001). "Summary judgment . . . serves as the mechanism for deciding, as a matter of law, whether the agency action is supported by the administrative record and otherwise consistent with the APA standard of review." *Innovator Enters., Inc. v. Jones*, 28 F. Supp. 3d 14, 20 (D.D.C. 2014).  But the ordinary Rule 56 standard does not apply. *Brinklys v. Johnson*, 175 F. Supp. 3d 1338, 1349–50 (M.D. Fla. 2016), *aff'd*, 702 F. App'x 856 (11th Cir. 2017) *Louisiana v. Salazar*, 170 F. Supp. 3d 75, 83 (D.D.C. 2016).  Instead, the APA provides the governing standard. *Id.* at 1350.

Under that deferential standard, agency action can be overturned only if it is found to be "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  5 U.S.C. § 706(2)(A).  "The scope of review" is "narrow and a court is not to substitute its judgment for that of the agency." *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).  Where, as here, an agency's technical expertise is involved, the reviewing court should be particularly zealous in guarding the agency's discretion. *Marsh v. Or. Nat. Res. Council*, 490 U.S. 360, 376-77 (1989); *accord Balt. Gas & Elec. Co. v. NRDC*, 462 U.S. 87, 103

---

summary judgment motion on or before July 24, 2023.  *Id.*  Without having requested an extension or providing any explanation, Plaintiff filed its motion four days late.  On August 9, 2023, the Court granted EPA and the State's motion for a four-day extension of their deadlines to file their respective combined cross-motions for summary judgment and oppositions to Plaintiff's motion.  Dkt. No. 35.

(1983).  Agency action "is entitled to a presumption of regularity," *Citizens to Pres. Overton Park, Inc. v. Volpe*, 401 U.S. 402, 415 (1971), *abrogated on other grounds*, *Califano v. Sanders*, 430 U.S. 99 (1977), and so the "party challenging an agency's action . . . bears the burden of proof," *City of Olmsted Falls v. FAA*, 292 F.3d 261, 271 (D.C. Cir. 2002) (internal quotation marks omitted); *see also Citizens for Smart Growth v. Sec'y of Dep't of Transp.*, 669 F.3d. 1203, 1211 (11th Cir. 2012).

## ARGUMENT

EPA reasonably concluded that the State submitted all the required elements of a program submission and that the State has the necessary authority to administer a program that complies with the statutory and regulatory requirements.  Plaintiff's arguments to the contrary are unavailing.  The Tribe contends: (1) that the State's submission did not adequately describe the waters to be assumed by the State and retained by the Corps; (2) that EPA improperly interpreted "Indian lands", as used in its regulations to refer to the general jurisdictional dividing line between state and federal/tribal Clean Water Act authority, as "Indian country"; and (3) that EPA had to ascertain the precise boundaries of state and tribal jurisdiction before granting the State's assumption request.

All these arguments fail.  Nothing in the CWA or implementing regulations requires EPA to ensure a state submits a detailed delineation of the scope of Indian lands as a condition for approving a state program, or precludes the longstanding use of the term "Indian country" to interpret the meaning of "Indian lands."  As described in greater detail below, EPA is entitled to summary judgment with respect to all counts in the Complaint.

I.      **The State's Description of Assumed and Retained Waters Was Consistent with the Clean Water Act Implementing Regulations.**

Plaintiff first argues that the State's submission did not satisfy 40 C.F.R. § 233.11(a) because it did not adequately define either "State assumed waters" or "retained waters."  The thrust of the Tribe's position is that the State's definitions and related descriptions of assumed and retained waters in its submission materials should have included a detailed description of waters on Indian lands.  Pl.'s Mot.[5] at 6-9, 13.  This argument does not withstand scrutiny.

