**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA**

MICCOSUKEE TRIBE OF INDIANS OF
FLORIDA,

          *Plaintiff*,

     v.

U.S. ENVIRONMENTAL PROTECTION
AGENCY and UNITED STATES OF
AMERICA,

          *Defendants*,

THE STATE OF FLORIDA and FLORIDA
DEPARTMENT OF ENVIRONMENTAL
PROTECTION,

          *Defendant-Intervenors*.

**CASE NO.** 1:22-cv-22459-KMM

---

**STATE OF FLORIDA AND FLORIDA DEPARTMENT OF ENVIRONMENTAL
PROTECTION'S COMBINED CROSS-MOTION FOR SUMMARY JUDGMENT AND
OPPOSITION TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT WITH
SUPPORTING MEMORANDUM OF LAW**

---

**TABLE OF CONTENTS**

Page

INTRODUCTION & BACKGROUND .................................................................................1

I.     Florida's Section 404 Program ............................................................. 1

II.    State and Federal Engagement with the Miccosukee Tribe.................................. 2

III.   Florida's Section 404 Program Does Not Apply to Dredge-and-Fill Activities in "Retained Waters" or "Indian Country.".............................................. 4

STANDARD OF REVIEW ..........................................................................................5

ARGUMENT ...............................................................................................................6

I.     The Tribe's Challenge to Florida's 404 Application Fails. .................................. 7

    A.    A "Complete Application" Finding Is Not Reviewable. .............................7

    B.    The Tribe Lacks Standing to Challenge the "Application." ......................8

    C.    Even if this Claim Is Reviewable, Florida's Application Was "Complete." ...........................................................................................9

II.    The Tribe's Challenge to EPA's Approval of Florida's 404 Program Fails......... 10

    A.    The Tribe Lacks Standing to Challenge EPA's Approval of Florida's Program. .........................................................................10

        1.    The Tribe's Declaration Does Not Demonstrate Cognizable Injury Sufficient for Article III Standing. ......................................10

        2.    The Tribe Suffers No Cognizable Injuries from State Assumption of *Primary* Permitting Responsibility, Especially Where EPA Maintains Program-Level and Permit-by-Permit Oversight and Independent Enforcement Authority. .................................................................................12

    B.    Even if this Claim Is Reviewable, EPA's Approval of Florida's Program Was Correct....................................................................13

III.   The Tribe's Claim that Florida's Section 404 Program Cannot Apply to "Miccosukee Lands" Fails. ................................................................... 15

    A.    The Tribe Lacks Standing for this Claim and It Is Not Ripe. ...................15

    B.    The "Miccosukee Lands" Argument Fails on the Merits. ........................15

        1.    The Perpetual Leased Area Remains Subject to Florida Regulatory Jurisdiction. .................................................................16

        2.    The Tribe's Fee Simple Lands Remain Subject to Florida 404 Jurisdiction..............................................................................17

3.     The Tribe's "Reserved Rights" Lands Are Undefined and
       Any Challenge Based on Those Areas Is Entirely Unripe.............18

4.     The Tribe's Claim Regarding Everglades National Park
       Fails............................................................................................18

CONCLUSION.................................................................................................................20

# TABLE OF AUTHORITIES

**Cases**

*AT&T Corp. v. FCC,*
   369 F.3d 554 (D.C. Cir. 2004) (*per curiam*).............................................................13

*Bennett v. Spear,*
   520 U.S. 154 (1997)...................................................................................................8

*Cahaba Riverkeeper v. EPA,*
   938 F.3d 1157 (11th Cir. 2019) ...........................................................................1, 6, 9

*Clapper v. Amnesty Int'l USA,*
   568 U.S. 398 (2013)..................................................................................................12

*Crow Creek Sioux Tribe v. Brownlee,*
   331 F.3d 912 (D.C. Cir. 2003) .............................................................................10, 13

*Ctr. for Biological Diversity v. Regan,*
   2023 WL 5437496 (D.D.C. Aug. 23, 2023) ...............................................................6

*Ctr. for Biological Diversity v. Regan,*
   597 F. Supp. 3d 173 (D.D.C. 2022) ......................................................................6, 13

*Fed. Trade Comm'n v. Standard Oil Co. of Ca.,*
   449 U.S. 232 (1980)...................................................................................................8

*Ga. Republican Party v. SEC,*
   888 F.3d 1198 (11th Cir. 2018) .................................................................................6

*Hous. Study Grp. v. Kemp,*
   736 F. Supp. 321 (D.D.C. 1990) ...............................................................................8

*Legal Env't Assist. Found. v. EPA,*
   400 F.3d 1278 (11th Cir. 2005) .................................................................................6

*Lujan v. Defs. of Wildlife,*
   504 U.S. 555 (1992)...................................................................................................6

*Menominee Indian Tribe of Wis. v. Env't. Prot. Agency,*
   947 F.3d 1065 (7th Cir. 2020) ..............................................................................4, 13

*Miccosukee Tribe of Indians of Fla. v. Fla. Dep't of Env't Prot.,*
   78 So.3d 31 (Fla. 2d Dist. Ct. App.) ........................................................................17

*Miccosukee Tribe of Indians of Fla. v. Fla. State Athletic Comm'n,*
   226 F.3d 1226 (11th Cir. 2000) .................................................................................6

*Miccosukee Tribe of Indians of Florida v. United States*,
    656 F. Supp. 2d 1375 (S.D. Fla. 2009) ..................................................................16

*Pub. Citizen, Inc. v. FERC*,
    839 F.3d 1165 (D.C. Cir. 2016) ...........................................................................13

*Sackett v. EPA*,
    598 U.S. 651 (2023) ...............................................................................................1

*Somday v. Rhay*,
    406 P.2d 931 (Wash. 1965) ...................................................................................15

*Spokeo, Inc. v. Robins*,
    578 U.S. 330 (2015) ................................................................................................6

*Sprint Nextel v. FCC*,
    508 F.3d 1129 (D.C. Cir. 2007) ...........................................................................13

*Swann v. Sec'y of Ga.*,
    668 F.3d 1285 (11th Cir. 2012) ............................................................................12

*TransUnion LLC v. Ramirez*,
    141 S. Ct. 2190 (2021) ............................................................................................6

*Tuscarora Nation of Indians v. Williams*,
    141 N.Y.S. 207 (N.Y. 1913) .................................................................................16

*U.S. Army Corps of Eng'rs v. Hawkes Co.*,
    578 U.S. 590 (2016) ...........................................................................................2, 8

*United States v. Daye*,
    696 F.2d 1305 (11th Cir. 1983) ............................................................................19

*Wash. Dep't of Ecology v. EPA*,
    752 F.2d 1465 (9th Cir. 1985) ..............................................................................14

*Wasser v. All Mkt., Inc.*,
    329 F.R.D. 464 (S.D. Fla. 2018) ..........................................................................12

*Waterkeeper All., Inc. v. Regan*,
    41 F.4th 654 (D.C. Cir. 2022) ..............................................................................10

**Statutes**

5 U.S.C. §701 .................................................................................................................8

5 U.S.C. §704 .................................................................................................................8

11 U.S.C. §1851 ............................................................................................................15

16 U.S.C. §410 ............................................................................................................18, 19

16 U.S.C. §698 ..................................................................................................................19

18 U.S.C §1151 ............................................................................................................ *passim*