What EPA's regulations require is that Florida provide "descriptions" of "the scope and structure" of its program, 40 C.F.R. § 233.11(a), and the waters over which the State would assume jurisdiction under the approved program and the waters within the state "over which the Corps retains authority under Section 404(g) of the Act," *id.* § 233.11(h).  Florida complied.  In its description of assumed and retained waters, *id.* § 233.11(g), Florida specifically defined the state-assumed waters and the retained waters the Corps would continue to administer.  Ex. O, Ex. P, Ex. E, Ex. D.  The State-assumed waters were defined as "all waters of the United States that are not retained waters."  The State defined "retained waters" to include "those waters which are presently used, or are susceptible to use in their natural condition or by reasonable improvement as a means to transport interstate or foreign commerce shoreward to their ordinary high water mark, including all waters which are subject to the ebb and flow of the tide shoreward to their mean high water mark, including wetlands adjacent thereto."  Ex. P.  The definition further made

---

[5] Citations to "Pl.'s Mot." refer to Plaintiff's Motion for Summary Judgment, untimely filed on July 28, 2023.  Dkt. No. 32.

clear that the Corps would retain responsibility for permitting in waters defined in the Retained

Waters List, which lists hundreds of named rivers, creeks, and lakes in Florida.[6] Ex. D at 43-46.

Further, Florida's submission repeatedly clarified that the Corps retains authority over

Indian country, meaning that the State did not assume such authority. *See id.* at 14 (stating that

"[t]he Corps also retains permitting authority for projects within 'Indian country' as that term is

defined at 18 U.S.C. § 1151."); Ex. G at 1 ("FDEP does not exercise jurisdiction over Indian

country, as that term is defined in 18 U.S.C. § 1151 and does not seek such authority through this

Agreement."); Ex. E at 3 (FDEP General Counsel statement) ("Indian Country, as defined in 18

U.S.C. § 1151, is not included in Florida's 404 program.).  Based on these authorities, it is clear

that the State (1) assumed all waters within the State's jurisdiction, other than retained waters;

and (2) did not assume any waters in "Indian country."

Florida's definition was consistent with EPA's regulations.  The State described the

waters retained by the Corps by tracking the description in 33 U.S.C. § 1344(g) and listing

hundreds of specific waterbodies in the Retained Waters List.  Moreover, FDEP's General

Counsel confirmed that the State was not assuming jurisdiction over waters in Indian country.

And the State correctly described the remaining waters—those that are not retained and are not

in Indian country—as being assumed by the State after program approval.  The regulations do

not require more specificity, nor do they demand that either the State or EPA address the status

of specific waters.

Plaintiff's arguments fail to correctly apply these principles and suggest that the

definition in Florida's application is incomplete because the definition of assumed waters "does

---

[6]  The Retained Waters List satisfied the State's obligation to "obtain from the [Corps] an identification of those waters of the U.S. within the State over which the Corps retains authority under section 404(g) of the Act."  40 C.F.R. § 233.11(h) (note).

not include certain waters that were not assumed by the State, such as waters on Indian lands or in Indian Country." Pl.'s Mot. at 7. This argument is incorrect. The State's submission included a four-page Retained Waters List, which lists hundreds of named rivers, creeks, and lakes in Florida. Ex. D at 43-46. Florida appropriately defined "State assumed waters" as those "waters of the United States that are not retained waters," as well as "waters of the United States that the state assumes permitting authority over pursuant to" Section 404. Pl.'s Mot. at 7 (citing Exs. O and P). Given that the State's application also stated in numerous locations that the State did not assume waters in Indian country, this submission was consistent with the EPA's regulations and the definition of "retained waters" set forth in the statute. 33 U.S.C. § 1344(g). To the extent that Plaintiff finds fault with the Retained Waters List because it does not include all waters in Indian country, it misapprehends that list's purpose, which is to identify "waters of the U.S. within the State over which the Corps retains authority" pursuant to the explicit statutory language in 404(g), 40 C.F.R. § 233.11(h), which carves out waters which are presently used, or may be used, as a means to transport interstate or foreign commerce. The statute and EPA's regulations are silent as to other waters over which, for jurisdictional reasons separate and apart from the Clean Water Act, a state may lack civil regulatory jurisdiction. Neither the statute nor the regulations require that a program description define all waters over which a state lacks jurisdiction.[7] The Tribe is thus wrong to infer that the omission of any waters within Indian country from the Retained Waters List means that those waters have been assumed by Florida.