33 U.S.C. §1251 ..................................................................................................................1

33 U.S.C. §1344 .......................................................................................................... *passim*

33 U.S.C. §1377 ................................................................................................................14

FLA. ADMIN. CODE ch. 62-333 ...........................................................................................2

FLA. STAT. §373.4146 .........................................................................................................2

FLA. STAT. §403.021 ...........................................................................................................2

Florida Indian Land Claims Settlement Act of 1982, Pub. L. No. 97-399, 96 STAT.
   2012 (Dec. 31, 1982) ................................................................................................16, 17

48 STAT. 816 (May 30, 1934) ...........................................................................................18

**Regulations**

40 C.F.R. §144.3 ...............................................................................................................13

40 C.F.R. §233 ............................................................................................................ *passim*

40 C.F.R. §258.2 ...............................................................................................................13

49 Fed. Reg. 45292 (Nov. 15, 1984) ................................................................................13

88 Fed. Reg. 61963 (Sept. 8, 2023) ...................................................................................1

**Constitutional Provisions**

Fla. Const. Art. II, §7 .........................................................................................................1

**Other Authorities**

128 CONG. REC. S2 (Dec. 16, 1982) ..................................................................................16

Fla. Att'y Gen. Op. 75-68 (1975) ......................................................................................15

Retained Waters and Indian Country.
   https://fdep.maps.arcgis.com/apps/webappviewer/index.html?id=2cb8724cfd1
   8408db80c8f2d7bb68a2e ...............................................................................................5

## INTRODUCTION & BACKGROUND

### I.      Florida's Section 404 Program

The Miccosukee Tribe of Indians of Florida ("Miccosukee Tribe" or "Tribe") challenges the U.S. Environmental Protection Agency's ("EPA") approval of the State of Florida's application to administer the Clean Water Act ("CWA") Section 404 Program.[1] The CWA, 33 U.S.C. §§ 1251 *et seq*., is built on the principle of cooperative federalism where states and the federal government share stewardship responsibilities for water resources. *See* 33 U.S.C. § 1251(b) (recognizing the "primary" role of states over water resources). Congress created two CWA permit programs: the Section 402 program to control point source water pollution and the Section 404 program to regulate the dredge or fill of wetlands. *Id*. §§ 1342, 1344. "It is the policy of Congress that the States . . . implement the [402 and 404] permit programs..." *Id*. § 1251(b). To that end, CWA Sections 402 and 404 invite states to apply to administer their own programs. *Id*. §§ 1342(b), 1344(g); *see also Cahaba Riverkeeper v. EPA*, 938 F.3d 1157, 1160-61 (11th Cir. 2019) (explaining that states hold "primary responsibilities and rights" under CWA programs). For decades, Florida has administered the Section 402 program along with a separate state dredge-and-fill program known as the Environmental Resource Permit ("ERP") Program. Florida ERP is similar to the Section 404 program in many respects,[2] but ERP broadly applies to *all* waters in Florida not merely the narrower "waters of the United States" regulated under CWA Section 404.[3]

In 2017, Florida commenced efforts to obtain Section 404 program approval (FL. Ex. FF at 4; FL. Ex. R at 5-6), which was consistent with Florida's constitutional commitment to environmental protection. *See* Fla. Const. Art. II, Sec. 7(a) (establishing the "policy of the state to conserve and protect its natural resources and scenic beauty," with "[a]dequate provision" for the "conservation and protection of natural resources"). Florida's "public policy [is] to conserve the

---

[1] The Administrative Record ("AR") index (Dkt. 26a) contains links to all documents in the AR. With their cross motion (Dkt. 36), Federal Defendants provided an "Index of Exhibits" (Dkt. 36-3) with references to the applicable "AR Index Document ID." For consistency, Florida Intervenors will cite to Federal Defendants' exhibits as "Fed. Defs. Ex. #." Florida Intervenors are logging any additional exhibits on "Florida Supplemental Index of Exhibits," and citing those as "FL Ex. #" (beginning with "FL Ex. R").

[2] FL. Ex. R at 5-6; FL. Ex. S at App. J-3; Fed. Defs. Ex. E at 3.

[3] The U.S. Supreme Court recently adopted a narrow interpretation of "waters of the United States." *See Sackett v. EPA*, 598 U.S. 651, 143 S. Ct. 1322 (2023); *see also* 88 Fed. Reg. 61,963 (Sept. 8, 2023) (direct final rule implementing narrower "WOTUS" definition).

waters of the state," FLA. STAT. § 403.021(2), and "to provide for the management of water and related land resources," *id*. § 373.016(3)(a). Florida found that the Florida Department of Environmental Protection ("FDEP") would be better suited to administer the Section 404 program in Florida, particularly in light of FDEP's longstanding implementation of the ERP program, localized knowledge and experience, and a larger number of FDEP and Water Management District staff across the State. FL. Exs. T, GG. Florida also hoped to reduce permit delays and cut regulatory costs, along with addressing other challenges experienced under the federal 404 program. *See, e.g.,* FL. Ex. U (explaining that Everglades restoration projects have been "plagued by design, permitting, and construction delays under the U.S. Army Corps of Engineers"); *see also U.S. Army Corps of Eng'rs v. Hawkes Co.*, 578 U.S. 590, 592 (2016) (explaining that the "costs of obtaining [a federal 404] permit are significant," with a process that, on average, takes "788 days and $271,596" to complete); *Sackett*, 143 S. Ct. at 1336 ("[The Corps 404] process can take years and cost an exorbitant amount of money.").

After enacting new state legislation (*see, e.g.*, FLA. STAT. § 373.4146), adopting regulations through a statewide public notice and comment process (*see, e.g.*, FLA. ADMIN. CODE ch. 62-333), and expending substantial resources to develop a new comprehensive permit program, Florida submitted a voluminous Section 404 program application to EPA in August of 2020. Fed. Defs. Exs. B-C. EPA completed its own public notice and comment process, evaluated the proposed application, consulted with necessary agencies and stakeholders, and approved Florida's program in December 2020 (Fed. Defs. Exs. A, M, N), which was within the statutorily-required timeframe of 120 days. *See* 33 U.S.C. § 1344(h)(3). For almost three years, FDEP has had primary responsibility for administering the Section 404 program in "assumable waters," subject to EPA oversight.

## II.    State and Federal Engagement with the Miccosukee Tribe

As part of the Section 404 program application process, Florida and EPA engaged in significant outreach and coordination with the Miccosukee Tribe.[4] Additionally, Florida entered agreements with the State Historic Preservation Officer to ensure significant opportunities for tribal engagement throughout implementation of Florida's Section 404 program. *See* FL Ex. Z; FL Ex. AA. And before deciding whether to approve Florida's application, EPA engaged in direct

---

[4] *See*, *e.g.*, Fed. Defs. Ex. M at 17-21; FL Ex. V at 7-14; FL Ex. W at 1; FL Ex. X at 5; FL Ex. Y at 7-8.

"government-to-government" consultation with the Miccosukee Tribe. Fed. Defs. Exs. H-L. As part of this engagement, EPA informed the Tribe that "FDEP has committed to providing notice on all permit applications where the tribes have expressed an interest in being notified," and that, under Florida's program, FDEP will, as a rule, provide the Tribe with notice of "any activity that is within two miles" of reservations or other areas where the Tribe has asserted an interest,[5] a commitment that is also codified in FDEP's regulations found at F.A.C. 62-331.060(2)(a)(8).