The Clean Water Act provides that a state may administer a Section 404 program for all waters "within its jurisdiction," except for certain waters (retained waters) that are explicitly

---

[7] Indeed, the State is supposed to obtain this list from the Corps. *See* 40 C.F.R. § 233.11(h) ("States should obtain from the Secretary an identification of those waters of the U.S. within the State over which the Corps retains authority under section 404(g) of the Act.")

described in the statute, which are retained by the Corps.  33 U.S.C. § 1344(g)(1).  It follows, as

a matter of statutory construction and common sense, that a state cannot assume permitting

authority over waters that lie outside of its regulatory jurisdiction.  Such waters include waters in

Indian lands where states generally lack "authority to regulate" discharges of dredge or fill

material under the CWA.  40 C.F.R. § 233.1(b).  And EPA interprets "Indian lands" in 40 C.F.R.

§ 233.1(b) as synonymous with "Indian country" (as defined in 18 U.S.C. § 1151) precisely

because under principles of federal Indian law, "Indian country" denotes the geographic scope

where primary civil regulatory jurisdiction generally rests with the Federal Government and the

Indian tribe inhabiting it, and not with states.  *See, e.g.*, *Michigan v. EPA*, 268 F.3d 1075, 1079

(D.C. Cir. 2001) (quoting *Alaska v. Native Vill. of Venetie Tribal Gov't*, 522 U.S. 520, 527 n.1

(1998) (alteration in original); *see also Citizens Against Casino Gambling in Erie Cnty. v.

Chaudhuri*, 802 F.3d 267, 279–80 (2d Cir. 2015) (noting that "'tribal jurisdiction' is a

combination of tribal and federal jurisdiction over land, to the exclusion of the jurisdiction of the

state," and that lands "subject to federal and tribal jurisdiction have historically been referred to

as 'Indian country.'").

      Consistent with this understanding, the State did not include in its submittal to EPA an

analysis establishing its authority over activities in Indian country because it was not seeking

approval to cover activities in Indian country.  40 C.F.R. § 233.12(b).  Indeed, as noted above,

the State's Attorney General statement explicitly noted that Indian country is not included in

Florida's program.  Ex. E.  The result is that the Corps "will continue to administer the program

[in "Indian country"] if a State . . . does not seek and have authority to regulate activities on

[such] lands."  40 C.F.R. § 233.1(b).

As reflected in numerous record documents, including the MOA between FDEP and EPA, the Agency and the State agreed that the State was not asserting jurisdiction over waters in Indian country and, accordingly, Indian country was excluded from the State's application. Moreover, the exclusion of State jurisdiction over Indian country was recognized in EPA's approval. Plaintiff recognizes that EPA took the same approach with Michigan and New Jersey by explicitly asserting that its approval of those programs did not apply on "Indian lands," which EPA uses synonymously with "Indian country." Pl.'s Mot. at 10 (citing 40 C.F.R. §§ 233.70, 233.71). Indeed, Plaintiff undercuts its position by correctly pointing out that Florida "did not seek authority to implement the state's CWA § 404 permitting program on Indian lands, and explicitly stated that the State's program did not include 'Indian Country,' as defined in 18 U.S.C. § 1151." Pl.'s Mot. at 9 (citing Ex. E at 3). Because the State did not attempt to assert jurisdiction over waters in Indian country—and EPA did not find otherwise—Florida appropriately did not specify such waters in its definition of "retained waters" and such waters were reasonably omitted from the accompanying Retained Waters List.

For these reasons, the State's submission was complete and its definitions of retained waters and assumed waters were reasonable. There is no basis to conclude that, where all parties agree that the State was not seeking assumption of waters within Indian country, the State was nonetheless required to provide an analysis of its authority over waters within Indian country. Because the Agency reasonably determined that the State met the submission requirements in Section 404 and EPA's regulations, and neither the Act nor the regulations require a delineation of waters in Indian country, EPA is entitled to summary judgment on this issue.