At every step in the process, Florida and EPA emphasized that Florida would not administer the Section 404 program in "Indian country." *See*, *e.g.*, Fed. Defs. Exs. E at 3, Ex. A at 2. At the commencement of EPA's review of Florida's application, EPA assured the Miccosukee Tribe in an August 31, 2020 letter that, "[i]f the EPA approves Florida's request, the assumed program will not apply to waters within 'Indian country,' as that term is defined at 18 U.S.C. § 1151." Fed. Defs. Ex. H at 2. EPA explained that projects located outside of Indian country are still "subject to federal review" if a "tribe's recommendations for addressing the effects [of a proposed Florida 404 permit] are not accepted by Florida..." *Id.* Because Florida did not seek to regulate "activities on Indian lands," Florida's application did not include an "analysis of the State's authority over such activities" on Indian lands. 40 C.F.R. § 233.12(b).

Furthermore, EPA explained that approval of Florida's program would not "redefine or change what is Indian country" or otherwise "alter the legal status of any land." FL Ex. V at 8. And EPA assured the Tribe that, if "a question arises whether activities proposed in a [Florida 404] permit application or draft general permit are within Indian country, and thus should be processed by the Corps, information regarding the issue may be presented to FDEP during the comment period and may also be provided to EPA." *Id.* Any such information "shall be considered by EPA in exercising its CWA authority to oversee FDEP's program and may, as appropriate, provide a basis for EPA to comment upon, object to, or make recommendations with respect to the permit application or draft general permit." Fed. Defs. Ex. G at 1-2.[6] EPA also explained that approving Florida's program does not constitute a determination whether any particular lands "meet the definition of Indian country" nor "does it affect the legal status of those or any other lands." FL.

---

[5] FL Ex. BB at 1; FL Ex. V at 7.

[6] Section 4.1 of the State 404 Program Applicant's Handbook, incorporated by reference into F.A.C. 62-331.010(5), also makes clear that the Corps retains jurisdiction for projects within Indian country. Fed. Defs. Ex. D at 14-15.

Ex. V at 8-9 (internal quotes omitted). Site-specific concerns are addressed on a case-by-case basis.

Following approval of Florida's Section 404 program, EPA maintains oversight responsibility – both on a program level as well as permit-by-permit basis – to ensure continued compliance with federal requirements. 33 U.S.C. § 1344(h)-(j); 40 C.F.R. § 233, Subpart F. EPA receives a copy of all individual permit applications (except where EPA waives review) and may comment on any state permit application. If Florida rejects EPA's comments or changes for a particular permit action, EPA is authorized to transfer the permit to the Corps. *Id.*; *see also* Fed. Defs. Ex. G at 7-9; F.A.C. § 331.052(3)(b) at FL. Ex. CC at 8-9. In other words, "where Section 404 permitting authority has been delegated to a state, the EPA retains an oversight role… The EPA reviews, and can object to, proposed permits…If the agency lodges objections, the state cannot issue a permit without revising and resubmitting it for approval…" *Menominee Indian Tribe of Wis. v. Env't. Prot. Agency*, 947 F.3d 1065, 1071 (7th Cir. 2020) (involving tribal challenge related to state 404 program).

## III.   Florida's Section 404 Program Does Not Apply to Dredge-and-Fill Activities in "Retained Waters" or "Indian Country."

While Florida has assumed administration of the Section 404 program in "assumable waters" within the State, the Corps of Engineers retains responsibility for permitting dredge-and-fill activities in "Retained Waters" and "Indian country."

First, the Corps expressly retains Section 404 responsibility in Florida for the discharge of dredged or fill material in "retained waters," i.e., those waters that are not "assumable" by Florida under CWA Section 404(g). Fed. Defs. Ex. F. As part of the approval process, the Corps and FDEP established a "Retained Waters List," comprised of more than 500 water bodies across the state. *Id.*; *see* also Fed. Defs. Ex. D at App. A. Because it was not feasible to identify with precision all waters in the State of Florida that may, at any point in time, constitute "retained waters," this list serves as a starting point. Some waters, like Biscayne Bay, the St. John's River, and Lake Okeechobee, are obviously "retained waters," but many others require a site-specific analysis as to, for example, whether the waterbodies are "presently used, or are susceptible to use in their natural condition or by reasonable improvement as a means to transport interstate or foreign commerce..." 33 U.S.C. § 1344(g). Thus, in catch-all fashion, the list also covers *all other waters* in Florida (even if not expressly named in the list) if those waters are "subject to the ebb and flow of the tide shoreward to their mean high water mark including wetlands adjacent thereto landward to the [300 feet] administrative boundary." Fed. Defs. Ex. D at App. A. And the Memorandum of

Agreement ("MOA") accompanying the Retained Waters List sets a process for regularly updating it, as needed. *Id.*; Fed. Defs. Ex. F.

Second, the Corps of Engineers "retain[s] responsibility for permitting the discharge of dredged and fill material in waters of the United States within 'Indian country,' as that term is defined at 18 U.S.C. § 1151." Fed. Defs. Ex. F at 2-3. This includes "(a) all land within the limits of any Indian reservation …, (b) all dependent Indian communities …, and (c) all Indian allotments…." *Id.* at 2. "Indian reservations include lands held in trust by the United States for an Indian tribe even if such lands have not been formally designated as an Indian reservation." *Id.* at 3. Thus, Florida did not seek or obtain Section 404 authority over any area of Florida that currently meets the definition of "Indian country," including Indian reservations (e.g., Miccosukee Federal Reservation including Alligator Alley Reservation, Miccosukee Ranch North Reservation, Miccosukee Ranch West Reservation, etc.), other parcels held "in trust" by the federal government on behalf of the Miccosukee Tribe, or any other lands that meet that definition. *Id.* at 2-3.

Whether a particular project is located within Retained Waters and/or Indian country is reserved for case-by-case determination during agency review of a specific permit application. Fed. Defs. Ex. F.[7] Given the site-specific nature of these determinations, Florida's 404 Program contains a "screening" process, whereby applications are reviewed using the Retained Waters List and other resources to determine if the project will occur within Corps-retained areas. Fed. Defs. Ex. D at 24. Under the FDEP-Corps MOA, FDEP may refer the applicant to the Corps if the project is located in retained areas, and likewise, when the Corps receives an application and finds that the proposed activity falls in State-assumed waters, the Corps may refer the applicant to FDEP. Fed. Defs. Ex. G. As shown in Section 4.1 of the Florida 404 Handbook, this is the process used for evaluating whether particular projects occur in Indian country as well. Fed. Defs. Ex. D at 14.

## STANDARD OF REVIEW

As to the merits, Florida adopts the standard of review set forth in the Federal Defendants' brief. Dkt. 36 at 20-21.[8] For purposes of standing, which is an "essential and unchanging" requirement for judicial review in any case, *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992),

---

[7] FDEP has created a publicly-accessible mapping tool to assist the public with understanding the approximate extent of Retained Waters and Indian Country. https://fdep.maps.arcgis.com/apps/webappviewer/index.html?id=2cb8724cfd18408db80c8f2d7b b68a2e.