## II.     EPA Reasonably Construed "Indian lands" as "Indian country."

In Count II of the Complaint and in its motion, Plaintiff argues that EPA's approval was arbitrary and capricious because the Agency interpreted "Indian lands" to mean "Indian country," as defined in 18 U.S.C. § 1151.  Pl.'s Mot. at 9-16.

As an initial matter, no argument that the use of the term "Indian lands" in EPA's regulations has a different meaning than the definition of "Indian country" was raised by Plaintiff (or any other party) during the administrative process.  This argument therefore cannot be raised for the first time in litigation.  "It is a hard and fast rule of administrative law, rooted in simple fairness, that issues not raised before an agency are waived and will not be considered by a court on review.'"  *New LifeCare Hosps. of N.C., LLC v. Azar*, 466 F. Supp. 3d 124, 135 (D.D.C. 2020) (emphasis omitted) (quoting *Wallaesa v. FAA*, 824 F.3d 1071, 1078 (D.C. Cir. 2016)).  In fact, during EPA's consultations with tribes during its review of Florida's assumption request, Plaintiff employed the term "Indian country" synonymously with "Indian lands." [8]  Because Plaintiff waived its arguments regarding the definition of "Indian lands" as used in EPA's regulations, the Court should grant summary judgment to EPA with respect to this issue.

Even if the Court were to reach the merits, it should reject Plaintiff's arguments.  Plaintiff provides no support for its assertion that the State lacks authority in Indian lands, to the extent that such term could mean anything more than Indian country.  In contrast, no party disputes that Florida is not seeking to assume the program in Indian country, which is the term that correlates

---

[8]  Notes of the October 8, 2020, meeting between Plaintiff and EPA illustrate this point.  Ex. I. According to the Agency's notes: "The Tribe takes the position that all of Florida is still Indian country" and that the "leased lands are therefore Indian country."  *Id.*  Plaintiff also committed to providing EPA with "information that supports the Tribe's position about lands in Florida that it believes meet the statutory definition of Indian country."  *Id.*  The notes reveal no discussion regarding any difference between the terms "Indian country" and "Indian lands," much less that the Tribe objected to the term "Indian country."  *See also* Ex. K.

to the general dividing line between state and federal/tribal jurisdiction for CWA purposes.  The use of the term "Indian lands" in EPA's regulations is an acknowledgement of this general jurisdictional divide, as the regulations recognize that "in many cases, States . . . . will lack authority to regulate activities on Indian lands." 40 C.F.R. § 233.1(b).  In other words, EPA's reference in the regulations to Indian lands is expressly tied to those Indian-related areas within a state's border that may generally be outside a state's primary regulatory jurisdiction under the CWA, and thus need not be included in a state's submission for its program to be complete.  As courts and EPA have long recognized, such areas are widely understood to correspond to "Indian country."  Plaintiff offers no argument to support its view that the State lacks jurisdiction, for CWA Section 404 purposes, to implement its program in lands other than those in Indian country.

EPA's treatment of "Indian lands" as "Indian country" for purposes of CWA Section 404 is in keeping with the Agency's longstanding practice of interpreting the term Indian lands as synonymous with "Indian country" in implementing other environmental statutes that, like Section 404, allow qualifying states to administer permitting programs created by federal law. EPA has in certain instances added definitions to its existing regulations to clarify that "Indian lands," a term that the Agency used interchangeably with "Indian country," is indeed a synonymous term.  *See, e.g.*, 40 C.F.R. § 144.3 (defining "Indian lands" as "'Indian country' as defined in 18 U.S.C. 1151" for purposes of the Underground Injection Control program promulgated under Section C of the Safe Drinking Water Act); 40 C.F.R. § 258.2 (adopting the same definition regarding municipal solid waste landfill units under the Resource Conservation and Recovery Act and the Clean Water Act); 49 Fed. Reg. 45292, 45294 (Nov. 15, 1984) (Defining "Indian lands" as used in EPA's Safe Drinking Water Act Underground Injection