[8] Page numbers for prior filings refer to the PDF page number marked at the top of the document.

courts universally recognize that "standing is not dispensed in gross." *TransUnion LLC v. Ramirez*, 141 S. Ct. 2190, 2208 (2021). Standing must be "demonstrate[d] for each claim" and "for each form of relief that [plaintiffs] seek." *Id.* The "irreducible constitutional minimum of standing" requires that plaintiffs demonstrate, for each claim, that they have "(1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Spokeo, Inc. v. Robins,* 578 U.S. 330, 338 (2015) (citing *Lujan*, 504 U.S. at 560); *see also Cahaba Riverkeeper*, 938 F.3d at 1162.

Plaintiffs have the burden to prove standing. *See Legal Env't Assist. Found. v. EPA*, 400 F.3d 1278, 1281 (11th Cir. 2005) (denying standing and explaining that a "threshold issue in this case is whether [plaintiff] can satisfy Article III standing."). Plaintiffs must include in their opening briefs sufficient evidence to demonstrate their standing where it is not self-evident. *Miccosukee Tribe of Indians of Fla. v. Fla. State Athletic Comm'n*, 226 F.3d 1226, 1229–30 (11th Cir. 2000). Plaintiffs must satisfy each element of standing "in the same way as any other matter on which the plaintiff bears the burden of proof, *i.e.,* with the manner and degree of evidence required at the successive stages of the litigation." *Lujan,* 504 U.S. at 561. While general factual allegations of harm may suffice at the pleading stage, such "mere allegations" are insufficient to support standing at the summary judgment stage. *See id.* Instead, plaintiffs must provide affidavits or other evidence to demonstrate the specific facts necessary to support standing. *Ga. Republican Party v. SEC*, 888 F.3d 1198, 1201 (11th Cir. 2018).

## ARGUMENT

In the Complaint, the Miccosukee Tribe raises four counts under the Administrative Procedure Act ("APA") and a fifth count based on the U.S. Constitution, seeking vacatur of EPA's approval as to "certain waters within the State." Dkt. 1 at 27-30.[9] However, the Tribe's motion for summary judgment does not discuss or reference specific counts in the Complaint, nor does the Tribe's motion explain how any particular count warrants judgment in the Tribe's favor. Instead, the Tribe moves for summary judgment on three grounds, essentially arguing that: (1) Florida's

---

[9] A separate lawsuit with entirely different claims challenging Florida's Section 404 Program is pending in the U.S. District Court in Washington, D.C. That court has issued rulings dismissing two procedural claims. *See Ctr. for Biological Diversity v. Regan*, 597 F. Supp. 3d 173 (D.D.C. 2022); *Ctr. for Biological Diversity v. Regan*, No. CV 21-119 (RDM), 2023 WL 5437496 (D.D.C. Aug. 23, 2023). The parties have completed briefing on the merits of the remaining claims in that case.

Section 404 program application inadequately described the State's jurisdiction over lands where the Tribe asserts an interest; (2) EPA's approval of Florida's program used the wrong definition of "Indian lands"; and (3) EPA unlawfully transferred Section 404 authority to Florida over "Miccosukee lands," which the Tribe broadly defines to include Florida-owned lands leased by the Tribe, off-reservation lands owned by the Tribe in fee simple, various unidentified "Reserved Rights" lands, and essentially all of Everglades National Park. As shown in the Federal Defendants' brief and herein, the Tribe is incorrect as to each of these claims.

Stated simply, Florida submitted an appropriate application for program approval that neither sought nor obtained Section 404 permit authority over lands for which only the federal government or an Indian tribe is legally authorized to exercise jurisdiction. EPA had no obligation when approving Florida's program to make site-specific determinations about whether any particular parcel of interest to an Indian tribe fall within state or federal permitting for Section 404 programs. Yet this Court need not even reach the merits since the Tribe's claims simply are not justiciable.[10] Each of the Tribe's three claims are addressed and responded to below, going claim-by-claim. For each specific claim, Florida explains why each should be rejected on justiciability grounds and the merits.

**I.       The Tribe's Challenge to Florida's 404 Application Fails.**

The Tribe first targets Florida's Section 404 program application, arguing that the State's application failed to adequately "describe" the "waters [Florida] will assume after program approval…" Dkt. 32 at 5-9. The Tribe seems to challenge Florida's application along with EPA's finding that Florida's application was "complete," contending that Florida should have clearly identified – at the very front of the process – whether all particular areas of special interest to an Indian tribe are subject to state 404 purview. Dkt. 32 at 16-19. Section 404(g) establishes the state application requirements while Section 404(h) lists the findings that EPA must make when approving a state program. 33 U.S.C. § 1344(g)-(h). Florida Intervenors concur with Federal Defendants that Florida's application was complete. Dkt. 36 at 22-26. But before reaching the merits of this issue, the Court should consider at least two grounds for finding that the Tribe's challenge to the application itself is not justiciable.

**A.       A "Complete Application" Finding Is Not Reviewable.**

An agency's finding that an application is complete lacks the essential elements of "final

---

[10] *See* Declaration of Justin Wolfe, FDEP General Counsel ("Wolfe Decl.") (Attachment 1).

agency action" under the APA. 5 U.S.C. § 701 (a)(2), § 704. Agency actions are "final" under the APA if, first, it "mark[s] the consummation of the agency's decisionmaking process—*it must not be of a merely tentative or interlocutory nature*," and second, it "must be one by which rights or obligations have been determined, or from which legal consequences will flow." *U.S. Army Corps of Eng'rs v. Hawkes Co.*, 578 U.S. 590, 597 (2016) (quoting *Bennett v. Spear*, 520 U.S. 154, 177–78 (1997)) (emphasis added).

Taking those two elements in turn, the first is not met here as the "completeness" determination is not the "consummation of the agency's decisionmaking process." It is just the beginning of the process - the very first step in EPA's process for reaching a final determination. *See Fed. Trade Comm'n v. Standard Oil Co. of Ca.*, 449 U.S. 232, 241 (1980) (explaining that a "threshold determination that further inquiry is warranted" is not a "definitive statement of position," thus it is not final agency action); *Hous. Study Grp. v. Kemp*, 736 F. Supp. 321, 331 (D.D.C. 1990) ("Agency action which merely initiates proceedings has no legal force, is not a definitive statement of position, and therefore is not final agency action ripe for review.").

But even on the second step, though consequences may flow from a completeness determination – namely, the triggering of a 120-day clock for EPA to make a final decision - that is it. And that 120-day clock was created by congressional design to protect the interests of the State applicants. Dkt. 37 at 15-16. There are no consequences from the complete application finding that impacts *the Tribe*. The completeness determination gets folded into the final approval determination, which becomes the final agency action subject to review. Tellingly, the Tribe cites no cases recognizing that an agency's finding of completeness is reviewable. Based on the legal test for final agency action, it is not.

**B.    The Tribe Lacks Standing to Challenge the "Application."**

The Tribe also fails to show cognizable injury related to the application itself or EPA's determination that the application was complete. Indeed, the Tribe has not cited, and Florida Intervenors have not located, any case law finding that a non-applicant (here, Florida is the "applicant") has Article III standing to challenge an "application." The absence of precedent is telling. Moreover, nothing in the Tribe's Donaldson Declaration avers that there is specific, concrete injury from the application itself, nor does the Tribe provide sworn testimony showing that the application itself (as opposed to EPA's final decision approving the program) *causes* purported injury. And, as importantly, the Tribe has not shown that an order of this Court related

to the application could redress any purported injury currently suffered by the Tribe. For these reasons, the Tribe lacks standing for this claim. *See Cahaba Riverkeeper*, 938 F.3d at 1162.