Control regulations as "Indian country," and explaining that "EPA believes this definition is most consistent with the concept of Indian lands as the Agency has used it in regulations and . . . program approvals to date."). Even where the Agency had not by regulation defined "Indian lands" as equating to "Indian country", courts have recognized that EPA's interpretation of "Indian lands" as "synonymous with 'Indian country'" provides "a reasonable marker of the geographic boundary" between those areas that are subject to full state civil regulatory jurisdiction for purposes of a program under a statute administered by EPA and those that are not. *Wash. Dep't of Ecology v. EPA*, 752 F.2d 1465, 1467 n.1 (9th Cir. 1985).[9] Here, consistent with its longstanding position, EPA construed "Indian lands" as "Indian country" for purposes of 40 C.F.R. § 233.1(b). There was nothing remotely arbitrary or capricious about that decision.

While, as noted above, Plaintiffs did not take issue with the applicability of the term "Indian country" during the administrative process, they now assert that this term, which the Supreme Court has recognized has applicability in both the civil and criminal context, was erroneously relied upon by EPA. It is immaterial that "Indian country" is defined in Title 18 of the U.S. Code, which defines federal crimes. "Although this definition by its terms relates only to federal criminal jurisdiction," the Supreme Court has long "recognized that it also generally applies to questions of civil jurisdiction." *Alaska*, 522 U.S. at 527; *DeCoteau v. Dist. Cnty. Ct. for Tenth Jud. Dist.*, 420 U.S. 425, 427 n.2 (1975). Plaintiff is thus wrong to suggest that EPA erred in applying a definition from a federal criminal statute.

---

[9] In the interest of consistency and clarity, EPA recently promulgated a proposed rule that would formally incorporate 18 U.S.C. § 1151 as the meaning of "Indian lands" in the context of a state assumption of a Section 404 permitting program. 88 Fed. Reg. 55276, 55316 (Aug. 14, 2023) (Proposed rule re: Clean Water Act Section 404 Tribal and State Program Regulation) ("Consistent with the Agency's long-standing interpretation of 'Indian lands' as synonymous with 'Indian country,' EPA is proposing to add a definition clarifying that 'Indian lands' means 'Indian country' as defined at 18 U.S.C. 1151.").

Plaintiff is also wrong to suggest that 18 U.S.C. § 1151's definition of "Indian country" is defective because it references "lands," "communities," and "allotments," but not "waters." Pl.'s Mot. at 12-13. For one thing, the term "Indian lands" includes no explicit reference to "waters" either. But it is clear enough from the context of 40 C.F.R. § 233.1(b) that EPA used "lands" to refer not to dry land, but to jurisdictional boundaries. So too for "Indian country," which encompasses "the limits of any Indian reservation," the "territory" acquired by dependent Indian communities and "Indian titles" and "rights-of-way" pertaining to Indian allotments. 18 U.S.C. § 1151. These legal boundaries are generally understood to include geographic features of all types. And Plaintiff would presumably agree that Indian country does not necessarily end at the water's edge.

Finally, the Court should reject Plaintiff's vague arguments concerning FDEP General Counsel's statement confirming that the State's program does not include Indian country. Pl.'s Mot. at 14. The State's confirmation that Florida was not assuming waters in Indian country is clear and definitive. Ex. E at 3. Far from being "conclusory," Pl.'s Mot. at 14, it is consistent with EPA's understanding of Florida's assumption of the Section 404 program and does not constitute a valid basis for setting aside EPA's action.

Even if the Court were to consider the relevant regulatory text, structure, history, and context and conclude that the term "Indian lands" remains "genuinely ambiguous," EPA is entitled to "*Kisor*" deference, under which EPA's interpretation is controlling unless plainly erroneous or inconsistent with the regulation. *Kisor v. Wilkie*, 139 S. Ct. 2400, 2414-19 (2019); *see Auer v. Robbins*, 519 U.S. 452 (1997); *Bowles v. Seminole Rock & Sand Co.*, 325 U.S. 410 (1945). For the same reasons as those discussed above, EPA's decision to interpret the term "Indian lands" to have the same meaning as the term "Indian country" in 18 U.S.C. § 1151 was