**C.      Even if this Claim Is Reviewable, Florida's Application Was "Complete."**

The Tribe contends that Florida's application "includes *no information* that would help a person understand whether a particular water was an 'assumed water'." Dkt. 32 at 7 (emphasis added). The Tribe is wrong. Florida's Section 404 application, which includes thousands of pages of information about the program,[11] clearly explains how a member of the public can determine if a particular area is subject to Florida's Section 404 program. This is clearly set forth in the "Florida 404 Handbook," which was adopted by FDEP as a "rule" and made part of the Section 404 application package. Fed. Defs. Ex. D. Likewise, Florida's application includes an MOA entered between the Corps of Engineers and FDEP, which fully explains the division between "assumable" and "retained waters." Fed. Defs. Ex. F. Section II of this MOA explains in detail how to identify whether a water is "retained" by the Corps or "assumed" by Florida. *Id*. at 2. "All waters of the United States not retained by the Corps will be assumed by DEP ...." *Id.* Any discharge of dredged and fill material in waters of the United States "within Indian country, as that term is defined at 18 U.S.C. § 1151" is a "retained" area for these purposes. *Id.* at 2-3. The MOA also provides "Joint Coordination Procedures" for screening applications to "determine if the proposed activity will occur within Corps retained waters..." *Id*. at 3. The MOA provides a process for FDEP and the Corps to address and resolve site-specific questions about whether a particular project involves "retained" waters. *Id.* Similarly, the Tribe claims that Florida's application contains an "incomplete and, as a result, inaccurate" description of "retained waters" because it "omits" any reference to "Indian lands." Federal Defendants have already explained why this argument is baseless. Dkt. 32 at 8.

The Tribe also argues that the State's legal authority statement (which is one part of the application package) does not analyze the extent to which Florida's program applies to "Indian lands." Dkt. 32 at 9. However, the Tribe fails to acknowledge that there is no statutory obligation under the CWA to include such a statement in the application, and even under EPA's regulations, the obligation for a legal statement only applies *when a state seeks to assert jurisdiction over Indian lands.* 40 C.F.R. § 233.12(b) ("*If a State seeks approval of a program covering activities*

---

[11] The application materials are listed across the first four pages of the AR index, including records from EPA-HQ-OW-2018-0640-0001 through EPA-HQ-OW-2018-0640-0020-A4.

*on Indian lands*, the statement shall contain an analysis of the State's authority over such activities."). Here, of course, Florida's program does not cover dredge and fill activities in "Indian lands" (defined by EPA as "Indian country"), meaning that there was no need to evaluate state legal authority over those lands.

## II.    The Tribe's Challenge to EPA's Approval of Florida's 404 Program Fails.

Beyond Florida's application, the Tribe further argues that EPA unlawfully relied on the statutory definition of "Indian country" found in 18 U.S.C. § 1151 when deciding the extent to which "Indian lands" are retained by the federal government. Dkt. 32 at 9-16. Springing from this point, the Tribe argues that EPA should have required "retained waters" to include all "Indian lands" (using the very broad definition that the Tribe seeks here), and should not allow Florida to "decide" which waters in "Indian lands" are subject to Florida's Section 404 purview. All of these points are erroneous, including for the reasons explained by Federal Defendants. Dkt. 36 at 22-31.[12] Yet, again, this is a claim that the Court need not reach as it is not justiciable at this juncture.

### A.    The Tribe Lacks Standing to Challenge EPA's Approval of Florida's Program.

This Court need not reach the merits of this claim either. The Tribe is simply uninjured in any legally cognizable manner by Florida administering a program based on federal standards where EPA has continuous oversight and enforcement responsibility on a program level and permit-by-permit. Federal courts have been skeptical of standing in contexts involving transfers of federal roles or responsibilities to states where federal standards remained applicable and/or the federal agency had oversight and enforcement authority. *See Waterkeeper All., Inc. v. Regan*, 41 F.4th 654, 661 (D.C. Cir. 2022) (dismissing *sua sponte* an environmental group's challenge to EPA's approval of Oklahoma's state coal ash program for lack of standing); *Crow Creek Sioux Tribe v. Brownlee*, 331 F.3d 912, 917 (D.C. Cir. 2003) (holding that Indian tribe lacked standing to challenge transfer of federal lands to state government where the federal land transfer statute ensured continued enforcement of cultural protection requirements). And that skepticism should be even greater in this case where the Tribe has not submitted adequate declarations demonstrating standing (as is their burden to do).

#### 1.    The Tribe's Declaration Does Not Demonstrate Cognizable Injury Sufficient for Article III Standing.

---

[12] Florida agrees with Federal Defendants that the Tribe did not make these arguments during the public comment process and cannot make them here. Dkt. 36 at 27.

The Tribe's opening brief makes no effort to demonstrate Article III standing to bring each claim. This Court and other parties are left to try to conjure the Tribe's basis for standing. In the original complaint, the Tribe submitted a "Declaration of Kevin Donaldson," Dkt. 1-2, which does not expressly address standing but does ambiguously allude to one purported form of injury; namely, to "protect the Tribe's sovereignty," the Tribe "requested FDEP to suspend the processing of the applications" for two projects – the "Susan Billie permit application" and the "Tigertail Camp permit application" – for which the Tribe had previously requested Section 404 permits from the Corps. Dkt. 1-2 at 5. The Donaldson declaration asserts that, because FDEP now administers the Section 404 program, the Tribe has "not been able to initiate the work contemplated" in these permits applications "because the Tribe has been unable to obtain a permit authorizing such work." *Id*. This appears to be the sole basis for the Tribe's asserted Article III standing. It is not a basis for standing here.

First, EPA's approval of the Florida 404 program does not harm the Tribe's sovereignty. To the contrary, EPA's approval gave Florida *primary* responsibility for administering the program in assumable waters, outside of Indian country, but EPA maintains oversight of the program on a permit-by-permit and program basis. Various features of this cooperative federalism program ensure that the Tribe's sovereignty is respected and effective mechanisms exist to ensure that the Tribe has the opportunity to participate in the permit program – both as an applicant where appropriate and also as an interested party where other proposed projects may impact the Tribe's interests. While the Tribe implies that its "sovereignty" would be adversely impacted by participating in the Florida Section 404 process, the Tribe's track record of participating in other Florida permit programs undercuts that argument. As shown in the Wolfe Declaration, the Tribe has previously applied for and obtained permits and other authorizations from Florida including for projects on lands the Tribe considers to be Miccosukee lands. Wolfe Decl. at ¶ 4. For example, in 2019, the Miccosukee Tribe submitted an application to FDEP for an ERP to construct a home with an onsite sewage treatment disposal system at the Billie Indian Camp located in Big Cypress National Preserve. *Id*. at ¶ 8. Similarly, FDEP has issued various forms of environmental permits and/or authorizations to other Indian tribes in Florida, including state permits for wastewater treatment and drinking water systems. *Id.* at ¶ 7.