reasonable.  *See Wash. Dep't of Ecology*, 752 F.2d at 1467 n.1 (accepting EPA's decision to regard the term "Indian lands" as synonymous with "Indian country" as "a reasonable marker of the geographic boundary between state authority and federal authority.").  Further, as explained above, EPA's interpretation is the Agency's longstanding "authoritative" and "official position," and implicates the Agency's expertise in implementing Section 404(g) and approving state programs generally.  *See Kisor,* 139 S. Ct. at 2414-19.  This is particularly true here, as the Tribe has offered no competing interpretation of the term "Indian lands" but only quibbles with how the term might be applied to certain (but unspecified) parcels which it owns, leases, or has another nonpossessory interest.  Given the Agency's robust explanation for its interpretation, the Court need not and should not disturb this aspect of EPA's approval.

For the preceding reasons, Plaintiff's arguments challenging EPA's reference to the definition of "Indian country" in 18 U.S.C. § 1151 have been waived and, in any event, are meritless.  EPA is therefore entitled to summary judgment with respect to Count II of the Complaint.

**III.    EPA Was Not Required to Determine Whether Plaintiff's Lands Are in Indian Country.**

Having misconstrued the concepts of retained waters, assumed waters, and Indian country, Plaintiff next compounds the confusion by using its erroneous understanding of those concepts as a foundation for additional arguments.  Specifically, Plaintiff contends that EPA "refused" to determine the scope of Indian country prior to approving Florida's application, and relatedly, that Florida failed to provide an analysis of the impacts of the underlying statutes establishing Everglades National Park and Big Cypress National Preserve, as well as the Leased Lands, on the State's ability to implement the proposed permitting program "as required by 40 C.F.R. § 233.12."  Pl.'s Mot. at 14-20; *see also* Compl. ¶ 163 (Count I).  Specifically, Plaintiff

incorrectly contends that "before approving Florida's application, EPA was obligated to determine whether these lands were Indian lands." Pl's. Mot. at 14. As explained above, Florida's application did not purport to seek authority to administer the 404 program in Indian country, and accordingly, did not include an analysis of the State's authority over such areas. Such an analysis is only required where the State is seeking "approval of a program covering activities on Indian lands." *Id.* at 4.

The Court should reject the Tribe's arguments relating to lands outside the boundaries of Plaintiff's formal Reservations, Trust Lands, and MRA, in which the Tribe has an interest. As explained at length above, if the lands are within Indian country, they were not assumed by the State. Ex. E at 3. If the lands are not within Indian country, they were assumed by the State unless they are within the definition of retained waters and/or are on the Retained Waters List.

It is important to note that the MOA between EPA and FDEP explicitly sets forth a process if there are disputes regarding whether a water is or is not within Indian country, to be resolved at the permitting stage. Ex. G. Where "a question arises whether activities proposed in a permit application or draft general permit are within Indian country, and thus should be processed by the Corps." *Id.* at 1. The MOA explains that "information regarding the issue may be presented to FDEP during the comment period and may also be provided to EPA" and "[s]uch information shall be considered by EPA in exercising its CWA authority to oversee FDEP's program." *Id.* at 1-2.

In the limited time the Clean Water Act allowed EPA to take action on the State's application,[10] EPA was not required to make determinations as to whether each and every parcel

---

[10] The Agency had only 120 days after receipt of the State's submission to review the State's submission, receive and analyze public comments and consult with other federal and state agencies and tribal leaders to determine whether the State has the requisite authority to issue

that the Tribe has referenced in its comment letter were within Indian country prior to approving Florida's program.  As explained above, the State adequately described the scope of its program, consistent with the requirements of Section 404(g) and EPA's regulations.  Questions about the Indian country status of particular waters or parcels of land in Florida are outside the scope of EPA's approval and will be appropriately addressed in the State/EPA MOA as issues to be resolved during implementation of the program.  Florida was required only to "describe" the waters that were retained by the Corps and assumed by the State, 40 C.F.R. § 233.11(g), a requirement that it plainly satisfied, *see* Ex. D at 4, 10, 14 & App'x A; Ex. O at 2; Ex. P at 2. Plaintiff's suggestion that the Agency was required to research and verify precise boundaries as to hundreds of thousands of acres of the Tribe's lands (and presumably the lands of all Florida tribes) is wholly unsupported by any authority.  Moreover, Plaintiff's argument misses the mark because the Tribe did not even provide the State or EPA any meaningful information during the approval process to make the complex boundary delineations that the Tribe now desires about hundreds of thousands of acres.[11]