Second, this purported basis for standing is purely self-inflicted, which is not adequate for standing. *See Wasser v. All Mkt., Inc*., 329 F.R.D. 464, 470–71 (S.D. Fla. 2018) ("[A] controversy

is not justiciable when a plaintiff independently caused his own injury.") (*quoting Swann v. Sec'y of Ga.*, 668 F.3d 1285, 1288 (11th Cir. 2012)). The Tribe applied for Section 404 permits from the Corps for two particular projects. Because those projects are located in assumable waters, the Corps automatically transferred the permit files to FDEP for processing in early 2021. However, the Tribe requested that FDEP "suspend" the processing of the permit applications. FDEP consented to the Tribe's request. *See* Wolfe Decl. at ¶ 5. FDEP would promptly proceed with the permitting process for both applications upon the Tribe's request to do so. *Id.* And if that were to occur, the Section 404 permit process would ensure that the Tribe's concerns and interests are taken into account, including through continued oversight and involvement by EPA and other federal agencies. Fed. Defs. Exs. F-G; FL. Exs. Z, DD. In fact, EPA has expressly stated that it will review and evaluate Florida's proposed permits and will have its own obligation to ensure that tribal concerns are considered and addressed as appropriate. Fed. Defs. Ex. G at 1-2.

### 2.     The Tribe Suffers No Cognizable Injuries from State Assumption of *Primary* Permitting Responsibility, Especially Where EPA Maintains Program-Level and Permit-by-Permit Oversight and Independent Enforcement Authority.

The Tribe fails to provide any support for actual injuries arising to its cognizable interests from EPA's approval of Florida's 404 program. Florida's expanded role – which is not exclusive in any respect – causes no increased risk of injury relative to the pre-assumption 404 program, especially because EPA maintains oversight on a permit-by-permit basis. The Tribe does not assert that Florida's program is too protective such that the Tribe would have difficulty meeting state standards and would prefer federal standards. On the other hand, the Tribe does not allege that Florida's program fails to adequately protect the environment in some way that actually harms the Tribe. The only asserted basis for injury is a purported injury to the Tribe's sovereign interests to not engage directly with the State of Florida for purposes of obtaining Section 404 permits.

Mere speculation of future harm cannot support standing. *See Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013) (a "threatened injury must be certainly impending to constitute injury in fact, and that [a]llegations of possible future injury are not sufficient") (internal quotations and citations omitted). Because the Tribe has proffered no evidence of any concrete, particularized harms caused by Florida making a Section 404 permitting decision instead of the federal government, the Tribe has failed to meet its burden of proof on standing. *See Menominee Indian Tribe,* 947 F.3d at 1071 ("Nothing has been brought to our attention to suggest that the Tribe

12

cannot receive full and fair review in a Michigan court.").

Precedent teaches that a transfer from federal to state authority cannot support standing where the federal government maintains the ability to apply federal law. *See Crow Creek Sioux Tribe,* 331 F.3d at 917. In *Crow Creek,* an Indian Tribe argued that the transfer of lands from the Corps of Engineers to the State of South Dakota would impede or reduce the likelihood of enforcement of federal cultural protection statutes on the transferred lands by federal agencies, injuring the Tribe's rights under those statutes. *Id.* at 913. The D.C. Circuit found that the Tribe lacked standing because the statute that required the land to be transferred explicitly provided that the federal cultural protection statutes continue to apply on the transferred lands. *Id.* The same outcome applies here: EPA continues to oversee Florida's 404 permit decisions, both at the program level and on a permit-by-permit basis. That oversight role cuts off any possible claim of concrete injury here.[13]

### B.   Even if this Claim Is Reviewable, EPA's Approval of Florida's Program Was Correct.

When approving Florida's program, EPA correctly interpreted the CWA regulatory term "Indian lands" in a manner consistent with the federal statutory term "Indian country." EPA has chosen to exclude Indian country from State 404 programs because of legal limits on state regulatory jurisdiction within "Indian country" as a matter of federal law. Dkt. 36 at 27-31. As a longstanding practice across various programs, EPA has defined "Indian lands" consistent with "Indian country" per 18 U.S.C. § 1151. *See*, *e.g.*, 40 C.F.R. § 144.3; 40 C.F.R. § 258.2; 49 Fed. Reg. 45292, 45294 (Nov. 15, 1984) ("EPA believes this definition is most consistent with the concept of Indian lands as the Agency has used it in regulations and UIC program approvals to date."). Courts have consistently applied this approach as well. *See*, *e.g.*, *Wash. Dep't of Ecology v. EPA*, 752 F.2d 1465, 1467 n.1 (9th Cir. 1985) (referencing EPA's position that ''Indian lands''

---

[13] The Tribe's purported injuries are also not redressable because, under the unique statutory structure found in Section 404, an order vacating EPA's approval of Florida's program would automatically result in a situation where Florida's program is "deemed approved" by operation of law. *See* 33 U.S.C. § 1344(h)(3) (providing that, if EPA "fails to make a determination" on a State application within 120 days of receiving the application, the State program "shall be deemed approved"). When rules or orders become effective pursuant to a "deemed approved" provision, they are not reviewable as "final agency actions." *See Sprint Nextel v. FCC*, 508 F.3d 1129 (D.C. Cir. 2007); *AT&T Corp. v. FCC*, 369 F.3d 554 (D.C. Cir. 2004) (*per curiam*); *Pub. Citizen, Inc. v. FERC*, 839 F.3d 1165 (D.C. Cir. 2016); *but see Ctr. for Biological Diversity*, 597 F. Supp. 3d at 190-92 (rejected "deemed approved" argument as basis for motion to dismiss).

is ''synonymous with 'Indian country', which is defined at 18 U.S.C. []1151''). This approach is also consistent with the "Indian tribes" provisions in Clean Water Act. *See* 33 U.S.C. § 1377 (authorizing EPA to "treat an Indian tribe as a State for purposes of [Section 404]" where the tribe exercises management protection of water resources that are "otherwise within the borders of an Indian reservation").[14] EPA is clearly right to interpret "Indian lands" under 40 C.F.R. Part 233 consistent with the congressionally-crafted definition of "Indian country."

Likewise, the Retained Waters List, which uses the same correct definition of "Indian lands" and allows the Corps and FDEP to collaborate to determine whether particular waterbodies are subject to federal or state jurisdiction on a case-by-case basis during program implementation, is not unlawful. The Retained Waters List is a useful starting point for determining whether particular areas are subject to Corps 404 or Florida 404 permitting, but it is not the final word. Some waters, like Biscayne Bay, the St. John's River, and Lake Okeechobee, are easy to classify and found on the initial list of "retained waters" along with hundreds of other waterbodies. Fed. Defs. Ex. D at App. A. But many waterbodies require a careful analysis in the context of a specific dredge and fill project proposal as to, for example, whether the waterbodies are "presently used, or are susceptible to use in their natural condition or by reasonable improvement as a means to transport interstate or foreign commerce..." 33 U.S.C. § 1344(g). In fact, the Retained Waters List (and its related MOA) expressly include all other waters found to be non-assumable waters (even if not listed), and the Corps and FDEP agreed to a process for regularly updating the list. Any "retained waters," which are not subject to Florida's Section 404 program, remain under the permitting authority of the Corps of Engineers. Fed. Defs. Ex. D at 4-5. Thus, even if an area is not classified as "Indian lands," those areas are still subject to Corps 404 permitting if they constitute "retained waters." *Id.* at App. A.