---

permits pursuant to the Section 404 program.  33 U.S.C. § 1344(h).  The Clean Water Act thus demands that EPA's determination focus on the State's authority to operate a Section 404 program and that this determination be made within a relatively short four-month period.

[11]  A few months before EPA approved Florida's assumption of the Section 404 program, Plaintiff advocated a contrary position in an analogous context.  Plaintiff applied to EPA to supplement its treatment as a state to administer its water quality standards and water quality certification programs.  Ex. Q at 13.  Under applicable regulations, Plaintiff was obligated to provide "[a]n identification of the surface waters for which the Tribe proposes to establish water quality standards."  40 C.F.R. § 131.8(b)(3)(iii).  EPA agreed with Plaintiff's position that this requirement did not mean that the Tribe or EPA had to demonstrate that the identified waters were waters of the United States.  Ex. Q at 13.  Rather, EPA agreed with Plaintiff that it would "more fully delineat[e] the water resources for which it will develop water quality standards during the water quality standards development process."  *Id.*  Thus, EPA determined that it was enough that Plaintiff's submission implicated waters of the United States, but there was no requirement or need that each of those waters be specified in the context of the proposed supplementation to its treatment as a state authority.

Plaintiff's insistence that EPA classify each of the Tribe's waters outside its reservation boundaries also ignores the structure of the Clean Water Act's Section 404 program approval and oversight process and the implementing regulations.  Those authorities contemplate that, after approval of a State's assumption request, EPA, the Corps, and FDEP would continue to work hand-in-hand with interested parties, including Plaintiff, regarding delineations between retained and assumed waters.  For example, the MOA between FDEP and the Corps (required by 40 C.F.R. § 233.14) provides a process to resolve questions about whether a particular project implicates a retained water, rather than a state-assumed water.  Ex. F at 3-4.  The MOA requires FDEP to ask the Corps whether a project falls within retained waters, and the Corps shall respond within seven calendar days.  *Id.* at 3.  If the Corps determines that the proposed activity is within its jurisdiction, FDEP refers the applicant to the Corps.  *Id.*  If the Corps determines that a retained water is not implicated, FDEP processes the application.  The agreement makes clear that the status of every water in the state is not necessarily delineated at the time of assumption. Plaintiff has not identified any valid reason why this process cannot adequately address issues concerning projects or waterbodies in which the Tribe may have an interest.[12]  FDEP's Memorandum of Agreement with EPA also contemplates that disputes about whether a particular parcel is in Indian country will be addressed during program implementation.  *See* Ex. G at 6-7 (providing that EPA may object to the State's issuance of a Section 404 permit due to the impact of waters within Indian country).

---

[12]  Plaintiff broadly argues that addressing the status of its lands on a case-by-case basis would require it to "spend significant time and money."  Pl.'s Mot. at 15.  The Tribe did not make this argument to the Agency during the administrative process, nor has it submitted any supporting evidence with its motion.

Further, the text of the Clean Water Act makes clear that addressing project-specific questions during implementation of the Section 404 program is what Congress intended. *See* 33 U.S.C. § 1344(h)(1)(C) (requiring EPA to ensure that the public is notified and that a public hearing is held before a ruling on any permit application); *id.* § 1344(h)(1)(E) (requiring that the state program allow for any state—including Plaintiff and other tribes—to submit written recommendations with respect to any permit application). EPA has committed to working with Plaintiff regarding its potential issues as they arise on a case-by-case basis. Ex. L ("EPA believes that case-specific questions regarding what lands meet the definition of Indian country should be considered on a case-by-case basis during implementation."). Thus, if the Tribe wants a decision as to whether a particular tract is within Indian country, it has every opportunity to raise that issue in the context of a request for a jurisdictional determination or a Section 404 permit application. Through that process, the Corps and FDEP, with the Tribe's input, can assess whether the request should be processed by the Corps or FDEP.