---

[14] In Section 518 of the Clean Water Act, Congress set forth the scope of authority provided to Indian Tribes, including the physical area that may be regulated under the Act. *See* 33 U.S.C. § 1377(e); FL. Ex. EE at 3. In this section, Congress specifically defined "Federal Indian reservation" as "all land within the limits of any Indian reservation under the jurisdiction of the United States Government, notwithstanding the issuance of any patent, and including rights-of-way running through the reservation." 33 U.S.C. § 1377(h)(1). This definition is identical to the definition of "Indian Country" found at 18 U.S.C. § 1151(a) ("the term 'Indian country' . . . means (a) all land within the limits of any Indian reservation under the jurisdiction of the United States Government, notwithstanding the issuance of any patent, and, including rights-of-way running through the reservation . . .").

### III.     The Tribe's Claim that Florida's Section 404 Program Cannot Apply to "Miccosukee Lands" Fails.

As a final basis for its summary judgment motion, the Tribe targets a specific category of lands they call "Miccosukee lands," arguing that "EPA lacks authority to transfer" the Section 404 program over any of these areas to Florida. The motion itself does not define "Miccosukee lands." The Donaldson Declaration, which was attached to the Tribe's Complaint, defines "Miccosukee Lands" as including "[1] the Miccosukee Federal Reservation, [2] Trust Lands Held by the United States Government, [3] the Miccosukee Reserved Area, [4] Perpetually Leased Lands, [5] Reserved Rights Lands, and [6] Fee Simple Lands." Dkt. 1-2 at 4. The first three categories in that list are clearly within "Indian country," and thus, automatically excluded from the scope of Florida's Section 404 program. 11 U.S.C. § 1851. Whether the other categories of lands – leased lands, reserved rights lands, and fee simple lands – are beyond Florida's 404 purview is an entirely different question. For starters, the Tribe lacks standing to assert this claim and it is not ripe for review here. And regardless, the Tribe's reliance on an expansive notion of "Miccosukee lands" lacks legal support.

#### A.     The Tribe Lacks Standing for this Claim and It Is Not Ripe.

For the same reasons set forth in Section II.A. of this brief, the Tribe lacks standing to challenge EPA's approach for determining whether particular areas fall within federal or state primary permitting purview. The Tribe has simply made no showing of cognizable injury arising from EPA's transfer of Section 404 permit authority to FDEP, especially where EPA maintains oversight. Moreover, this claim is simply not ripe at this stage, for the reasons set forth as to each category of property (below). The ripeness argument, furthermore, reinforces the correct argument made by Federal Defendants that EPA had no obligation to definitively classify all categories of lands with tribal interests of any kind as "retained" or "assumable." Dkt. 36 at 34-35.

#### B.     The "Miccosukee Lands" Argument Fails on the Merits.

The Tribe has provided no basis – whether in the administrative record or elsewhere – for its broad definition of "Miccosukee lands" or for why the Tribe's definition controls EPA's determination under Section 404. It does not. Courts have found that "tribal lands" (a term similar to "Indian lands" or "Miccosukee lands") generally refer to lands *within an Indian reservation* held in trust by the federal government. *See* Fla. Att'y Gen. Op. 75-68, at 9 (1975) (citing *Somday v. Rhay*, 406 P.2d 931, 934 (Wash. 1965); *Tuscarora Nation of Indians v. Williams*, 141 N.Y.S.

207, 209 (N.Y. 1913)). To the extent "Indian lands" or "tribal lands" are coextensive with, or even narrower than, the statutory term "Indian country," the Tribe's reliance on arguments tied to "Miccosukee lands" fails. All Indian country is excluded from the Florida's Section 404 program, and thus, by definition, all "tribal lands," would be as well. Looking more closely at each category of lands, this fact becomes even clearer. For each of those categories, the Tribe's claim must fail – on the merits and for justiciability reasons.

### 1. The Perpetual Leased Area Remains Subject to Florida Regulatory Jurisdiction.

The Tribe argues that the "Leased Area" – approximately 189,000 acres of land *owned in fee simple by the State of Florida* that the Tribe leases pursuant to a "Settlement Agreement and Perpetual Lease Agreement" entered in 1982 ("1982 Agreement")[15] – is not subject to Florida Section 404 permitting. This is incorrect. The 1982 Agreement did not convert these leased lands into Indian country or otherwise remove Florida's environmental permitting authority over those lands.

"The Leased Area is located within Water Conservation Area 3A [which] is part of the Central and Southern Florida Project for Flood Control and Other Purposes..." *Miccosukee Tribe of Indians of Florida v. United States*, 656 F. Supp. 2d 1375, 1378 (S.D. Fla. 2009). "WCA-3A" is a vital link in regionwide efforts to restore and protect the Florida Everglades. The "purpose" of the 1982 Agreement is to "preserve the Leased Area in its natural state for the use and enjoyment of the Miccosukee Tribe *and the general public*," as well as to "assure proper management of *water resources*." 128 CONG. REC. S2 at 31641 (emphasis added). And the 1982 Agreement expressly provides that the Miccosukee Tribe's "use of the Leased Area…shall comply with all applicable laws and regulations" found in Chapter 373 of the Florida Statutes, both as in effect at that time (1982) and "those which may be promulgated in the future." *Id.* Congress reiterated this point when approving the 1982 Agreement, explaining that "nothing in this Act shall diminish, modify, or otherwise affect the extent of the civil and criminal jurisdiction of the State of Florida in the leased area," nor does it "otherwise affect the extent to which chapter 373, Florida Statutes, and its successor laws, have force and effect within such lands." 96 STAT. at 2015-16. Chapter 373

---

[15] The Settlement Agreement and Perpetual Lease Agreement is not in the Administrative Record; however, it was approved by Congress via legislative action (*see* Florida Indian Land Claims Settlement Act of 1982, Pub. L. No. 97-399, 96 STAT. 2012 (Dec. 31, 1982)), and a copy of it is found in the Congressional Record. *See* 128 CONG. REC. S2, 31636 (Dec. 16, 1982).

of Florida Statutes comprehensively addresses "water resources" including (among other things) the "management and storage of surface waters" in the state. That was true in 1982; it is still true today.

Accordingly, the Leased Area, which has never been formally recognized as an Indian reservation under federal law or taken into trust by the federal government, remains subject to the regulatory purview of the State of Florida for purposes of protection of water resources (among other things). The Tribe's attempt to carve-out this area from the scope of Florida's 404 program fails. In any event, for the reasons explained by Federal Defendants (Dkt. 36 at 35), this Court need not reach the issue of whether the Leased Areas (or other areas of tribal interest) are definitively subject to Florida's Section 404 purview. Such determinations can and should await actual Section 404 permitting decisions made by the Corps and/or FDEP.