For these reasons, EPA was not required to address those issues in approving Florida's submission to assume regulatory authority of the Section 404 program. The Corps, FDEP, and EPA will be making such determinations as part of the applicable MOA as actions are taken under the State's implementation of the 404 program. It would be inappropriate for the Court to address, in the context of this motion, whether specific parcels in Everglades National Park and Big Cypress National Preserve, as well as the Leased Lands, fall within the definition of Indian country. [13] *See* Pl.'s Mot. at 17-19. These are questions for another day.

---

[13] For example, Plaintiff erroneously argues that the federal government has exclusive jurisdiction over lands in Everglades National Park. Pl.'s Mot. at 16 (citing *United States v. Daye*, 696 F.2d 1305, 1307 (11th Cir. 1983); *Miccosukee Tribe of Indians v. United States*, No. 00-3453-CIV, 2000 WL 35623105, at *8 (S.D. Fla. Dec. 15, 2000)). The State of Florida has concurrent regulatory jurisdiction over the federal parks within its boundaries, including

## CONCLUSION

For the reasons set forth above, the Court should grant the Federal Defendants' Cross-

Motion for Summary Judgment and deny Plaintiff's Motion for Summary Judgment.

Dated:  September 27, 2023          Respectfully submitted,

                                   MARKENZY LAPOINTE
                                   United States Attorney
                                   Southern District of Florida
                                   99 N.E. 4th Street
                                   Miami, Florida 33132
                                   Telephone: (305) 961-9001
                                   Facsimile: (305) 530-7679

                                   TODD KIM
                                   Assistant Attorney General
                                   Environment and Natural Resources Division

                                          /s/ *Paul Cirino*
                                   PAUL CIRINO (DC Bar #1684555)
                                   ANDREW S. COGHLAN (CA Bar #313332)
                                   Environmental Defense Section
                                   U.S. Department of Justice
Of Counsel:                        P.O. Box 7611
                                   Washington, D.C. 20044-7611
Lauren Maher                       Telephone: (202) 514-3468 (Cirino)
Office of General Counsel          Telephone: (202) 514-9275 (Coghlan)
U.S. Environmental Protection Agency   paul.cirino@usdoj.gov
Washington, D.C.                   andrew.coghlan@usdoj.gov

                                   *Attorneys for the Federal Defendants*

---

Everglades National Park and Big Cypress National Preserve.  1986 Fla. Sess. Law, ch. 86-67
(codified as Fla. Stat. § 6.075); 52 Fed. Reg. 3355 (Feb. 3, 1987).  The concurrent state
jurisdiction, however, does not extend to Indian country located within the parks.  *See Daye*, 696
F.2d at 1307; Miccosukee Reserved Area Act, Pub. L. No. 105-313, 112 Stat. 2964, § 5(d) (Oct.
30, 1998).  By arguing here that the applicable regulations contemplate that parcel-by-parcel
assessments are intended to be discussed in the context of specific project applications after
Florida assumes the Section 404 permitting program, EPA does not waive its right to make
appropriate arguments regarding the applicability of the "Indian country" definition to specific
parcels at an appropriate time.

<u>**CERTIFICATE OF SERVICE**</u>

I HEREBY CERTIFY that on September 27, 2023, I electronically filed the Federal

Defendants' Combined Memorandum in Support of Their Cross-Motion for Summary Judgment

and in Opposition to Plaintiffs' Motion for Summary Judgment, the Statement of Material Facts,

the Response to Plaintiff's Statement of Material Facts, and all accompanying exhibits with the

Clerk of the Court using CM/ECF, and thereby served these documents on counsel of record for

Plaintiff and Intervenor.

/s/ Paul Cirino

PAUL CIRINO
Senior Trial Counsel
Environmental Defense Section
U.S. Department of Justice