**2.     The Tribe's Fee Simple Lands Remain Subject to Florida 404 Jurisdiction.**

The Tribe also argues that certain off-reservation parcels owned in fee simple by the Tribe (e.g., the 229-acre Miccosukee Tribe Golf Course and various other parcels) should not be subject to Florida's Section 404 program. To the extent the Tribe intends to perform a Section 404 project at one of these off-reservation fee simple parcels, the Tribe is certainly free to file its application with the Corps of Engineers or FDEP, and the procedures under the MOA would be followed to ensure that the proper agency processes the application. Fed. Defs. Ex. G. The Tribe simply gives no explanation for why that process harms them here. In any event, fee simple lands held by Tribes are not automatically within Indian country, unless those lands have been taken into trust by the federal government or otherwise meet the definition of Indian country. See *Miccosukee Tribe of Indians of Fla. v. Fla. Dep't of Env't Prot.*, 78 So.3d 31, 36 (Fla. 2d Dist. Ct. App.). Nothing in federal law would require EPA (or FDEP, for that matter) to evaluate the status of every property owned by the Tribe before approving a Section 404 program. Dkt. 36 at 33. Likewise, nothing in the complaint, the Donaldson Declaration, or the Tribe's summary judgment brief even suggests that the Tribe has applied for, or intends to soon file for, Section 404 permits for projects located at these locations.[16] Whether any of these particular fee simple areas are subject to Florida 404

---

[16] Moreover, the Tribe entirely fails to show that it suffers any cognizable injury with regard to these few fee simple parcels. No explanation of their claim is provided on these points. The Tribe

permitting simply is not ripe at this time.

### 3. The Tribe's "Reserved Rights" Lands Are Undefined and Any Challenge Based on Those Areas Is Entirely Unripe.

The Tribe also erroneously asserts that Florida cannot administer the Section 404 program over certain *unidentified* "reserved rights" lands within Everglades National Park ("ENP") and Big Cypress National Preserve ("BCNP") where the Tribe asserts ownership of mineral rights, hunting rights, or other "reserved rights" based on various federal statutes. The Tribe only vaguely refers to these "Reserved Rights" lands and gives no specific information about how any particular statute that addresses these "rights" also deprives Florida of regulatory jurisdiction. To the extent these areas are relevant, it is clear that mere "reserved rights" in ENP and BCNP do not eliminate Florida's regulatory jurisdiction. For example, the ENP's authorizing legislation states that land obtained to create the park remains "subject to such reservations of oil, gas, or mineral rights as the Secretary [of the Interior] may approve…" 16 U.S.C. § 410d; *see also* 16 U.S.C. § 410e. There is also no information suggesting that any of these "reserved rights" lands have been taken into trust by the federal government. Yet, again, this Court does not need to reach the merits of this undefined issue. The Tribe has entirely failed to show any cognizable injury to their interest in these "Reserved Rights" lands caused by EPA's approval of Florida's program. Of course, there is no such specific, concrete injury. The Tribe entirely fails to prove that it has any particular interest in these lands that are disrupted by EPA's action here. The Tribe's complaint merely refers, in very general and vague terms, to certain unidentified lands within the ENP and BCNP, but the Tribe fails to give any specificity whatsoever. As such, any purported claim of injury to specific, concrete interests of the Tribe is speculative at best.

### 4. The Tribe's Claim Regarding Everglades National Park Fails.

Apart from the "reserved rights" argument, the Tribe also argues that EPA should have excluded all "lands within Everglades National Park" from Florida's Section 404 program. Dkt. 32 at 15-16. Almost a century ago, Congress established ENP, comprised primarily of lands donated by the State of Florida. 48 STAT. 816 (May 30, 1934). This legislation "vested in the United States" the lands comprising the ENP and "set apart" those lands "as a public park for the

---

provides no sworn testimony about these parcels or the nature of the injury, nor does the Tribe aver that it plans to pursue new projects at these specific fee simple parcels.

benefit and enjoyment of the people…" 16 U.S.C. § 410. Though "Congress ceded exclusive jurisdiction over the entire land area [in ENP] to the United States," *United States v. Daye*, 696 F.2d 1305, 1307 (11th Cir. 1983), here that simply means Florida "cannot extend its jurisdiction to cover *Indian lands located within the Park*." *Id.* (emphasis added). Federal law does not prohibit Florida from exercising permitting authority over activities in ENP (except for Indian country).[17] The same is true for BCNP. *See generally* 16 U.S.C. §§ 698f-698m-4.

Likewise, nothing in CWA Section 404 itself – adopted four decades *after* the ENP was created – restricts a state from administering the Section 404 program in areas administered by the National Park Service ("NPS"). To the contrary, Congress specifically decided that states could administer the Section 404 program in all areas "within its jurisdiction" except for "those waters" that are not assumable (i.e., retained waters). 33 U.S.C. § 1344(g)(1). Many areas within the ENP are "retained waters," and thus already not covered by Florida's Section 404 permit program. But no federal law prohibits Florida from exercising *primary* permitting authority in those waters made "assumable" by Congress, even if those waters are within ENP.

Apart from the merits of this question, however, the Tribe lacks standing to challenge the program approval on the basis of the ENP writ large. The Tribe's declaration provides no support for standing to challenge EPA's approval as to the entirety of the ENP, nor has the Tribe shown that such a claim is ripe. To the extent the Tribe would seek to pursue a permit for a project within the ENP, the Tribe would be able to bring a challenge to the Corps' (or FDEP's) determination concerning the project at that time. And, in any event, the Tribe's assertion that Florida lacks regulatory authority in the ENP is refuted by the fact that FDEP often receives permit applications for activities within the ENP, including applications filed by federal agencies such as the NPS. Wolfe Decl. at ¶ 10.

In conclusion, the Tribe's claim that EPA's approval was unlawful because Florida's 404 program may apply to the Tribe's projects in one of these areas (i.e., Perpetually Leased Areas,

---

[17] In 1998, Congress enacted the Miccosukee Reserved Area Act, Pub. L. 105-313, 112 STAT. 2964, to set aside "a strip of land on the northern edge of the Everglades National Park" as a "Reserved Area" for the Tribe. As previously stated, EPA and Florida have treated this 695-acre "Miccosukee Reserved Area" as part of the Tribe's reservation and, as such, it is not covered by Florida 404 permitting.

Fee Simple Lands, Reserved Rights Lands, and ENP) fails for lack of standing and on the merits.[18]

**CONCLUSION**

For the foregoing reasons, Florida Intervenors are entitled to summary judgment on all claims and Plaintiffs' motion for summary judgment should be denied. To the extent the Court is inclined to agree with the Tribe as to any of its claims, Florida Intervenors respectfully request an opportunity for the parties to brief remedy separately.


Dated: October 17, 2023                    Respectfully submitted,
                                            BAKER BOTTS L.L.P.

                                            */s/ Jeffrey H. Wood*
                                            Jeffrey H. Wood (Fla. Bar No. 713333)
                                            700 K Street, NW
                                            Washington, D.C. 20001
                                            Phone: (202) 639-7700
                                            jeff.wood@bakerbotts.com

                                            Lily N. Chinn (*pro hac vice*)
                                            101 California Street
                                            San Francisco, CA 94111
                                            Phone: (415) 291-6200
                                            lily.chinn@bakerbotts.com

---

[18] The Tribe also raises undefined and unsupported arguments regarding various other lands. As to all of the various other parcels mentioned, those are not pursued with enough specificity to warrant a response. If a response is required, no showing has been made that any of those lands are within the federally-recognized areas of Indian country.

**CERTIFICATE OF SERVICE**

I hereby certify that on this 17th day of October 2023, I electronically filed the foregoing

document using the CM/ECF system. Service was accomplished by the CM/ECF system.

Respectfully submitted,
BAKER BOTTS L.L.P.

*/s/ Jeffrey H. Wood*
Jeffrey H. Wood (Fla. Bar No. 713333)
700 K Street, NW
Washington, D.C. 20001
Phone: (202) 639-7700
jeff.wood@bakerbotts.com